No. 25-3371
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| NETCHOICE, LLC, | : |
| | : On Appeal from the |
| Appellee, | : United States District Court |
| | : for the Southern District of Ohio |
| v. | : Eastern Division |
| | : |
| DAVE YOST, | : District Court Case No. |
| | : 2:24-cv-00047 |
| Appellant. | : |

---

## BRIEF OF APPELLANT OHIO ATTORNEY GENERAL DAVE YOST

---

DAVE YOST
Attorney General of Ohio

MATHURA J. SRIDHARAN
Ohio Solicitor General
  *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.sridharan@ohioago.gov

*Counsel for Appellant*
   *Dave Yost*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ........................... x

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

INTRODUCTION ............................................................................. 3

    I.     Most adolescents use social media, and many are harmed by it. .............. 5

    II.    Ohio enacted a law to protect children who engage with social media. ..... 9

    III.   NetChoice sued. ........................................................................... 12

    IV.   The District Court permanently enjoined the child-protection statute... 13

SUMMARY OF THE ARGUMENT ................................................. 15

ARGUMENT ................................................................................... 19

    I.     NetChoice lacks third-party standing to assert the rights of children. .... 19

        A.    A litigant may not assert the rights of a third-party child when the litigant's interests are adverse to the child's interests. ...................... 20

        B.    NetChoice is not an adequate representative of children in this case. ........................................................................................... 22

    II.    NetChoice has not justified facial relief. .................................. 24

    III.   Ohio's parental-consent provision passes constitutional muster. ........... 28

        A.    The States have long regulated children's ability to contract, without running afoul of the First Amendment. ............................... 29

        B.    Ohio's parental-consent provision regulates conduct, not speech. .... 32

C.      If the Court treats Ohio's parental-consent provision as a direct
        regulation of speech, then intermediate scrutiny applies. ..................40

D.      Ohio's parental-consent provision survives scrutiny. ........................47

    1.      The parental-consent provision advances several important
            State interests unrelated to the suppression of free expression. .....48

    2.      The parental-consent provision is properly tailored. ...................49

E.      Ohio's child-protection statute is not unconstitutionally vague. ........52

IV.     The District Court's contrary analysis is wrong. ....................................53

A.      The District Court misapplied the third-party standing doctrine. ......54

B.      The District Court's merits analysis is unconvincing. .......................55

V.      The District Court granted overbroad relief. ...........................................61

CONCLUSION...................................................................................................62

CERTIFICATE OF COMPLIANCE ....................................................................63

CERTIFICATE OF SERVICE ............................................................................64

DESIGNATION OF DISTRICT COURT RECORD.........................................65

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Amato v. Wilentz*,
952 F.2d 742 (3d Cir. 1991) ....................................................... 20, 54

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986) ................................................................. 33, 34

*Barr v. Am. Ass'n of Political Consultants*,
591 U.S. 610 (2020) ....................................................................... 43

*Blau v. Fort Thomas Pub. Sch. Dist.*,
401 F.3d 381 (6th Cir. 2005) .......................................................... 32

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) .......................................................... 15, 18, 58

*Buehrle v. City of Key West*,
813 F.3d 973 (11th Cir. 2015) ....................................................... 39

*Burson v. Freeman*,
504 U.S. 191 (1992) ................................................................. 48, 58

*C.M.D. v. Facebook, Inc.*,
621 F. App'x 488 (9th Cir. 2015) ..................................................... 9

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
447 U.S. 557 (1980) ........................................................................ 27

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC*,
596 U.S. 61 (2022) ................................................................. *passim*

*Clark v. Community for Creative Non-Violence*,
468 U.S. 288 (1984) ....................................................................... 33

*Clementine Co., LLC v. Adams*,
74 F.4th 77 (2d Cir. 2023) ............................................................. 38

*Craig v. Boren*,
429 U.S. 190 (1976) ....................................................................... 55

*Davenport v. Wash. Educ. Ass'n,*
  551 U.S. 177 (2007) .................................................. 40, 44

*Donohue v. Cuomo,*
  980 F.3d 53 (2d Cir. 2020) .......................................... 37

*Dunn v. Activision Blizzard, Inc.,*
  749 F. Supp. 3d 976 (E.D. Ark. 2024) ................................. 9

*E.K.D. v. Facebook, Inc.,*
  885 F. Supp. 2d 894 (S.D. Ill. 2012) ................................. 9

*Elk Grove Unified Sch. Dist. v. Newdow,*
  542 U.S. 1 (2004) ................................................ *passim*

*EMW Women's Surgical Ctr., P.S.C. v. Beshear,*
  920 F.3d 421 (6th Cir. 2019) ................................ 17, 32, 39

*Exxon Corp. v. Eagerton,*
  462 U.S. 176 (1983) .................................................. 49

*FCC v. Pacifica Found.,*
  438 U.S. 726 (1978) .................................................. 45

*Fieger v. Mich. Supreme Court,*
  553 F.3d 955 (6th Cir. 2009) ........................................ 21

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) .................................................. 61

*Free Speech Coal., Inc. v. Paxton,*
  145 S. Ct. 2291 (2025) ...................................... 17, 40, 46

*Gary v. City of Warner Robins,*
  311 F.3d 1334 (11th Cir. 2002) ...................................... 33

*Giboney v. Empire Storage & Ice Co.,*
  336 U.S. 490 (1949) ............................................. 34, 37

*Ginsberg v. New York,*
  390 U.S. 629 (1968) .................................................. 49

iv

*Hoffman Estates v. Flipside, Hoffman Estates*,
    455 U.S. 489 (1982) ........................................................ 52, 53

*Indigo Room, Inc. v. City of Fort Myers*,
    710 F.3d 1294 (11th Cir. 2013) ........................................... 33

*K.F.C. v. Snap, Inc.*,
    No. 3:21-cv-9, 2021 WL 2376359 (S.D. Ill. June 10, 2021) ................. 9

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ........................................... 15, 20, 22, 54

*L.W. v. Skrmetti*,
    83 F.4th 460 (6th Cir.) ...................................................... 48

*Lichtenstein v. Hargett*,
    83 F.4th 575 (6th Cir. 2023) ........................................*passim*

*Lowe v. SEC*,
    472 U.S. 181 (1985) .......................................................... 36

*McCoy v. BAFTE*,
    140 F.4th 568 (4th Cir. 2025) .......................................... 17, 31

*McLemore v. Gumucio*,
    — F.4th —, 2025 WL 2319119 (6th Cir. August 12, 2025) ........*passim*

*Mestetzko v. Elf Motor Co.*,
    119 Ohio St. 575 (1929) ..................................................... 31

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...................................................*passim*

*N.A. v. Nintendo of Am. Inc.*,
    No. 230cv-02424, 2023 WL 8587628 (N.D. Cal. Dec. 11, 2023) ......... 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ............................................................. 35

*NEOCH v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006) .............................................. 20

*New York v. Ferber*,
   458 U.S. 747 (1982) ......................................................... 48

*NIFLA v. Becerra*,
   585 U.S. 755 (2018) ............................................... 28, 32, 34

*NRA v. Bondi*,
   133 F.4th 1108 (11th Cir. 2025) (*en banc*) ........................ *passim*

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) ...................................................... 44, 50

*Pierce v. Soc'y of Sisters*,
   268 U.S. 510 (1925) ...................................................... 48, 59

*Pryor v. Ohio State Univ.*,
   139 F.4th 536 (6th Cir. 2025) ............................................ 19

*R.A.V. v. St. Paul*,
   505 U.S. 377 (1992) ...................................................... 33, 35

*Reed v. Town of Gilbert*,
   576 U. S. 155 (2015) ................................................. 40, 41, 42

*Reznik v. Coinbase, Inc.*,
   No. 23-CV-10248, 2024 WL 1055002 (S.D.N.Y. March 11, 2024) ..................... 8

*Roberts v. United States*,
   2015 WL 7424858 (S.D. Ohio, Nov. 23, 2015) ................................ 50

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) ...................................................... 34, 37

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
   547 U.S. 47 (2006) ........................................................ 33

*Sable Comms. of Cal., Inc. v. FCC*,
   492 U.S. 115 (1989) ....................................................... 48

*Schall v. Martin*,
   467 U.S. 253 (1984) ................................................... 29, 48

*Schickel v. Dilger*,
    925 F.3d 858 (6th Cir. 2019) ...........................................................44

*Secretary of Maryland v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984)......................................................15, 20, 21, 22

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...........................................................*passim*

*Specht v. Netscape Communs. Corp.*,
    306 F.3d 17 (2d Cir. 2002) .....................................................7

*TikTok, Inc. v. Garland*,
    145 S. Ct. 57 (2025)...........................................................*passim*

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025)........................................................ 61

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)........................................ 17, 44, 45, 57

*United States v. Williams*,
    553 U.S. 285 (2008) ...................................... 28, 52, 60

*Vidal v. Elster*,
    602 U.S. 286 (2024).................................... 16, 28, 35, 37

*W. Va. Univ. Hosps. v. Casey*,
    499 U.S. 83 (1991) .......................................................34

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ....................................................41

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)....................................................24

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) ..............................................50, 52

*Woodman v. Kera LLC*,
    486 Mich. 228 (2010) ...............................................31

## Statutes, Regulations, and Constitutional Provisions

U.S. Const. amend I ....................................................................... 32

16 C.F.R. §312.2 ............................................................ 11, 42, 53

18 U.S.C. §922 ............................................................................... 39

28 U.S.C. §1291 ............................................................................... 1

28 U.S.C. §1331 ............................................................................... 1

Fla. Stat. §381.00787 ..................................................................... 39

N.J. Stat. §2C:40-21 ...................................................................... 39

Ohio Rev. Code §1.50 ................................................................... 43

Ohio Rev. Code §1349.09 ....................................................... *passim*

Ohio Rev. Code §2923.211 ........................................................... 39

Ohio Rev. Code §3109.01 ............................................................ 31

Ohio Rev. Code §3730.06 ............................................................ 39

## Other Authorities

*5 Best Ways to Use Instagram Without an Account*, Lifehack ................. 38

Burlington Public Library, *Library Card Policy* ............................... 39

James Kent, *Commentaries on American Law* (O. Halsted 1827) ............. 30

Julian Morgans, *The Secret Ways Social Media Is Built for Addiction*,
   Vice (May 17, 2017) ................................................................. 6

LA County Library, *Library Cards* ................................................. 39

Letter to James Sullivan (May 26, 1776) ....................................... 29

Letter to Samuel Smith (May 3, 1823) ........................................... 29

Library of Congress, *Get Your Library Card* ................................... 39

Mark D. Griffiths, *Adolescent social networking: How do social media operators facilitate habitual use?*, 36 Educ. & Health 66 (2018)............................5

Mike Allen, *Sean Parker Unloads on Facebook: "God only Knows What it's Doing to Our Children's Brains,"* Axios (Nov. 9, 2017) ..................................6

Noah Webster, On the Education of Youth in America (1788)............................29

*Potential risks of content, features, and functions: The science of how social media affects youth,* American Psychological Association (April 2024) ........................................................................................................5

Restatement (Second) Contracts §14 (1981) (updated October 2024).................. 31

*Social Media and Children 2025 Legislation*, NCSL (April 8, 2025) ........................9

St. Charles City-County Library, *FAQs: How old must my child be to get a library card of his/her own?*................................................................39

*Terms of Service*, Meta .............................................................................8

*Terms of Service*, TikTok .........................................................................8

*Testimony of Tim Kendall*, House Committee on Energy and Commerce (Sept. 24, 2020) ..............................................................6

William Blackstone, *Commentaries on the Laws of England* (1765) ................... 30, 31

Zara Abrams, *How can we minimize Instagram's harmful effects?*, American Psychological Association, 53 Monitor on Psychology 30 (March 2022)...........................................................................................6

**STATEMENT REGARDING ORAL ARGUMENT**

This case presents important issues regarding the constitutionality of an Ohio statute:  Ohio Revised Code §1349.09.  Ohio Attorney General Dave Yost requests oral argument.

# JURISDICTIONAL STATEMENT

NetChoice, LLC, filed this lawsuit, alleging that Ohio Revised Code §1349.09 violates the First Amendment to the United States Constitution. The District Court had jurisdiction under 28 U.S.C. §1331. It entered a final judgment on April 16, 2025, granting judgment in NetChoice's favor and permanently enjoining the challenged statute. Op. & Or., R.56, PageID#1348. The Attorney General timely appealed on May 12, 2025. Notice, R.59, PageID#1352. This Court has jurisdiction under 28 U.S.C. §1291.

**STATEMENT OF THE ISSUES**

1.  Whether NetChoice has third-party standing to assert the First Amendment rights of children?

2.  Whether Ohio Revised Code §1349.09 violates the First Amendment speech rights of children or social-media entities?

3.  Whether Ohio Revised Code §1349.09 is unconstitutionally vague?

4.  Whether, assuming a constitutional violation, the District Court issued an overbroad injunction?

**INTRODUCTION**

Social media poses many dangers to children. Some dangers are hard to miss these days—such as how constant social-media use imperils children's mental health. Others are more subtle—such as how sophisticated social-media entities impose lopsided contract terms on children as a condition of using their platforms. This case involves an Ohio law that confronts these complex problems through a careful-yet-significant step: requiring parental consent before children contract with social-media entities. Ohio's law is part of the States' long history of regulating children's ability to contract. It does nothing to offend the First Amendment.

The Court need not take Ohio's word regarding the dangers of social media. Two years ago, the United States Surgeon General issued an urgent public-health advisory about children's social-media use. "Our children have become unknowing participants in a decades-long experiment," he explained. Surgeon General Advisory, R.42-2, PageID#500. With "[n]early every teenager in America" on social media, and with rapidly "mounting evidence" of social media's negative effects on young people, the Surgeon General warned that children "don't have the luxury of waiting years until we know the full extent of" the damage. *Id.*, PageID#500, 502–03. He thus called on this nation's policymakers to act. *Id.*, PageID#504.

Ohio answered the call, enacting a law to protect children from these harms. Ohio Rev. Code §1349.09. This child-protection statute's key provision requires that social-media platforms seeking to "contract with a child" obtain consent from the child's parent. *Id.* at (B)(1). This parental-consent provision is simultaneously important and modest. It ensures that parents have at least some awareness of their children's social-media use, but it does not place significant burdens on children, parents, or social-media entities.

Unsatisfied with this modest burden, social-media entities seek to avoid the regulation. In this lawsuit, NetChoice—a trade association that represents social-media giants—argues that Ohio's parental-consent provision violates the First Amendment. NetChoice purports to bring this case on behalf of Ohio's children. But that is fanciful. NetChoice's obvious concern is its members' bottom line.

This lawsuit should fail for two main reasons. *First*, NetChoice lacks third-party standing to assert children's rights. The conflicts between social-media entities and children are too great to allow NetChoice to stand in children's shoes. Doing so would mean the fox guards the henhouse. *Second*, Ohio's parental-consent provision does not run afoul of the First Amendment. The requirement targets conduct—contracting with children—not speech, so it receives only rational-basis review. *See McLemore v. Gumucio*, — F.4th —, 2025 WL 2319119, at *3–*5 (6th Cir. August 12,

2025).  History, moreover, is on Ohio's side.  The States have long regulated children's ability to contract.  Such regulation dates back to the founding, and it has seamlessly co-existed with the First Amendment all the while.  No reason exists to suspect a problem now.

Despite all this, the District Court wrongly enjoined enforcement of Ohio's child-protection statute.  This Court should reverse.

## STATEMENT OF FACTS

### I.    Most adolescents use social media, and many are harmed by it.

In recent years, social media has become a fixture of American life.  Today, "[s]ocial media use by youth is nearly universal."  Surgeon General Advisory, R.42-2, PageID#493.  Roughly 95% of teenagers between the ages of thirteen and seventeen use social media, with many doing so "'almost constantly.'"  *Id.* (quoting Pew Research data).  A 2021 survey of 8th and 10th graders reflected that these children average "3.5 hours per day" on social media.  *Id.*, PageID#499.  A quarter report using social media over 5 hours daily.  *Id.*

Though staggering, these figures make sense.  Social-media platforms are "designed" to keep adolescents "coming back again and again."  Mark D. Griffiths, *Adolescent social networking: How do social media operators facilitate habitual use?*, 36 Educ. & Health 66, 68 (2018).  And they have succeeded.  *See, e.g.*, *Potential risks of content,*

*features, and functions: The science of how social media affects youth,* American Psychological Association (April 2024), https://perma.cc/3D4H-EKR8; Zara Abrams, *How can we minimize Instagram's harmful effects?*, American Psychological Association, 53 Monitor on Psychology 30 (March 2022); Julian Morgans, *The Secret Ways Social Media Is Built for Addiction*, Vice (May 17, 2017), https://perma.cc/W3X6-GNX3.

Social-media entities understand their platforms' addictiveness. As one Facebook executive testified to Congress, "we sought to mine as much human attention as possible and turn [it] into historically unprecedented profits." *Testimony of Tim Kendall*, House Committee on Energy and Commerce (Sept. 24, 2020), https://perma.cc/X8D6-HWMZ. A Facebook founder similarly described that social media "exploit[s] a vulnerability in human psychology." Mike Allen, *Sean Parker Unloads on Facebook: "God only Knows What it's Doing to Our Children's Brains,"* Axios (Nov. 9, 2017), https://tinyurl.com/mrn2wyej (last visited August 8, 2025). The "inventors … understood this consciously," the founder explained, but they "did it anyway." *Id.*

Unfortunately, children's screentime comes with significant costs. Social media poses risks to adolescents during "a highly sensitive period of brain development." *See* Surgeon General Advisory, R.42-2, PageID#494. For children under sixteen,

research has shown a negative relationship between social-media use and life satisfaction. Orben Study, R.42-3, PageID#519–20. More startling, research has also linked youth's social-media use to poor sleep, anxiety, neuroticism, body-image disorders, and depression. Surgeon General Advisory, R.42-2, PageID#495–96, 499. Social media also facilitates cyberbullying. *Id.*, PageID#498. And worse, social-media platforms are a breeding ground for predators targeting children. *See id.*; North Aff., R.42-4, PageID#528–30; Borj Survey, R.42-8, PageID#594.

Meanwhile, social-media entities profit greatly from children—mining their data and feeding them advertisements. As one indicator, a 2022 study of six major platforms concluded that the platforms generated roughly $11 billion in annual youth-directed advertising revenue. Raffoul Study, R.42-1, PageID#484.

One way social-media platforms protect their profits is by imposing terms of service as a condition for using their platforms. These terms cover things like liability, arbitration, choice of law and forum, and using users' content and information. Online proprietors often present these terms in confusing formats whereby prospective users must scroll to the screen bottom to even find them. *See Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 31 (2d Cir. 2002). Realistically, most people do not read these terms. *See* Obar Survey, R.42-7, PageID#557. Even so, courts have

generally found them enforceable. *See Reznik v. Coinbase, Inc.*, No. 23-CV-10248, 2024 WL 1055002, at *4 n.4 (S.D.N.Y. March 11, 2024) (collecting authority).

A few examples add context. Facebook requires that users agree to Meta's terms of service. *See Terms of Service*, Meta, https://www.facebook.com/terms/ (last visited August 8, 2025). The terms give Meta permission to use personal information from users "in connection with ads, offers, and other sponsored or commercial content ... without any compensation." *Id.* at 3.3.4. Meta also receives license to "distribute, modify, run, copy," or "create derivative works of" any user's content. *Id.* at 3.3.2. And, according to the terms of service, Meta faces little liability for its actions—no matter the "theory of liability, including negligence." *Id.* at 4.3. Meta's terms also channel legal disputes to select California courts, which then apply California law. *Id.* at 4.4.

TikTok's terms of service are similar. They supposedly give TikTok an "unconditional irrevocable" license "to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit" user-created content. *See, e.g.*, *Terms of Service*, TikTok, https://perma.cc/7D4C-W7ZH. They require users to indemnify and defend TikTok against potential legal claims. *Id.* And they also limit TikTok's liability and exposure. *Id.* Further, TikTok's terms include forum selection and choice of law provisions, funneling lawsuits to California. *Id.*

Social-media platforms and other online proprietors frequently argue that terms of service are enforceable against children. Such arguments have often succeeded—or at least made litigation more cumbersome. *See, e.g.*, *C.M.D. v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015); *Dunn v. Activision Blizzard, Inc.*, 749 F. Supp. 3d 976, 982 (E.D. Ark. 2024); *E.K.D. v. Facebook, Inc.*, 885 F. Supp. 2d 894, 898–900 (S.D. Ill. 2012); *K.F.C. v. Snap, Inc.*, No. 3:21-cv-9, 2021 WL 2376359, at *1, *3 (S.D. Ill. June 10, 2021); *N.A. v. Nintendo of Am. Inc.*, No. 230cv-02424, 2023 WL 8587628, at *2, *5 (N.D. Cal. Dec. 11, 2023).

## II.     Ohio enacted a law to protect children who engage with social media.

Against this background, States have actively legislated to protect children from social media. *E.g.*, *Social Media and Children 2025 Legislation*, NCSL (April 8, 2025) https://tinyurl.com/4837mefn (last visited August 8, 2025). Ohio, for its part, enacted the Parental Notification by Social Media Operators Act in 2023.

The Act codified Ohio's child-protection statute: Ohio Revised Code §1349.09. In key part, the statute requires operators of social-media platforms to obtain parental consent if they seek to enter a "contract with a child" as a condition for using their platform. *Id.* at (B)(1). It also requires that such operators take a few basic steps to inform parents about a platform's censoring and content-moderation features. *Id.* at (B)(2)–(3).

A closer look at the text sharpens the statute's parameters. Begin with the threshold definitions of "child" and "operator." The statute defines "child" as an unemancipated person under sixteen years old. *Id.* at (A)(2). And it defines "operator[s]" as those whose online platforms allow users to (a) interact socially with others, (b) construct a profile, (c) identify other users with whom they share a connection, and (d) post content that others may view. *Id.* at (A)(1). To avoid confusion, the statute exempts other platforms that involve less interaction. *Id.* at (N), (O). For instance, platforms that limit user interaction to "[r]eviewing products offered for sale" and "commenting on reviews posted by other users" fall outside the child-protection statute. *Id.* at (O)(1). So too do platforms where interaction consists of "[c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." *Id.* at (O)(2).

To further zero-in on harms to children, the statute's requirements cover only certain operators. Specifically, they apply to only those operators that run platforms "target[ing] children" or that are "reasonably anticipated to be accessed by children." *Id.* at (B). The statute provides eleven discretionary factors to guide consideration of whether a platform engages children. *Id.* at (C). These factors include things like whether a website uses animated characters and evidence of a platform's

intended audience. *Id.* Notably, the child-protection statute's factors largely mirror federal regulations governing when a website is "directed to children." 16 C.F.R. §312.2.

For covered operators, Ohio's statute imposes three requirements. Ohio Rev. Code §1349.09(B)(1)–(3). The first is housed in the statute's parental-consent provision. *Id.* at (B)(1). That provision directs covered operators to "Obtain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product from the child's parent or legal guardian." *Id.* As this text illustrates, the provision applies solely to operators seeking to "contract with" children as a condition for using their platform. *Id.* The provision does not cover operators that do not contract with children. For operators that do contract with children, the statute outlines various methods for verifying parental consent, such as through signed forms, credit-card transactions, and phone calls. *Id.*; *see id.* at (D) (addressing confirmation of consent). As a corollary, operators seeking to bind children to "terms of service" or any "other contract" must "deny the child access" to their platforms if they are unable to obtain parental consent. *Id.* at (E).

The statute's two other requirements concern parental notifications. Operators of platforms directed at children must present parents with a list of features their

platform offers "related to censoring or moderating content, including any features that can be disabled for a particular profile." *Id.* at (B)(2). Operators must also provide "a web site link at which the parent or legal guardian may access and review" the available features for censoring or moderating content. *Id.* at (B)(3).

The child-protection statute grants Ohio's Attorney General enforcement authority. *Id.* at (G)–(H). If the Attorney General commences a lawsuit, and a court finds an operator in violation, the operator faces civil penalties, which escalate based on the period of non-compliance. *Id.* at (I). But the Attorney General must allow operators in substantial compliance ninety days to cure technical violations before commencing any lawsuit. *Id.* at (M).

## III.    NetChoice sued.

NetChoice is a trade association whose members include prominent social-media entities like Meta, Snap Inc., and X. Szabo Decl., R.2-1, PageID#64. NetChoice filed this pre-enforcement lawsuit in January 2024, shortly before the child-protection statute was scheduled to take effect. It brought facial challenges against the child-protection statute under the First Amendment. It claimed that the statute's parental-consent provision abridges (1) the speech rights of children and (2) social-media platforms' ability to disseminate speech. NetChoice Mot. Summ. J., R.43,

PageID#628.  NetChoice also claimed that the statute is unconstitutionally vague. *Id.*, PageID#661.

The District Court preliminarily enjoined Ohio's statute pending litigation.  Op. & Or., R.33, PageID#359–60.  To streamline proceedings, the parties agreed to forgo discovery and stipulate to evidence.  Or. & Or., R.56, PageID#1308.  They then filed cross motions for summary judgment.  *Id.*

The District Court held oral argument on the parties' motions.  It asked the parties whether further proceedings were necessary because of *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)—a decision that clarified the standard for facial challenges.  The Attorney General submitted that the record was insufficient to justify facial relief, but that the burden rested with NetChoice.  Op. & Or., R.56, PageID#1310.  NetChoice agreed to proceed with the case without further record development, notwithstanding *Moody*.  *Id.*

## IV.  The District Court permanently enjoined the child-protection statute.

The District Court granted judgment in NetChoice's favor and permanently enjoined Ohio's statute.  Op. & Or., R.56, PageID#1300–48.

To reach that result, the District Court first held that NetChoice had third-party standing to assert the rights of Ohio children.  *Id.*, PageID#1326.  The court acknowledged "compelling" evidence of conflicts between social-media platforms and

children.  *Id.*, PageID#1322.  But it still held that there was a sufficiently close relationship to allow NetChoice to assert children's rights.  The court specifically compared the relationship to a vendor-customer relationship.  *Id.*, PageID#1323.

On the merits, the District Court noted that the case involved a facial challenge.  *Id.*, PageID#1326.  The District Court, however, made no serious attempt to sort through all potential applications of the child-protection statute.  *Id.*, PageID#1327–28.  Such legwork was unneeded, the court reasoned, because the statute raises "the same First Amendment issues" in every application.  *Id.*, PageID#1327.

The District Court next addressed the underlying merits of NetChoice's First Amendment claims.  On that front, the court treated Ohio's statute as a content-based restriction on speech, justifying strict scrutiny.  *Id.*, PageID#1332–39.  In doing so, it rejected Ohio's argument that the challenged statute regulates conduct, not speech.  *Id.*, PageID#1329–30.  As the court saw things, Ohio's statute forces social-media entities to choose between obtaining parental consent and denying children access to their platforms.  *Id.*, PageId#1331–32.  Ohio's statute is also content based, the court concluded, because it distinguished between websites based on their interactive features.  *Id.*, PageID#1338–39.

Applying strict scrutiny, the District Court held Ohio's statute facially unconstitutional.  The court concluded that the statute is not sufficiently tailored to Ohio's

various interests. Op. & Or., R.56, PageID#1341–44. To reach that conclusion, the court relied heavily on *Brown v. Entertainment Merchants Association*, a Supreme Court decision about violent video games. 564 U.S. 786 (2011).

Finally, the District Court described Ohio's statute as "troublingly vague." Op. & Or., R.56, PageID#1345. The court opined that operators would be confused by the statute's expansive scope and lack of definitions. *Id.*

The District Court entered a permanent injunction, blocking any enforcement of Ohio's statute. *Id.*, PageID#1348. And the court enjoined the *entire* statute, even though it never analyzed the constitutionality of the statute's parent-notification requirements. *See* Ohio Rev. Code §1349.09(B)(2)–(3); *above* 11–12.

The Attorney General timely appealed. Notice, R.59, PageID#1352.

## SUMMARY OF THE ARGUMENT

The Court should reverse the judgment below, for many reasons.

**I.** Begin with NetChoice's standing to assert the rights of third parties: children. Usually, courts carefully limit third-party standing to situations where a close relationship exists between a litigant and the rightholder. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Though courts somewhat relax third-party standing in the First Amendment context, it remains "crucial" that a litigant be able to "satisfactorily []frame" the issues in a manner that advances the rightholder's interests. *Secretary of*

*Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). Traveling either path, conflicts of interest between a litigant and the rightholder destroy third-party standing. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004).

Here, conflicts of interest between children and social-media platforms make third-party standing unjustified. In taking aggressive First Amendment positions, NetChoice shows little regard for children's health and well-being. And NetChoice's maximalist First Amendment stance necessarily sacrifices the contract protections Ohio's statute affords children. Whether Ohio's statute regulates conduct—contracting—rather than speech is important to the First Amendment analysis in this case. Because the contracting interests of children and social-media platforms are at odds, NetChoice cannot be trusted to satisfactorily frame that issue.

**II.** NetChoice's lawsuit also fails because of an insufficient record. Though NetChoice brought only a facial challenge, it did not create a sufficient record for facial review. The sparse record did not allow the District Court to consider the full coverage of the challenged statute. That is a necessary step to proper facial review. *Moody*, 603 U.S. at 724–25.

**III.** Regardless, NetChoice's constitutional claims lack merit, for five reasons.

*First*, NetChoice's First Amendment claims are at odds with history. *See Vidal v. Elster*, 602 U.S. 286, 295–96 (2024). Since the founding, the States have regulated

children's ability to contract without constitutional concern.  *See McCoy v. BATFE*, 140 F.4th 568, 575 (4th Cir. 2025).  Ohio's parental-consent provision—which regulates child contracting in the social-media context—is a mere application of that tradition.

*Second*, Ohio's parental-consent provision regulates conduct, not speech.  *See Lichtenstein v. Hargett*, 83 F.4th 575, 582, 598 (6th Cir. 2023).  That is because the parental-consent provision targets social-media entities that "contract" with children.  Ohio Rev. Code §1349.09(B)(1), (E).  And laws that regulate conduct, and not speech, are entitled to deferential review.  *McLemore*, 2025 WL 2319119, at \*3–\*5; *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 446 (6th Cir. 2019).

*Third*, even if treated as targeting speech, Ohio's parental-consent provision is content neutral.  None of the distinctions within Ohio's statute reflects—either expressly or implicitly—that Ohio is trying to "single out any topic or subject matter for differential treatment."  *See City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 71 (2022).  And while the requirement is certainly directed at a particular medium (social media), it does not target the medium because of any message.  *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 645 (1994).  Ohio's requirement, moreover, exercises the State's "traditional power to prevent minors" from contracting.  *See Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2306 (2025).  Thus, Ohio's

requirement should receive at most intermediate scrutiny under the First Amendment. *See TikTok, Inc. v. Garland*, 145 S. Ct. 57, 67 (2025) (*per curiam*).

*Fourth*, Ohio's parental-consent provision survives any appropriate constitutional scrutiny. The requirement is carefully tailored to Ohio's important interests in protecting children, involving parents, and regulating child contracting.

*Fifth*, Ohio's statute is not unconstitutionally vague. The statute's definitions, guidelines, and commonly understood terms provide more than fair notice of its application. The extreme medicine of finding a law facially vague, before any enforcement, is wholly unjustified here.

**III.** The District Court's contrary analysis made numerous mistakes. For example, much of the court's analysis relied on an inapt comparison to the Supreme Court's decision in *Brown*. *See* 564 U.S. 786. There, the Supreme Court applied strict scrutiny and invalidated a law targeting children's access to violent depictions in video games. *Brown* is distinguishable in many ways. Among other things, *Brown* said its analysis would have been different if there was a "longstanding tradition" of "restricting children's access to depictions of violence." 564 U.S. at 795. Here, there is a longstanding tradition of restricting children's ability to contract.

**IV.** If nothing else, this Court should narrow the relief. The District Court did not limit its injunction to the parties before it. And the District Court enjoined

Ohio's entire child-protection statute, without finding the entire statute unconstitutional. Specifically, the court never explained why it was enjoining the statute's parental-notification requirements. *See* Ohio Revised Code §1349.09(B)(2)–(3).

## STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment de novo. *Pryor v. Ohio State Univ.*, 139 F.4th 536, 538 (6th Cir. 2025).

## ARGUMENT

NetChoice's bid for a permanent injunction should have failed. NetChoice lacks third-party standing to assert the rights of children. And NetChoice's claims lack merit. The District Court's contrary analysis is unpersuasive. Beyond that, the District Court awarded overbroad relief.

## I. NetChoice lacks third-party standing to assert the rights of children.

NetChoice claims that Ohio's statute violates children's First Amendment rights. But NetChoice is a trade association, not a child. And children do not form part of NetChoice's membership. Szabo Decl., R.2-1, PageID#64.

To overcome these obstacles, NetChoice creates a standing chain: First, it claims associational standing to assert the rights of its members—social-media entities. Next, it claims that the relationship between the member social-media entities and children allows for third-party standing. Judges on this Court have questioned

whether associations can creatively extend their standing to non-members. *NEOCH v. Blackwell*, 467 F.3d 999, 1013 (6th Cir. 2006) (McKeague, J., concurring); *see also id.* at 1010 n.4 (majority op.). Even assuming linking standing in this manner is generally permissible, the second link in NetChoice's chain snaps with the slightest pressure.

### A. A litigant may not assert the rights of a third-party child when the litigant's interests are adverse to the child's interests.

A litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski*, 543 U.S. at 129 (quotation omitted). This rule, while prudential, is "not completely separable from" constitutional standing requirements. *Munson*, 467 U.S. at 955 n.5. The rule ensures that a litigant has a "sufficiently concrete interest in the outcome of" a lawsuit "to make it a case or controversy." *Id.* (quotation omitted).

Barriers against third-party standing are not absolute. A litigant with constitutional standing may assert another's rights when (1) the litigant has "a close relationship" with the rightholder and (2) something hinders the rightholder from bringing a lawsuit. *Kowalski*, 543 U.S. at 130. These requirements help ensure that the litigant will supply an "appropriate presentation" for the rightholder. *See id.* at 129. If the litigant has a reason to "raise positions contrary to the interests of the third party," then third-party standing will be unavailable. *Amato v. Wilentz*, 952 F.2d 742, 751–

52 (3d Cir. 1991). In other words, third-party standing will be unjustified when the "interests of affected persons … are in many respects antagonistic" and "potentially in conflict." *Newdow*, 542 U.S. at 15.

In the First Amendment context, the analysis varies slightly. Under the First Amendment's overbreadth doctrine, litigants may "challenge a statute not because their own rights of free expression are violated," but because the statute may violate the rights of others. *Munson*, 467 U.S. at 956–57. This doctrine, too, requires a close alignment of interests. Namely, a "crucial" issue is whether a litigant seeking to assert the rights of others "can be expected satisfactorily to frame the issues in the case." *Id.* at 958; *accord Fieger v. Mich. Supreme Court*, 553 F.3d 955, 961–62 (6th Cir. 2009). An overbreadth challenge is inappropriate if there is any reason that the litigant will be "an inadequate advocate to assert" the third party's rights. *See Munson*, 467 U.S. at 958. Thus, like traditional third-party standing, First Amendment overbreadth requires, at least implicitly, a close relationship between the litigant and the rightholder.

In the context of children, the Supreme Court's decision in *Newdow* brings many of these notions together. There, an atheist father tried to bring a First Amendment free-exercise claim on behalf of his daughter. *Newdow*, 542 U.S. at 5. But the child's mother—who possessed legal custody—disfavored the lawsuit, thinking that it

might harm her daughter's interests.  *Id.* at 10.  The Court held that the father lacked prudential standing.  *Id.* at 17–18.  Federal courts should be "customarily" reluctant, the Court cautioned, to insert themselves into the "parent and child" relationship— an area that "belongs to the laws of the States and not to the laws of the United States."  *Id.* at 12 (quotation omitted).  Standing was lacking, the Court went on, because the interests of the daughter and father were "not parallel" and "potentially in conflict."  *Id.* at 15.  That potential conflict, and the corresponding chance of "adverse effect on the" child, was enough to make it "improper for the federal courts to entertain a claim."  *Id.* at 17.

## B. NetChoice is not an adequate representative of children in this case.

Here, NetChoice lacks a sufficient relationship with children to justify third-party standing.  That holds true whether the Court applies the traditional third-party standing test or an overbreadth analysis.  Because NetChoice's interests conflict with children's interests in material ways, the Court cannot trust NetChoice to adequately present or satisfactorily frame the issues.  *See Kowalski*, 543 U.S. at 129; *Munson*, 467 U.S. at 958.

The interests of social-media platforms and those of children are "in many respects antagonistic."  *See Newdow*, 542 U.S. at 15.  As discussed above (at 5–7), a key aspect of the social-media business model is getting users addicted, even at the cost

of their mental health.  As part of that effort, social-media platforms impose lopsided contract terms on their users.  Those contracts allow social-media platforms to (1) profit from children's information, while (2) minimizing their risks of liability. *See above* 7–9.  Online platforms, moreover, often attempt to enforce these terms against minors.  *Above* 9 (collecting authority).

These conflicts are relevant to any First Amendment analysis, and especially the one here.  As explored below, the question presented in this case is whether Ohio can, consistent with the First Amendment, protect children from intrusive contracting.  In suggesting an answer, NetChoice takes a maximalist view of the First Amendment that sacrifices children's contracting rights.  Children, by contrast, have an interest in striking a balance.  If well informed, children would likely prefer protection from social-media entities' one-sided contract terms even if that means they must obtain a parent's permission to use social media.

*Newdow* hammers home the point.  If the father there could not be trusted to litigate the First Amendment interests of his daughter due to potential conflicts, then it is hard to fathom how NetChoice can bypass parents altogether in this case.  Rather, because NetChoice's "lawsuit may have an adverse effect on the person who is the source of [NetChoice's] claimed standing," it would be "improper for the federal courts to entertain" a third-party claim.  *See Newdow*, 542 U.S. at 17.

## II. NetChoice has not justified facial relief.

NetChoice brought only a facial challenge to Ohio's statute, before any enforcement of the statute. *See* Compl., R.1, PageID#6 (describing the case as a "purely legal, facial challenge"). That "decision comes at a cost." *Moody*, 603 U.S. at 723. Facial challenges are not how "courts usually handle constitutional claims." *Id*. They "often rest on speculation about the law's coverage and its future enforcement." *Id.* (quotation omitted). The Supreme Court has therefore intentionally made such challenges "hard to win." *Id.* And NetChoice cannot win its challenge on the slim record here.

**1.** Normally, plaintiffs bringing facial challenges must show that a law "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). The Supreme Court has "lowered that very high bar" for First Amendment cases. *Moody*, 603 U.S. at 723. In that setting, plaintiffs must show that a "law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. That standard remains "rigorous"; especially in cases about the "online world." *Id.* at 723, 725. Today's technology "is variegated and complex, encompassing an ever-growing number of apps, services, functionalities, and methods for communication and connection." *Id.* at 725. Each variable may import a new "set of issues." *See id.*

Facial challenges under the First Amendment proceed in two steps. The first step "is to assess" the challenged law's "scope," or the total number of possible applications of the challenged law. *Id.* at 724. In the online context, that means sorting out the "actors" a law covers. *Id.* It also means sorting out the various "activities" that each actor engages in and the various "functionalities" of their services. *Id.* at 724, 725. After determining the challenged law's full scope, the second step is figuring out which applications of a law violate the First Amendment; and then measuring those unconstitutional applications against the full universe of possible applications. *Id.* at 725. The plaintiff bears the burden of facilitating each step. *See id.* at 723.

2. Applying these principles here, NetChoice did not build a sufficient record to win its facial challenge. It acknowledged below that Ohio's statute covers "myriad websites," involving "all manners of topic." NetChoice Mot. Summ. J., R.43, PageID#643. And it acknowledged that Ohio's statute applies not only to prominent platforms, but also to "mom-and-pop" websites. *Id.*, PageID#657. Nonetheless, NetChoice made no serious attempt to develop an evidentiary record that provides a full picture of the statute's applications. *See Moody*, 603 U.S. at 726. Thus, the District Court could not perform the first step of a "proper facial analysis"—a mandatory step that "must" occur before any facial relief. *See id.* at 724–25.

This shortcoming is no technicality. When applying the First Amendment to the world of social media, constitutional "answers might differ" depending on the precise nature of "each thing covered." *See id.* at 725. For example, NetChoice argues that Ohio's statute unconstitutionally interferes with the ability of social-media platforms to disseminate the speech of others. NetChoice Mot. Summ. J., R.43, PageID#628. *Moody* left unsettled what First Amendment standards apply to the various activities of social-media entities. *E.g.*, 603 U.S. at 740; *see also id.* ("[N]othing said here puts regulation of NetChoice's members off-limits as to a whole array of subjects."). But the decision openly acknowledged that the regulation of "diverse activities," even within a single platform, "could well fall on different sides of the constitutional line." *Id.* at 726. And *Moody* further signaled that First Amendment answers might change with "every covered platform or function," depending on the level to which a challenged law intrudes on or burdens a social-media entity's desired activities. *See id.* at 725. Conducting such burden inquiries requires a fact-intensive, application-specific analysis of what each "covered platform or function" is attempting to do. *See id.* The record NetChoice created below provides no way to do that.

Even if NetChoice could assert the rights of children, the analysis would still be application dependent. As argued below, Ohio's parental-consent provision

regulates conduct, not speech. But even assuming otherwise, not all speech receives the same protection. For instance, commercial speech receives less protection than the strict scrutiny that the District Court applied. *See Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562–63 (1980). Think for example of online marketplaces, where children's speech might well be solely for commercial purposes. As just this example shows, the same legal claim about a child's right to use a social-media platform will vary depending on which platform the child wishes to access. Without a sufficient record to compare the challenged statute's many possible applications, NetChoice has closed the door on a proper facial analysis.

Finally, NetChoice also failed to establish that Ohio's *entire* statute is unconstitutional. The arguments below focused on the statute's parental-consent provision and its corresponding access barrier. *See* Ohio Rev. Code §1349.09(B)(1), (E). But Ohio's statute also includes separate parental-notification requirements. *Id.* at (B)(2)–(3). NetChoice did not develop arguments for why those requirements are unlawful. *See, e.g.*, NetChoice Mot. Summ. J., R.43, PageID#638–66. Nor did the District Court analyze those requirements. *See* Op. & Or., R.56, PageID#1326–47. Notably, those aspects of the challenged statute would have likely triggered a different First Amendment analysis than the one the District Court performed. Laws that require disclosure of "factual, noncontroversial information" as part of commercial

speech receive relatively "deferential review." *NIFLA v. Becerra*, 585 U.S. 755, 768 (2018).

At bottom, NetChoice failed to build a proper record to support facial relief. Because NetChoice only sought facial relief, that failure dooms NetChoice's First Amendment claims.

**3.** One last point about the underdeveloped record: NetChoice's failure to construct a sufficient record also dooms its vagueness challenge. A few "close cases" do not render a statute facially vague. *United States v. Williams*, 553 U.S. 285, 304 (2008). Rather, a lack of clarity must persist in a significant number of potential applications. *See id.* Here, because NetChoice has not engaged with the child-protection statute's full scope, it has not justified any finding of facial vagueness.

## III. Ohio's parental-consent provision passes constitutional muster.

Even if NetChoice built a proper record for facial review (it did not), Ohio's child-protection statute passes muster. To see why, it helps to first review history, which often provides powerful guidance of the First Amendment's parameters. *See Vidal v. Elster*, 602 U.S. 286, 295–96 (2024). The Attorney General thus: (1) addresses the States' long history of regulating children's ability to contract; then (2) explains why any First Amendment review in this case should be deferential; and (3) shows

why Ohio's statute survives such review. Lastly, after completing the First Amendment analysis, the Attorney General refutes NetChoice's vagueness claim.

**A. The States have long regulated children's ability to contract, without running afoul of the First Amendment.**

Throughout this country's history, the law has treated children much differently than adults. As the Supreme Court once explained, "[c]hildren, by definition, are not assumed to have the capacity to take care of themselves." *Schall v. Martin*, 467 U.S. 253, 265 (1984). They must "be subject to the control of their parents, and if parental control falters, the State must play its part." *Id.*

These notions about children have a long tradition. Our nation's early leaders believed that children lacked developed reasoning and needed close supervision. John Adams once stated that "Children have not Judgment or Will of their own." Letter to James Sullivan (May 26, 1776), https://founders.archives.gov/documents/Adams/06-04-02-0091. Noah Webster similarly believed that children needed to "be kept untainted" until "their reasoning faculties have acquired strength." Noah Webster, On the Education of Youth in America 21 (1788), https://www.gutenberg.org/files/44416/44416-h/44416-h.htm. Thomas Jefferson, for his part, compared children to "maniacs, gamblers, and drunkards"; all people who could not "take care of themselves" and thus required "restrictive measures." Letter to Samuel Smith (May 3, 1823), https://perma.cc/YD6X-H6PN.

Founding-era laws reflected these views. The common law presumed that children lacked the rationality necessary to exercise and protect their rights. Children thus required the protection of their parents or guardians to "[s]ecure them from hurting themselves by their own improvident acts." *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* 435, 440–41, 452–53 (1765), https://www.gutenberg.org/files/30802/30802-h/30802-h.htm. The common law thus taught that the "necessity of guardians results from [children's] inability to take care of themselves." 2 James Kent, *Commentaries on American Law* 191 (O. Halsted 1827). These principles affected the lives of children in many ways. *See* 1 Blackstone, *Commentaries* at 451–52. Parents generally "controlled children's access to information, including books." *NRA v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (*en banc*). And, because children were incapable of performing "any legal act" themselves, they could not sue or be sued without their guardian's or next friend's participation. 1 Blackstone, *Commentaries* at 452–53.

Important here, children were incapable of forming binding contracts during the founding era. *Id.* at 453–54; 2 Kent, *Commentaries* at 191. The common law's infancy doctrine allowed children to void contractual obligations upon reaching the age of majority. 2 Kent, *Commentaries* at 191–92. "Like many common law principles, the infancy doctrine made its way across the Atlantic, and early American courts

routinely applied it." *McCoy*, 140 F.4th at 575; *accord Mestetzko v. Elf Motor Co.*, 119 Ohio St. 575, 581–82 (1929). Thus, in the early nineteen century, the law made it "almost impossible for children to form any contracts." *NRA*, 133 F.4th at 1118 (quotation and emphasis omitted).

In practical effect, the infancy doctrine greatly restricted children's life experiences. Early America was largely "a credit economy." *McCoy*, 140 F.4th at 576. Thus, restricting children's contracting naturally restricted their ability to "exercise rights and deal with others in society." *NRA*, 133 F.4th at 1118. But, to early Americans, that was a good thing. A main goal of founding-era law was to protect children from the "snares" of life—including "artful and designing persons"—during the "weakness" of their "infancy." 1 Blackstone, *Commentaries* at 441.

While attitudes toward children have changed somewhat over the years, the infancy doctrine persists. Most States still restrict children's ability to contract before the age of majority. *See* Restatement (Second) Contracts §14 (1981) (updated October 2024). For example, in Ohio and Michigan, persons generally are not "capable of contracting" before they turn eighteen. Ohio Rev. Code §3109.01; *accord Woodman v. Kera LLC*, 486 Mich. 228, 237 & n.14 (2010).

## B. Ohio's parental-consent provision regulates conduct, not speech.

Turn, then, from history to constitutional text. The First Amendment, which applies to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech, or of the press." U.S. Const. amend. I. That text bars States "from 'abridging' oral expression … or written expression." *Lichtenstein*, 83 F.4th at 582. But it does not bar States "from restricting conduct." *Id.*; *accord Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005). Laws that target speech often receive strict scrutiny. Laws that target conduct receive a much "softer" touch. *Lichtenstein*, 83 F.4th at 598. More specifically, laws that target conduct, and affect speech incidentally, are "not subject to any heightened scrutiny." *EMW Women's Surgical Ctr.*, 920 F.3d at 446. They instead receive rational-basis review. *McLemore*, 2025 WL 2319119, at *3–*5.

In the same vein, the "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *NIFLA*, 585 U.S. at 769 (quotation omitted). That remains true even when a "ban on conduct" hinders expressive activity or imposes downstream burdens on speech. *Lichtenstein*, 83 F.4th at 583.

Many examples prove the point. A law may prohibit discriminatory hiring conduct even if that restricts (in practical effect) an employer from expressing

discriminatory hiring views. *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006). A law may prohibit "outdoor fires" even if that prevents flag burning. *R.A.V. v. St. Paul*, 505 U.S. 377, 385 (1992). A law may prohibit camping in national parks even if that blocks an overnight demonstration calling attention "to the plight of the homeless." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 289 (1984). A law may prohibit minors from entering bars even if that prevents minors from participating in particular expressive conduct or hearing speech there. *See Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1299–1300 (11th Cir. 2013); *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002). A law may prohibit prostitution rings even if that prevents an establishment from doubling as a bookstore. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986). And a law may regulate professional auctioneering even though auctioneers "conduct their business primarily through the use of language." *McLemore*, 2025 WL 2319119, at *4. None of this should be a surprise. "[C]onduct often accompanies speech." *Lichtenstein*, 83 F.4th at 587. So laws regulating conduct often affect speech. A speed limit might make it harder for a political candidate "to travel in between venues"—thus reducing the "reach" of the candidate's speech. *See id.* But no one would argue that speed limits implicate the First Amendment.

Once a court recognizes the conduct-speech distinction, though, a "difficult" task remains. *See NIFLA*, 585 U.S. at 769. The court must draw "the line between" laws that target speech and laws that target conduct. *Id.* Four considerations—grounded in text, structure, history, and precedent—help guide that inquiry here.

*First*, when deciding whether a law targets conduct or speech, the obvious place to start is a challenged law's text. A law's text, after all, is the "best evidence" of legislative purpose. *W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 98 (1991).

*Second*, accounting for our federalist structure, the First Amendment saves considerable room for States to engage in economic regulation. As the Supreme Court has explained, "restrictions on protected expression are distinct from restrictions on economic activity." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The States are generally free to impose "economic regulations without creating constitutional problems." *Arcara*, 478 U.S. at 704 (quotation omitted). And the States' "legislative power to regulate trade and commerce" naturally "includes the power to determine what groups, if any, shall be regulated." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 497 (1949). That is so even when regulations "help or injure" certain groups. *Id.* The upshot is that the First Amendment does not guarantee businesses "a right to choose" their "customers … without restraint from the State." *Roberts v. United States Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring).

*Third*, history often supplies strong evidence "about the reach of the First Amendment's protections." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24–25 (2022). There is far less "cause for constitutional concern" if a law resembles regulations that have long "coexisted with the First Amendment." *See Vidal*, 602 U.S. at 295–96; *accord McLemore*, 2025 WL 2319119, at *6 (Bush, J., concurring).

*Fourth*, and finally, this Court's decision in *Lichtenstein* offers a helpful precedent-based shortcut. *Lichtenstein* observed that the "Supreme Court has never applied exacting free-speech scrutiny to laws that bar conduct based on the harm that the conduct causes apart from the message it conveys." 83 F.4th at 583. So, if a law can be justified by a harm that is "over and above" disapproval of a particular message, the First Amendment does not require rigorous scrutiny. *Id.* at 584 (quotation omitted); *accord McLemore*, 2025 WL 2319119, at *3. That leaves States free to regulate conduct "because of the action it entails" rather than the "ideas it expresses." *R.A.V.*, 505 U.S. at 385.

**2.** Applying these principles, Ohio's parental-consent provision regulates conduct, not speech. *See* Ohio Rev. Code §1349.09(B)(1), (E). The conduct it targets is contracting with children.

Start with the text of Ohio's statute. The parental-consent provision says that operators "shall" obtain "verifiable consent for any contract with a child, including

terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product, from the child's parent or legal guardian." Ohio Rev. Code §1349.09(B)(1). Parsing that language, operators are required to obtain parental consent only if they "contract with" children as a condition for using their platforms. If operators are willing to skip the regulated conduct (contracting with children under sixteen years old), the parental-consent provision does not apply to them.

The statute's corresponding access requirement is much the same. The access provision says this: "If a child's parent or legal guardian does not affirmatively consent to the terms of service or other contract, the operator shall deny the child access to or use of the online web site, service, or product." *Id.* at (E). This conditional statement is satisfied only if an operator seeks to contract with children. It follows that this access barrier applies only to the subset of operators that are seeking to contract with children. And that reading is especially justified when the access provision is read in context with the parental-consent provision. *Id.* at (B)(1). Again, if operators skip the contracting, then the requirement falls away.

Thus, the text alone shows that this requirement targets contracting—a form of conduct. *See Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring in the result). The remaining considerations discussed above all reinforce the point.

Consider, for instance, our federalist structure: contracting is a classic form of economic activity that the States have traditionally regulated. *Donohue v. Cuomo*, 980 F.3d 53, 65 (2d Cir. 2020). That makes it unlikely that the First Amendment has "greatly impaired" the States' traditional "power to govern" contracting. *See Giboney*, 336 U.S. at 497. Relatedly, there is little reason to think that the First Amendment affords social-media entities "a right to choose" their "customers … without restraint from the State." *Roberts*, 468 U.S. at 634 (O'Connor, J., concurring).

Return to history, which reinforces that Ohio's requirement targets conduct. Again, from this nation's founding, the common law's infancy doctrine has significantly restricted children's ability to contract. *Above* 30–31. Children have thus always depended largely on their parents to contract on their behalves. *See NRA*, 133 F.4th at 1118. And such contracting restrictions have "coexisted with the First Amendment" throughout this nation's history, with no sign of serious "constitutional concern." *Vidal*, 602 U.S. at 295–96; *accord McLemore*, 2025 WL 2319119, at *6 (Bush, J., concurring). These restrictions are not a problem now simply because Ohio confronts a new style of contracting.

Finally, consider this Court's precedent: Ohio's parental-consent provision satisfies the shortcut from *Lichtenstein*. It is easy to identify a "harm that [children's

contracting] causes" that is apart from any "message" children might want to convey. *See Lichtenstein*, 83 F.4th at 583. The law has long viewed children as lacking sufficient judgment to bind themselves to contracts. *Above* 30–31. Restrictions on child contracting thus protect individuals with insufficient capacity from harming themselves through uninformed agreements. Thus, the parental-consent provision is readily justified by a harm that is "over and above … disapproval of [a] message." *See Lichtenstein*, 83 F.4th at 584 (quotation omitted). So too is the corresponding access restriction. *See* Ohio Rev. Code §1349.09(E).

On the other side of the coin, Ohio's parental-consent provision has limited incidental effects on children's speech. Children are free to speak any message. And they may use the internet to deliver their message. They may also access the speech of others; and many platforms do not require an account to do so. *E.g.*, *5 Best Ways to Use Instagram Without an Account*, Lifehack, https://perma.cc/UT2J-STXB. True, Ohio's restriction blocks a child unable to obtain parental consent from becoming a "user" of certain social-media platforms (those unwilling to sacrifice contracting with children). But while the First Amendment "protects the right to express one's viewpoint," it "does not guarantee ideal conditions for doing so." *Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (quotation omitted).

Children must often obtain parental consent to fully exercise their rights. For example, public libraries often require parental consent before giving a child a library card. *See, e.g.*, Library of Congress, *Get Your Library Card*, https://perma.cc/4EBA-AP6A; LA County Library, *Library Cards*, https://perma.cc/J369-9L4D; St. Charles City-County Library, *FAQs: How old must my child be to get a library card of his/her own?*, https://perma.cc/8LJF-B3AM; Burlington Public Library, *Library Card Policy*, https://perma.cc/GG5T-MX87. And, while tattoos are a "protected artistic expression," *Buehrle v. City of Key West*, 813 F.3d 973, 975 (11th Cir. 2015), many States require parental consent before a child receives one. *E.g.*, Fla. Stat. §381.00787; N.J. Stat. §2C:40-21; Ohio Rev. Code §3730.06. The First Amendment is not unique in this regard. For instance, many laws limit minors' ability to purchase or possess firearms without a parent's involvement. *E.g.*, 18 U.S.C. §922(x); Ohio Rev. Code §2923.211.

**3.** All told, Ohio's parental-consent provision regulates conduct while, at most, incidentally burdening speech. That means it needs to survive only rational-basis review. *McLemore*, 2025 WL 2319119, at *3–*5; *see also EMW Women's Surgical Ctr.*, 920 F.3d at 446. And because the provision regulates *conduct*, it does not matter whether the provision is content based or content neutral. *See Lichtenstein*, 83 F.4th at 588.

## C. If the Court treats Ohio's parental-consent provision as a direct regulation of speech, then intermediate scrutiny applies.

If the Court decides that the parental-consent provision targets speech, not conduct, it should apply intermediate scrutiny because Ohio's statute is content and speaker neutral; it merely focuses on a particular medium.

***Content neutrality.*** Review under the First Amendment distinguishes "between two types of restrictions on protected speech: content-based laws and content-neutral laws." *Paxton*, 145 S. Ct. at 2302. Content-based laws "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U. S. 155, 163 (2015). Such laws generally receive strict scrutiny. *Id.* at 163–64; *see Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007) (recognizing that not all content-based distinctions raise "the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace" (quotation omitted)). Content-neutral laws are those that remain "agnostic as to content." *Austin*, 596 U.S. at 69. Such laws "are subject to an intermediate level of scrutiny." *TikTok*, 145 S. Ct. at 67 (quotation omitted).

To decide whether a law is content based or content neutral, courts look to *why* the law burdens speech. A restriction that targets "particular speech *because of*" its topic, idea, or message is content based. *Reed*, 576 U.S. at 163 (emphasis added). The most clearly content-based laws are those that single out certain speech expressly. But even laws that appear facially neutral may be content based if they

"cannot be justified without reference to the content of the regulated speech." *Tik-Tok*, 145 S. Ct. at 67 (quotation omitted). The key distinguisher is whether a law's application depends on the message expressed. For example, the content-based law in *Reed* treated outdoors signs expressing ideological and political messages differently from others. 576 U.S. at 159–60. And, in *Brown*, the Court encountered a law that singled out video games with violent "depictions" for unfavorable treatment. 564 U.S. at 789, 795.

On the other hand, laws are content neutral if the "substantive message" of the regulated speech "is irrelevant" to the law's application. *Austin*, 596 U.S. at 71. For example, *Austin* involved a local signage law that distinguished between on- and off-premise signs, but was agnostic as to messaging. *Id.* at 69. True, the law could not be applied without reading the content of the signs in question. *See id.* at 69. But the Court still held that the law was content neutral because it did "not single out any topic or subject matter for differential treatment." *Id.* at 71. Said differently, a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

These principles show that Ohio's parental-consent provision is content neutral. The requirement's coverage depends on three distinctions: (1) it applies only to

operators of online platforms with certain interactive features; (2) it applies only to operators of platforms "reasonably anticipated to be accessed by children"; and (3) it applies only to operators that seek to "contract with" children. Ohio Rev. Code §1349.09(A)(1), (B)(1). None of these distinctions reflects, either expressly or implicitly, that Ohio is trying to "single out any topic or subject matter for differential treatment." *See Austin*, 596 U.S. at 71. Rather, given Ohio's weighty interests in protecting children and empowering parents, *below* 48–49, these distinctions are easily justified "without reference to the content of" speech on social media, *see TikTok*, 145 S. Ct. at 67.

Put another way, the parental-consent provision does not reflect governmental disagreement with any message. Any social-media platform that children will likely access—good, bad, or ugly—triggers the parental-consent provision. The topic, subject, message, or idea of the speech simply does not matter. That makes the challenged law here much different than the challenged laws in *Reed* (targeting ideological signs) or *Brown* (targeting violent depictions in video games). *See also below* 58–59 (further distinguishing *Brown*).

Other features of Ohio's statute do not make the parental-consent provision content based. Similar to federal law, *see* 16 C.F.R. §312.2, Ohio's statute lists factors that courts "may consider" when deciding if children are likely to access a platform.

Ohio Rev. Code §1349.09(C).  Those factors are neither exhaustive nor mandatory.  And while some of the factors involve "evaluation of" a website's content, that does not mean that the factors are content based in the First Amendment sense.  *See Austin*, 596 U.S. at 72.  The critical point is that none of the factors singles out any topic or message; they guide an *objective* assessment of whether children are likely to use a given platform.

The statute's limited exceptions also do not lead to strict scrutiny.  Recall that the statute excludes certain websites—involving news postings and sales reviews— that have less interactive features than typical social-media platforms.  Ohio Rev. Code §1349.09(O).  These exceptions, however, merely drive home that the statute covers social-media platforms and not other types of media.  *See below* 45.  Regardless, even if the Court deems these exceptions content based and unconstitutional, the exceptions are readily severable from the rest of the statute.  *See Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 623–28 (2020) (Kavanaugh, J., op.); Ohio Rev. Code §1.50.  The child-protection statute does not depend on these limited exceptions to function.  Indeed, the exceptions are either a null set or close to it.  Websites that fall within the exceptions—due to their limited interactive features—are unlikely to meet the statute's definition of "operator" in the first place.  *See* Ohio Rev.

Code §1349.09(A)(1)(a)–(d).  Thus, if the Court decides that the exceptions cause a constitutional problem, it should limit any remedy to *that* problem.

Social media's ubiquity also supports finding that Ohio's statute is not content based.  Social media has "become the modern public square." *Moody*, 603 U.S. at 767 (Alito, J., concurring) (quotation omitted).  Its "users employ these websites to engage … on topics as diverse as human thought." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (quotation omitted).  As a result, state regulation generally aimed at social media does not raise "the specter" that the government is disfavoring any idea, message, or viewpoint. *See Davenport*, 551 U.S. at 188 (quotation omitted).

***Speaker neutrality*.**  Approaching content neutrality from another angle, First Amendment cases often consider whether a law targets speech based on speaker identity. *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019).  Speaker-based laws "are not automatically content based or content neutral." *Id.*  When a speaker-based distinction is really "a content preference," then the First Amendment "demand[s] strict scrutiny." *Id.* (quotation omitted).  But if the speaker-based distinction arises from a "special characteristic of the particular speaker being regulated," then strict scrutiny is unwarranted. *TikTok*, 145 S. Ct. at 68 (quotation and bracket omitted).

Sometimes laws target a "medium" rather than specific speakers. *See Turner*, 512 U.S. at 660 (addressing a law targeting cable broadcasters).  A law that "applies

to one medium (or a subset thereof) but not others" does not automatically "mandate[] strict scrutiny." *Id.* That is true even if a medium-based law "impose[s] an incidental burden on speech." *Id.* at 662. Strict scrutiny applies to such laws only if the medium-based distinction targets "the messages" that the medium carries. *See id.* at 645. At bottom the question is this: do the speaker- or medium-based distinctions stand as a proxy for content discrimination? If not, a lesser form of scrutiny applies.

All this solidifies that Ohio's statute should receive less-than-strict scrutiny. To the extent it incidentally affects speech, Ohio's statute is best viewed as a medium-based statute applicable to a subset of social-media platforms (those that engage with children). As already discussed, the statute does not single out particular messages, topics, or ideas. It regulates social-media platforms because of special characteristics—namely, their "uniquely pervasive presence in the lives of all Americans," including "children." *See FCC v. Pacifica Found.*, 438 U.S. 726, 748–49 (1978).

**Supreme Court precedent.** If any doubt remains, the Supreme Court's decisions this year in *Free Speech Coalition* and *TikTok* remove it. They show that something less than strict scrutiny applies here.

Start with *Free Speech Coalition*. There, the Court confronted a Texas age-verification law that incidentally burdened adults' ability to access pornographic websites.

*Free Speech Coal.*, 145 S. Ct. at 2299–30.  The Court held that strict scrutiny was "ill suited for" the "nuanced work" of gauging the law's constitutionality.  *Id.* at 2311.  That was so because the law exercised the State's "traditional power to prevent minors" from accessing speech that, while protected speech for adults, was obscene from a child's perspective.  *Id.* at 2306.

Consider *TikTok* next.  In that case, the Court addressed federal law specifically focused on TikTok.  The Court assumed that some First Amendment scrutiny was necessary given that "an effective ban" targeting a specific "social media platform" burdened the expressive activity of that platform's users.  *TikTok*, 145 S. Ct. at 66.  Even so, the Court did not apply strict scrutiny.  *Id.* at 69.  The Court emphasized that it was treading cautiously in a case involving "new technologies with transformative capabilities."  *Id.* at 62.  That is, because the case presented "totally new problems raised" by social media, the Court took care "not to embarrass the future."  *Id.* (quotation omitted).

With the ink still drying on these Supreme Court decisions, their lessons apply with full force to this case.  Like *Free Speech Coalition*, this case involves a State exercising its "traditional power" concerning children:  here, the power to protect children from contracting without parental involvement.  *See NRA*, 133 F.4th at 1123 (recognizing that children traditionally exercised their rights as "a matter of parental

consent"). Like *TikTok*, this case involves a law directed at the "totally new problems" that social media presents. The Court should therefore tread carefully so as "not to embarrass the future." Applying strict scrutiny—which would greatly reduce or eliminate state experimentation in this area—would amount to just the opposite.

### D.  Ohio's parental-consent provision survives scrutiny.

Given the above analysis, Ohio's parental-consent provision—which regulates conduct—is subject to only rational-basis review. *McLemore*, 2025 WL 2319119, at *3–*5. Under that incredibly deferential standard, laws are presumed constitutional and need simply be rationally connected in some way to a legitimate government purpose. *Id.* at *4–*5. But even treating Ohio's requirement as if it regulates speech, it should receive intermediate scrutiny at most. A challenged law survives such scrutiny when it "further[s] an important Government interest unrelated to the suppression of free expression" and does "not burden substantially more speech than necessary to further that interest." *TikTok*, 145 S. Ct. at 69. Ohio's parental-consent provision readily passes both tests.

1. **The parental-consent provision advances several important State interests unrelated to the suppression of free expression.**

Ohio has many interrelated and compelling interests when it comes to children, parents, social media, and contracts. These interests have nothing to do with suppressing the content of anyone's speech.

*Child welfare.* As part of its reserved powers, Ohio has "a *parens patriae* interest in preserving and promoting the welfare of the child." *Schall*, 467 U.S. at 263 (quotation omitted); *accord L.W. v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023), *aff'd sub nom. United States v. Skrmetti*, 145 S. Ct. 1816 (2025). It follows that Ohio's "interest in protecting the physical and psychological well-being of minors" is "compelling." *Sable Comms. of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). So compelling, in fact, that the interest "is evident beyond the need for elaboration." *New York v. Ferber*, 458 U.S. 747, 756 (1982).

*Parental information.* Ohio also has a "compelling interest" in securing the "fundamental rights" of its citizens. *See Burson v. Freeman*, 504 U.S. 191, 199, 211 (1992) (plurality op.). That matters here because parents have a recognized fundamental right to direct the upbringing of their children. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925). Ohio may thus exercise its legislative power to ensure that parents, "who have th[e] primary responsibility for children's well-being," receive

support in the "discharge of that responsibility." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968).

*Child contracting.* Ohio has the "inherent police power" to regulate contracts so as "to safeguard the vital interests of its people." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) (quotation omitted). More relevant here, Ohio has a compelling—and historically supported—interest in protecting children from being taken advantage of through contracts. As discussed above (at 30–31), from this nation's inception the States have recognized the need to protect children from contracts, when their judgment is not yet fully formed.

## 2. The parental-consent provision is properly tailored.

Requiring parental consent before children use social-media platforms—which force contracts as a condition of use—is a narrow and appropriate response to the new-age problems that social-media platforms pose.

To understand why, recall first the complex problems associated with social media and children. *See above* 5–9. As the Surgeon General aptly described, this country's children are currently "unknowing participants in a decades-long experiment." Surgeon General Advisory, R.42-2, PageID#500. Given social media's addictive qualities, adolescents are now spending many hours each day on social-media platforms. *See id.*, PageID#496, 498. And such rampant social-media use comes with

many potential harms for children ranging from poor sleep, to cyberbullying, to depression, to eating disorders, to encounters with sex predators. *See id.*, PageID#496; North Aff., R.42-4, PageID#528–30. Ohio, unfortunately, is all too familiar with such dangers. *See Roberts v. United States*, 2015 WL 7424858, at *2–*3 (S.D. Ohio Nov. 23, 2015) (Report and Recommendation) (discussing a child rape in which the rapist lured the child via "a social networking website called vampirefreaks.com").

Think, also, from a parent's perspective. It is quite difficult "for parents to monitor" children's social-media use given the many different ways children may access the internet. *See Packingham*, 582 U.S. at 118 (Alito, J., concurring). As for the people children encounter on social media, the internet allows "an unprecedented degree of anonymity" that clouds parents' ability to monitor their children's interactions and safety. *Id.*

Ohio's child-protection statute does not purport to solve these complex problems all at once. Nor does it need to. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449, (2015). Instead, Ohio's statute takes a careful and important step. It requires parental consent to ensure that parents are at least involved in a child's decision to use social media and assent to contract terms. At the same time, the statute does nothing to interfere with parental discretion. Parents remain free to let their children use social media as they see fit.

Several aspects of Ohio's statute confirm its careful tailoring. The statutory definition of "operator" pulls in only platforms with interactive features that contribute to user addiction. *See* Ohio Rev. Code §1349.09(A)(1); Surgeon General Advisory, R.42-2, PageID#498. The parental-consent provision is also limited to platforms directed at children, thereby eliminating any burden for adult-focused websites. *See* Ohio Rev. Code §1349.09(B)(1), (C). Further, the statute defines "child" to mean those under the age of sixteen, meaning Ohio's requirement focuses on a particularly vulnerable group of minors. *See id.* at (A)(2); Orben Study, R.42-3, PageID#520.

The parental-consent provision is also well tailored to Ohio's interest in preventing social-media platforms' exploitative contracting with children. For much of this country's history, the infancy doctrine (which allows for disaffirmance of contracts) served as an effective model for protecting children from binding contracts. *See NRA*, 133 F.4th at 1118. But the doctrine has not stopped online platforms from saddling children with lopsided terms of service. *See above* 7–9. Parental consent thus ensures that children will not bind themselves to social-media contracts without parental oversight.

One final point. Based on the above analysis, this Court need not answer the more difficult question of whether Ohio's parental-consent provision survives strict constitutional scrutiny. But, while a closer call, Ohio's provision survives even that

demanding standard. *See Williams-Yulee*, 575 U.S. at 444. There is no as-effective but less-intrusive way for Ohio to safeguard its various compelling interests in this area. True, Ohio's requirement does not fix "all aspects" of the child-and-social-media crisis in "one fell swoop"; but not even strict scrutiny requires such a feat. *See id.* at 449.

### E. Ohio's child-protection statute is not unconstitutionally vague.

NetChoice's vagueness claim fares no better. The Supreme Court's vagueness doctrine requires that a statute give people "of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304. A law violates the doctrine when it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

The Supreme Court has generally employed a "less strict vagueness test" for "economic regulation," though not for laws interfering with First Amendment rights. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498–99 (1982). Whatever the context, even when a law implicates "expressive activity," it does not become vague merely because it lacks "perfect clarity and precise guidance" on application. *Williams*, 553 U.S. at 304 (quotation omitted). And "the mere fact" that there could be "close cases" does not render a law unconstitutionally vague. *Id.* at 305–06. What is more, facially invalidating a law for vagueness is particularly

extreme in the pre-enforcement context, where "no evidence" can be "introduced to indicate" how a law "has been enforced." *See Hoffman Estates*, 455 U.S. at 503.

Here, Ohio's statute survives any vagueness inquiry, regardless of whether the Court treats the statute as one implicating First Amendment rights. As a general matter, the statute uses plain terms to describe its coverage. More specifically, the statute offers a four-prong definition of the operators to which it applies. Ohio Rev. Code §1349.09(A)(1). It then asks an additional, objective question: can children be "reasonably anticipated" to access the platform? *Id.* at (B). To assist with that question, the statute provides a list of discretionary, commonsense factors that largely mirror federal law. *Id.* at (C); *see* 16 C.F.R. §312.2. And to protect against honest mistakes, the statute also includes a grace period for operators to correct technical mistakes. Ohio Rev. Code §1349.09(M)(2).

True, given the "variegated and complex" nature of the "online world," *Moody*, 603 U.S. at 725, any person could no doubt imagine hard hypotheticals. But that does not render Ohio's statute facially vague prior to any enforcement.

## IV. The District Court's contrary analysis is wrong.

In ruling otherwise, the District Court made many errors.

## A. The District Court misapplied the third-party standing doctrine.

For third-party standing, the District Court's analysis began on solid footing. The court recognized that Ohio's evidence of conflicts—between children and social-media platforms—was "certainly compelling." Op. & Or., R.56, PageID#1322. But the District Court mistakenly cast aside those conflicts. In the court's view, children's "general interests" did not matter to third-party standing because the right at issue was "the rights of minors to access social media platforms." *Id.*, PageID#1323. That reasoning is mistaken, on multiple levels.

First, conflicts between litigants and rightholders are relevant to third-party standing. If litigants pursue third-party claims that "may have an adverse effect on" rightholders, that is reason enough to deny third-party standing. *See Newdow*, 542 U.S. at 17. Relatedly, prudential standing recognizes that third parties deliberately choose to "not challenge" government action for many reasons. *See Kowalski*, 543 U.S. at 129. Courts must therefore examine reasons why rightholders might decide a lawsuit is not in their best interests. *See Amato*, 952 F.2d at 753 (analyzing the "considerations" that might have informed a rightholder's "calculus" in deciding "not to sue").

Second, the District Court downplayed the interrelationship between conflicts and the merits analysis in this case. The child-protection statute's regulation of child

contracting is a key component of this case's constitutional analysis. *E.g.*, *above* 35–38, 49. Thus, that children might feel differently about their contracting rights than social-media platforms is a red flag for third-party standing. NetChoice takes a maximalist First Amendment position at the cost of children's contracting rights. It is a leap to assume children would do the same. The District Court was thus wrong to view children and social-media platforms as automatically aligned on the merits. *See* Op. & Or., R.56, PageID#1323.

Finally, the District Court's third-party standing analysis relied on inapt comparisons. For example, the court leaned heavily on cases involving traditional vendor-customer relationships. *Id.* (citing *Craig v. Boren*, 429 U.S. 190, 195 (1976)). But the relationship between social media and children is much different than those relationships. The far better comparison is *Newdow*, where the Supreme Court recognized that an aggressive constitutional position—even from a father—might harm a child. *See Newdow*, 542 U.S. at 9, 17.

### B. The District Court's merits analysis is unconvincing.

On the merits, the District Court made several mistakes.

*Facial challenge.* Initially, the District Court brushed past NetChoice's failure to develop a sufficient record for facial relief. With little analysis, the court assumed that "every application" of Ohio's statute would yield "the same First Amendment

issues." Op. & Or., R.56, PageID#1327. As discussed above (at 26), that assumption is incredibly shaky: First Amendment standards applicable to social-media platforms are unsettled, and differences between (and within) platforms may well alter the analysis. *See Moody*, 603 U.S. at 725–26, 740. Regardless, the Supreme Court has commanded that courts "must" determine a law's coverage to perform a "proper facial analysis" under the First Amendment's overbreadth doctrine. *Id.* at 724–25. The District Court was wrong to skip that mandatory step.

***Conduct versus speech.*** The District Court also erred in determining that Ohio's parental-consent provision regulates speech rather than conduct. Op. & Or., R.56, PageID#1329–32. The District Court misread the requirement. It said that a social-media platform's only options are to secure parental consent or deny children access. *Id.*, PageID#1331–32. That is a false dichotomy. A social-media platform can also avoid the statute's parental-consent provisions by refraining from the regulated conduct (contracts with children). Ohio Rev. Code §1349.09(B)(1), (E).

The District Court's heavy reliance on *Sorrell* was also misplaced. Op. & Or., R.56, PageID#1330–32. That case involved a Vermont law that restricted the sale of pharmacy records that disclosed "the prescribing practices of individual doctors." *Sorrell*, 564 U.S. at 557. At best, that law "ostensibly" involved conduct. *Lichtenstein*, 83 F.4th at 585. The law "on its face and in its practical operation" was

"directed at certain content." *Sorrell*, 564 U.S. at 567. Here, unlike the law in *Sorrell*, Ohio's parental-consent provision does not target any particular topic, and it is readily justifiable to prevent harms "over and above" the disapproval of any topic. *See Lichtenstein*, 83 F.4th at 584 (quotation omitted).

***Content neutrality.*** For similar reasons, the District Court also mistakenly concluded that Ohio's law was content based. In its view, Ohio's statutory definition of "operator" uses a platform's features as a "proxy" for targeting "specific types of speech." Op. & Or., R.56, PageID#1337–38. That is a non-sequitur. Platforms can have similar features but involve much different speech content (for example, Facebook versus LinkedIn). And medium-based laws by their nature distinguish between the characteristics of groups of speakers. Such distinctions do not automatically trigger strict scrutiny. *Turner*, 512 U.S. at 660.

The District Court also faulted the exceptions within Ohio's statute as content based. Op. & Or., R.56, PageID#1338–39. But those exceptions do not single out any message, they merely sharpen the statute's medium-based distinction. Regardless, those exceptions are severable if they cause any infirmity. *Above* 43–44.

***Strict scrutiny.*** The District Court applied strict scrutiny and held that Ohio's parental-consent provision failed the test. Op. & Or., R.56, PageID#1340–44. In

doing so, the court relied heavily on the Supreme Court's decision in *Brown*. But the case is distinguishable.

Again, *Brown* involved a California law banning the sale of violent video games to minors. 564 U.S. at 789. Because the law squarely targeted speech "depicti[ng] … violence," the Supreme Court applied strict scrutiny. *Id.* at 795, 799. The law failed. Among other things, the Court concluded that there was insufficient evidence linking "violent video games and harm to minors." *Id.* at 799.

This case is distinguishable in at least four ways. *First*, *Brown* acknowledged that the California law would have fared better "if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence." 564 U.S. at 795. Here, *there is* a longstanding tradition in this country of specially restricting children's ability to contract. *Above* 30–31. *Second*, *Brown* did not analyze whether the California law targeted conduct or speech. Thus, the decision offers no guidance for that component of this case. *Third*, *Brown* involved a law that blatantly targeted speech with violent messaging. By contrast, Ohio's parental-consent provision targets no message. *Fourth*, *Brown*'s criticism of the evidentiary link between violent video games and harm to minors does not extend to this case. The evidence needed to satisfy strict scrutiny is highly context dependent. Sometimes even "common sense" will do. *Burson*, 504 U.S. at 207 (plurality op.). Here, there is an ever-

growing body of research showing the harms that social media inflicts on children. *See, e.g.*, Surgeon General Advisory, R.42-2, PageID#497–99; Orben Study, R.42-3, PageID#520; Borj Survey, R.42-8, PageID#594. Children today are active participants in a dangerous social-media experiment. Surely the States do not need to wait for perfect causal evidence to act.

In applying strict scrutiny, the District Court hypothesized several alternative approaches to Ohio's statute. But none would be as effective (in serving Ohio's interests), but less intrusive (on people's constitutional rights). For instance, the court suggested that Ohio could serve its contract-related interests by prohibiting certain terms within social-media contracts involving children. Op. & Or., R.56, PageID#1341. But that approach would not solve the root problem—unsupervised children entering binding contracts—and would undoubtedly be prone to evasion by clever lawyering. The District Court also insinuated that Ohio could take a heavier hand with parents. *See id.*, PageID#1342 (suggesting "one-time approval" is not enough). But that would interfere with parents' recognized fundamental right to direct their children's upbringings. *See Pierce*, 268 U.S. at 534–35. Finally, the court reasoned that parental controls, which platforms and devices self-impose, are enough. Op. & Or., R.56, PageID#1343. But in the next breath the court acknowledged that many parents "may be unaware of these tools." *Id.*; *cf.* North Aff., R.42-

4, PageID#530 (noting that parents of child victims are often unaware of the capabilities of social-media platforms). Relying on those tools, it follows, does not ensure parental engagement in the same way as a parental-consent provision.

*Vagueness.* The District Court further erred in finding Ohio's statute "troublingly vague." Op. & Or., R.56, PageID#1345. The court apparently faulted the statute for being too "expansive" and not having enough definitions. *Id.* But none of that makes the statute unconstitutionally vague, especially in a pre-enforcement context. While there will inevitably be some close cases, *Williams*, 553 U.S. at 304, the District Court failed to explain why the statute will be unclear in a significant number of applications.

*Platforms' rights.* One final merits point. The District Court largely grounded its analysis in the First Amendment rights of children. *E.g.*, Op. & Or., R.56, PageID#1339–40. At times, however, the court suggested that Ohio's statute also violates the First Amendment rights of social-media platforms to "disseminat[e]" the speech of others. *E.g.*, PageID#1341. As explained above (at 26), any claim based on the rights of social-media platforms is particularly unfit for facial review, given numerous possible variations across platforms and functionalities. *See Moody*, 603 U.S. at 725. Regardless, any such claim fails for reasons discussed already: Ohio's

parental-consent provision regulates conduct, it is content neutral, and it survives any conceivable scrutiny.

## V. The District Court granted overbroad relief.

Setting other errors aside, the District Court's relief was improper. Recall that the District Court enjoined the Attorney General from enforcing Ohio's entire statute, with no qualifications. Op. & Or., R.56, PageID#1348. That broad relief has two problems.

*First*, courts must generally limit relief to the parties before them. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2551 (2025). The relief here violates that principle. Even if NetChoice may obtain relief for its members, the District Court's injunction captures non-members too.

*Second*, when a statute has a constitutional flaw, courts are supposed to "limit the solution to the problem." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (quotation omitted). By its own analysis, the District Court did not do so here. The court enjoined Ohio's entire statute, but it never explained why there was a constitutional problem with the statute's feature-notification requirements. *See* Ohio Rev. Code §1349.09(B)(2)–(3).

**CONCLUSION**

For these reasons, this Court should reverse and remand with instructions for

judgment in the Attorney General's favor.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN
Ohio Solicitor General
  *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.sridharan@ohioago.gov

*Counsel for Appellant*
  *Dave Yost*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 12,984 words. *See* Fed. R. App. P. 32(a)(7)(B)(ii).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2025, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

# DESIGNATION OF DISTRICT COURT RECORD

Appellants, pursuant to Sixth Circuit Rule 30(g), designate the following filings

from the District Court's electronic records:

### *NetChoice, LLC v. David Yost*, 2:24-cv-00047

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 1/5/2024 | R. 1; 6 | Complaint |
| 1/5/2024 | R. 2-1; 64 | Declaration of Carl Szabo |
| 2/12/2024 | R. 33; 359–60 | Order granting Motion for Preliminary Injunction |
| 5/3/2024 | R. 42-1; 484 | Raffoul Study |
| 5/3/2024 | R. 42-2; 493–504 | Surgeon General Advisory |
| 5/3/2024 | R. 42-3; 519–20 | Orben Study |
| 5/3/2024 | R. 42-4; 528–30 | Affidavit of Amanda North |
| 5/3/2024 | R. 42-7; 557 | Obar Survey |
| 5/3/2024 | R. 42-8; 594 | Borj Survey |
| 5/3/2024 | R. 43; 628, 638–66 | Plaintiff Motion for Summary Judgment |
| 4/16/2025 | R. 56; 1300–48 | Opinion and Order |
| 4/16/2025 | R. 57; 1349 | Judgment |
| 5/12/2025 | R. 59; 1352 | Notice of Appeal |