# In the United States Court of Appeals for the Sixth Circuit

NETCHOICE, LLC,

*Plaintiff-Appellee,*

v.

DAVE YOST, OHIO ATTORNEY GENERAL,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus
Case No. 2:24-cv-00047

## BRIEF OF *AMICI CURIAE* FLORIDA, 30 STATES, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF APPELLANT AND REVERSAL

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
*kevin.golembiewski
  @myfloridalegal.com*

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................ii

INTRODUCTION AND INTEREST OF AMICI ....................................................1

ARGUMENT ................................................................................................4

I. STATES HAVE A COMPELLING INTEREST IN PROTECTING CHILDREN FROM
SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES. ......................4

    A.    Social-media companies are misleading the public and harming
children. ................................................................................4

    B.    Regulation is needed to protect the next generation of children...........9

II. THE ACT IS A REASONABLE, CONSTITUTIONALLY VALID RESPONSE TO
SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES. ....................11

    A.    The Act directly regulates commercial activity, not speech. ..............12

    B.    The Act does not disproportionately burden any expression..............15

III. IN ANY EVENT, NETCHOICE LACKS PRUDENTIAL STANDING TO ASSERT
CHILDREN'S FIRST AMENDMENT RIGHTS. ......................................................19

CONCLUSION .............................................................................................21

CERTIFICATE OF COMPLIANCE ....................................................................24

CERTIFICATE OF SERVICE............................................................................25

i

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996) ........................................................................13

*Anderson v. TikTok*,
    116 F.4th 180 (3d Cir. 2024) ...........................................................6

*Arcara v. Cloud Books*,
    478 U.S. 697 (1986) ............................................................11, 16, 18

*Ass'n of Am. Physicians & Surgeons v. FDA*,
    13 F.4th 531 (6th Cir. 2021) ...........................................................20

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................20

*Gary v. City of Warner Robins*,
    311 F.3d 1334 (11th Cir. 2002) .................................................15, 17

*Indigo Room v. City of Fort Myers*,
    710 F.3d 1294 (11th Cir. 2013) .................................................15, 16

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ........................................................................17

*Moody v. NetChoice*,
    603 U.S. 707 (2024) ........................................................................10

*Ne. Ohio Coal. for the Homeless v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006) ...........................................................19

*NRA v. Bondi*,
    133 F.4th 1108 (11th Cir. 2025) ...........................................3, 11, 19

*Ogden v. Saunders*,
    25 U.S. 213 (1827) ..........................................................................14

*Pa. Psychiatric Soc. v. Green Spring Health Servs.*,
  280 F.3d 278 (3d Cir. 2002) ...................................................................19

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ...................................................................................14

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ...................................................................................3

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) .................................................................................14

*Sable Commc'ns of Cal. v. FCC*,
  492 U.S. 115 (1989) .................................................................................10

*Sorrell v. IMS Health*,
  564 U.S. 552 (2011) .................................................................................15

*TikTok v. Garland*,
  145 S. Ct. 57 (2025) ..........................................................................*passim*

*UAW v. Brock*,
  477 U.S. 274 (1986) .................................................................................20

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
  517 U.S. 544 (1996) .................................................................................20

*Virginia v. Hicks*,
  539 U.S. 113 (2003) .................................................................................18

**Statutes**

Cal. Civ. Code § 1798.99.31 .....................................................................10

Del. Code Ann. tit. 6, § 1204C .................................................................10

Fla. Stat. § 501.1736.................................................................................10

La. Stat. Ann. § 51:1753............................................................................10

Miss. Code Ann. § 45-38-7 .......................................................................10

N.Y. Gen. Bus. Law § 1501 ..................................................................10

Ohio Rev. Code § 1349.09 ...............................................................12

T.C.A. § 47-18-5703 .......................................................................10

**Treatises & Commentary**

Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (2005) ........................................14

**Other Authorities**

Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024) ...................................8

Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth Mental Health Crisis*, NPR (Oct. 24, 2023) .............................................1

Brian Fung, *Execs Ignored the Damage Instagram Does to Teens, Meta Whistleblower Tells Congress*, CNN Business (Nov. 7, 2023) .................5

Decl. of Adam Alter, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-2 ..................................................9

Decl. of Jean M. Twenge, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 12, 2025), ECF No. 51-1 .................................1, 4, 5, 9

Decl. of Tony Allen, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 9, 2025), ECF No. 51-3 ..................................................9

Dep. of Adam Alter, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 23, 2025), ECF No. 63-3 .......................................9

Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104 (Sep. 1, 2024) .............................................................................10

*Five Ways to Respond to Sextortion*, Meta (Aug. 20, 2025) ...................................6

Jacqueline Thomsen, *NetChoice Pulls Expert After Allegations of AI Fabrications*, Bloomberg Law (Aug. 17, 2025) .................................11

Justin Rohrlich, *A 10-year-old girl died during the viral 'blackout challenge.' Now TikTok could be held liable*, The Independent (Aug. 28, 2024) ................................................... 6

Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024) ........................................................ 1

Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg, June 21, 2023 ........................................ 5

Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* (2023) .................................... *passim*

Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO, to Senate Judiciary Comm. (Feb. 28, 2024) ........................... 9

Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021) ................................................................ 2, 7

*Snap Inc. Terms of Service*, Snap (Apr. 7, 2025) ................................. 12, 13

*Snapchat Ads Transparency*, Snap (Aug. 13, 2025) .............................. 12

Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sept. 30, 2021) ........................... 7

*What You Need to Know About Financial Sextortion*, Snap Inc. (Aug. 20, 2025) ............................................................... 6

# INTRODUCTION AND INTEREST OF AMICI

The public has learned—through whistleblowers and leaked internal documents—what social-media companies have known for years: Their products are destroying children's mental health. There is a "clear link" between social-media use and our kids' skyrocketing rates of depression, anxiety, self-harm, and suicide.[1] In the words of the Biden Administration's Surgeon General, "[o]ur children have become unknowing participants in a decades-long experiment."[2]

State and federal governments have come together to take swift, bipartisan action. Many States—including Ohio and several *Amici*—have passed laws regulating social-media platforms' interactions with vulnerable children, and more than 40 States have sued platforms for the harm they have caused children.[3] Several CEOs were recently subjected to "a bipartisan thrashing" in the Senate Judiciary Committee, at which Mark Zuckerberg famously apologized to parents whose children had been harmed by Meta platforms.[4]

---

[1] Decl. of Jean M. Twenge, Ph.D. ¶¶ 6, 59, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 12, 2025), ECF No. 51-1.

[2] Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 11 (2023), https://tinyurl.com/33u2t7kn.

[3] Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth Mental Health Crisis*, NPR (Oct. 24, 2023), https://tinyurl.com/y882nt5f.

[4] Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024), https://tinyurl.com/2p9vvy62.

Rather than scale back their predatory business practices—which range from confusing user contracts to design features that manipulate kids into compulsively using social media—tech companies have continued their nothing-to-see-here approach. They have refused "access to [their] data," insisted on a "lack of transparency," and resisted regulation at every turn.[5] They have enlisted their trade association, NetChoice, to fight all efforts to protect kids online. According to NetChoice, tech giants like Google and Meta have a constitutional veto for any law that regulates their business practices simply because their platforms host speech. The First Amendment, they say, grants platforms a right to contract with children, exploit their developing brains with addictive design features, expose them to sexual predators, and drive them to self-harm and suicide—all while misleading the public about their products.

*Amici* have an interest in resisting NetChoice's attempt to distort the First Amendment into an absolute regulatory immunity for internet platforms. The First Amendment is not a shield for platforms' harmful business practices.

---

[5] Surgeon General Advisory, *supra* n.2 at 11; *see also* Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021), https://tinyurl.com/yc4zex93 (Meta whistleblower exposing that "Facebook executives hide research about the social network's risks to keep its business humming").

The district court erred in permanently enjoining Ohio from enforcing the Parental Notification by Social Media Operators Act. The Act is a reasonable, constitutionally valid response to the harm that social-media companies are causing children. It zeroes in on commercial activity, regulating only platforms' contracts with children, and it in no way threatens to "drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992). If two social-media platforms were identical in all respects except that one required users to enter contracts and the other did not, the Act would impose no restrictions on the latter even though both platforms provide the same speech to children. That makes the Act "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First Amendment scrutiny." *TikTok v. Garland*, 145 S. Ct. 57, 66 (2025). Rather than targeting expression, the Act is directed at an age-old problem: Children, who "lack[] reason and judgment," being taken advantage of by sophisticated parties that seek to exploit them for financial gain. *NRA v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc).

# ARGUMENT

**I.** **STATES HAVE A COMPELLING INTEREST IN PROTECTING CHILDREN FROM SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES.**

**A.** **Social-media companies are misleading the public and harming children.**

In recent years, mounting evidence has emerged that social-media platforms are harming children. As child social-media use proliferated over the last 15 years, adolescent depression rates more than doubled,[6] and children experienced a rise in anxiety, low self-esteem, poor body image, and eating disorders.[7] Associated behaviors like self-harm and suicide also "skyrocketed."[8] "Between 2010 and 2022, emergency room admissions for self-harm increased 192% among 15- to 19-year-old girls" and "an incredible 411% among 10- to 14-year-old girls."[9] "The suicide rate among 10- to 14-year-old boys increased 166%," and "the suicide rate among

---

[6] Twenge Decl., *supra* n.1 ¶ 15.

[7] Surgeon General Advisory, *supra* n.2 at 6–7; *see also* Twenge Decl., *supra* n.1 ¶ 59.

[8] Twenge Decl., *supra* n.1 ¶¶ 17–18.

[9] *Id.* ¶ 17.

10- to 14-year-old girls increased 217%."[10] But for those spikes in youth suicide, "3,604 more" sons and daughters "would be alive today."[11]

Studies reveal that the correlation is no coincidence: Social-media use is a causal factor.[12] Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression.[13]

The harm does not stop there. Children are being victimized by "predatory behaviors"—including "sexual solicitation"—on platforms.[14] More than 25% of girls between ages 13 and 15 have "receiv[ed] unwanted sexual advances on Instagram," for example.[15] And Senators Richard Blumenthal and Marsha Blackburn recently wrote to Meta after "reports that Instagram has harbored an open-air market for the sale of child sexual abuse material and the trafficking of

---

[10] *Id.* ¶ 18.

[11] *Id.*

[12] *Id.* ¶¶ 34, 47.

[13] *Id.* ¶¶ 39, 47; Surgeon General Advisory, *supra* n.2 at 6.

[14] Surgeon General Advisory, *supra* n.2 at 9; Twenge Decl., *supra* n.1 ¶ 22.

[15] Brian Fung, *Execs Ignored the Damage Instagram Does to Teens, Meta Whistleblower Tells Congress*, CNN Business (Nov. 7, 2023), https://tinyurl.com/ak3d34p9.

children."[16] The problem is apparently so bad that Meta and Snap actively warn children of the dangers of "sextortion" on their platforms.[17]

Platforms also market dangerous "challenges" to children, like "ten-year-old Nylah Anderson." *Anderson v. TikTok*, 116 F.4th 180, 181–82 (3d Cir. 2024). TikTok, "via its algorithm, recommended and promoted" to Nylah a video that "depicted the 'Blackout Challenge,' which encourages viewers to record themselves engaging in acts of self-asphyxiation." *Id.* at 181. "After watching the video, Nylah attempted the conduct depicted in the challenge and unintentionally hanged herself." *Id.* Her mother found her "lifeless body on the bedroom floor" and "rushed" her "to the hospital," where she died.[18]

Still, platforms have resisted any effort to research or mitigate their products' effects. As the U.S. Surgeon General has explained, researching the danger that platforms' practices pose to children is difficult because platforms do not allow "access to data" and insist on a "lack of transparency."[19] Or as one former product

---

[16] Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg, June 21, 2023, https://tinyurl.com/2s4j243y.

[17] *Five Ways to Respond to Sextortion*, Meta (Aug. 20, 2025), https://tinyurl.com/292hmv44; *What You Need to Know About Financial Sextortion*, Snap Inc. (Aug. 20, 2025), https://tinyurl.com/4vwn9f39.

[18] Justin Rohrlich, *A 10-year-old girl died during the viral 'blackout challenge.' Now TikTok could be held liable*, The Independent (Aug. 28, 2024), https://tinyurl.com/yw3ebwj2.

[19] Surgeon General Advisory, *supra* n.2 at 11.

manager at a social-media company put it, "executives hide research about the social network's risks to keep its business humming."[20] Only because of whistleblowers and accidental leaks do Americans know that platforms have long been aware of the harm they are inflicting on children.

Meta, which operates Facebook and Instagram, is a prime example. A whistleblower exposed internal research showing that many of Instagram's youngest users "felt addicted to the app," "lacked the wherewithal to limit their use of it," and reported "that the app contributed to their depression and anxiety."[21] Meta also acknowledged—internally—that Instagram was causing nearly one third of adolescent-girl users to develop body-image issues.[22] Rather than roll back the features it was privately acknowledging are addictive and destructive, Meta pressed on and even sought to expand its products to younger children. The company "commissioned strategy papers about the long-term business opportunities" with preteens and discussed "whether there might be a way to engage children during

---

[20] Bond & Allyn, *supra* n.5.

[21] Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, The New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh.

[22] *Id.*

play dates."[23] Delivering its products to more "tweens," Meta explained in internal meetings, was imperative because "[t]hey are a valuable but untapped audience."[24]

Leaked documents from TikTok showed that it too "was aware its many features designed to keep young people on the app led to a constant and irresistible urge to keep opening the app" and that such "compulsive usage correlates with a slew of negative mental health effects like loss of analytical skills, memory formation, contextual thinking, conversational depth, empathy, and increased anxiety."[25] TikTok acknowledged that features like infinite scroll were most likely to addict children, stating that "across most engagement metrics, the younger the user, the better the performance" because "[m]inors do not have executive function to control their screen time."[26] And although TikTok has publicly touted some features ostensibly aimed at reducing the platform's addictive effects—like allowing parents to set time limits and prompting users to take a break—TikTok determined that those features "had little impact" and are "not altogether effective."[27] But that

---

[23] *Id.*

[24] *Id.*

[25] Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024), https://tinyurl.com/4e5un4ru.

[26] *Id.*

[27] *Id.*

did not matter because TikTok adopted the features solely to give it "a good talking point with policymakers."[28]

## B.    Regulation is needed to protect the next generation of children.

Because deceptive practices like Meta's and TikTok's have fueled the Nation's "youth mental health crisis,"[29] the U.S. Surgeon General has called on policymakers to develop "health and safety standards" for platforms and to adopt "policies that further limit access . . . to social media for all children"—including "strengthening and enforcing age minimums."[30]

Those policy responses are necessary because platforms' own interventions have proven inadequate. Platforms have long had parental controls, but they have made no dent in child addiction.[31] That is both because parents do not use them and because they are ineffective. Less than 1% of parents use Snapchat's controls, for

---

[28] *See id.*

[29] Surgeon General Advisory, *supra* n.2 at 13; *accord* Twenge Decl., *supra* n.1 ¶ 26.

[30] Surgeon General Advisory, *supra* n.2 at 15.

[31] Dep. of Adam Alter, Ph.D. at 183:16–23, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 23, 2025), ECF No. 63-3.

example.[32] And parental controls are difficult to manage[33]; they do not address the features that make platforms addictive[34]; and platforms do not implement them with fidelity. *See* Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104, at *9 (Sept. 1, 2024) (Facebook has "misled parents about their ability to control" their children's accounts).

Ohio and other States have therefore passed laws that regulate platforms' harmful commercial activity.[35] States and the federal government have a compelling interest in regulating platforms' business practices given their undeniable role in the Nation's youth mental-health crisis. *See Moody v. NetChoice*, 603 U.S. 707, 733 (2024) (acknowledging that social media poses unique "dangers" to kids' "mental health"); *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (States have a "compelling interest in protecting the physical and psychological well-being of

---

[32] *See* Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO, to Senate Judiciary Comm. at 1–2 (Feb. 28, 2024), https://tinyurl.com/55amwdfc.

[33] Decl. of Tony Allen ¶¶ 51–61, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 9, 2025), ECF No. 51-3.

[34] Decl. of Adam Alter, Ph.D. ¶¶ 48–50, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-2.

[35] *See, e.g.*, T.C.A. § 47-18-5703 (limits on social-media platforms contracting with children); Miss. Code Ann. § 45-38-7 (same); Fla. Stat. § 501.1736 (regulating platforms' use of "addictive features"); N.Y. Gen. Bus. Law § 1501-1502 (limits on "addictive feeds" and push "notifications"); Cal. Civ. Code § 1798.99.31(b)(7) (limits on targeting children with deceptive practices); Del. Code Ann. tit. 6, § 1204C (limits on advertising to children); La. Stat. Ann. § 51:1753(2) (same).

minors."). NetChoice cannot seriously dispute that, as much of the evidence has been leaked from its own members. Indeed, in at least one of its lawsuits challenging *Amici*'s laws, NetChoice has assumed States' compelling interest in protecting kids on platforms.[36] And in another case, where NetChoice has tried to dispute the harm its members are causing children, NetChoice had to resort to an expert report that relied on nonexistent studies.[37]

## II. THE ACT IS A REASONABLE, CONSTITUTIONALLY VALID RESPONSE TO SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES.

The Act is a quintessential consumer-protection law: It protects Ohio's most vulnerable citizens from predatory business practices. It does not trigger heightened scrutiny because it regulates only commercial activity with children, not speech. The Act limits social-media platforms' ability to enter harmful, one-sided contracts with children, who "lack[]" the "reason and judgment" to weigh the risks and benefits of the contracts. *NRA*, 133 F.4th at 1117.

That restriction is a valid exercise of the State's police power. First Amendment scrutiny applies only if a law either "directly regulates protected

---

[36] *See* Tr. 16:17–17:18, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Nov. 19, 2024), ECF No. 51-10 (Plaintiffs representing that they were "assuming" Florida's interest and arguing only that its law "is just not narrowly tailored").

[37] *See* Memo. in Support of Mot. to Exclude at 1–2, *NetChoice v. Murrill*, No. 3:25-cv-231 (M.D. La. Aug. 15, 2025), ECF No. 42-1; Jacqueline Thomsen, *NetChoice Pulls Expert After Allegations of AI Fabrications*, Bloomberg Law (Aug. 17, 2025), https://tinyurl.com/2nk64wss.

expressive activity" or regulates non-expressive activity but "impose[s] a disproportionate burden upon" "First Amendment activities." *TikTok*, 145 S. Ct. at 65; *Arcara v. Cloud Books*, 478 U.S. 697, 704 (1986). The Act does neither. It directly regulates commercial activity without "singl[ing] out" any expression. *Arcara*, 478 U.S. at 705.

### A.    The Act directly regulates commercial activity, not speech.

There is no disputing that the Act does not directly regulate expression. It limits covered platforms only from "contract[ing] with a child" younger than 16 without parental consent. Ohio Rev. Code § 1349.09(B)(1). That directly regulates a commercial transaction.

Social-media platforms require their users to enter complex contracts that shield the platforms from liability, allow the platforms to profit from users' online activity, and guarantee the platforms access to vast amounts of users' sensitive personal data. Snap, for instance, requires users—including children—to "form a legally binding contract" with it.[38] That contract requires children to (1) authorize Snap to "collect" and "obtain" personal information "about [them],"[39] including their "activity" on other "websites and platforms," data stored on their mobile "device,"

---

[38]    *Snap Inc. Terms of Service*, Snap (Apr. 7, 2025), https://www.snap.com/terms.

[39]    *Id.*

and their "location information"[40]; (2) "grant Snap and [its] affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute [their content], including the name, image, likeness, or voice of anyone featured in it"[41]; (3) acknowledge that they "may be exposed to content that might be offensive, illegal, misleading, or otherwise inappropriate" and release Snap from all warranties and liability "to the extent permitted by law"[42]; (4) limit Snap's "aggregate liability" to "the greater of $100 USD or the amount [the user] [has] paid" Snap in the past twelve months[43]; (5) submit any disputes to "binding individual arbitration" and waive all rights to participate in a "class action" or "jury trial"[44]; and (6) "consent to . . . personal jurisdiction" in Los Angeles.[45]

The Act directly regulates entering such contracts with children. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499 (1996) (distinguishing between "the State's power to regulate commercial transactions" and speech). The Ohio

---

[40] *Snapchat Ads Transparency*, Snap (Aug. 13, 2025), https://values.snap.com/privacy/ads-privacy.

[41] *Snap Inc. Terms of Service*, Snap (Apr. 7, 2025), https://www.snap.com/terms.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

Legislature determined that children below a certain age lack the capacity to weigh the risks and benefits necessary to decide for themselves whether to enter a contract that gives social-media platforms control over their sensitive personal data and allows the platforms to target them with addictive design features. That is a regulation of commercial activity, not speech. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part and in the judgment) ("[T]he State is free to impose any rational regulation on the commercial transaction itself.").

Contracts have been subject to State regulation—and even prohibition when deemed against public policy—throughout United States history. *See Ogden v. Saunders*, 25 U.S. 213, 347 (1827) (Marshall, C.J., dissenting) ("The [State's] right to regulate contracts, to prescribe rules by which they shall be evidenced, to prohibit such as may be deemed mischievous, is unquestionable, and has been universally exercised."). Corporations have never had a right to enter a "contract which the laws of th[e] community forbid, and the validity and effect of their contracts is what the existing laws give to them." *Id.* at 283 (opinion of Johnson, J.). That is especially true of contracts involving children, which have been heavily regulated and proscribed for centuries. *See* Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 264–71 (2005).

Because the Act directly regulates only contracting with children, this case is different from *Packingham v. North Carolina*, 582 U.S. 98 (2017). *See* Op. & Or.,

R.56, PageID#1328–29 (relying on *Packingham*). There, the Supreme Court applied heightened scrutiny to a law that made it a crime for a sex offender "to access" a social-media platform. *Packingham*, 582 U.S. at 101. That law was a direct regulation of speech—it made it a felony for a sex offender to post or read posts on social media. The Act does nothing of the sort. Children are free to speak and interact on social media. They can access any speech they want and post whatever they want. All the law does is limit platforms' ability to contract with them without parental consent. Platforms may prefer requiring children to enter complex contracts as a condition of access so they can collect their data and maximize revenue, but that preferred business model is not constitutionally protected.

### B.     The Act does not disproportionately burden any expression.

The Act does not impose a "disproportionate burden upon" expression either. *TikTok*, 145 S. Ct. at 65 (quoting *Arcara*, 478 U.S. at 704). It at most only "incidental[ly] burdens" speech. *Sorrell v. IMS Health*, 564 U.S. 552, 566–67 (2011) (heightened scrutiny applies to laws regulating commercial activity if their "purpose" is to "suppress speech"); *see also Indigo Room v. City of Fort Myers*, 710 F.3d 1294, 1299–1300 (11th Cir. 2013); *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002). Any burden on speech results solely from a platform's business decision to force children to enter complex contracts to access the platform's product.

Although the Supreme Court "has not articulated a clear framework for determining whether a regulation of non-expressive activity . . . disproportionately burdens" expression, it has identified some relevant factors. *TikTok*, 145 S. Ct. at 66. It matters whether the law's "focus" is preventing expression and whether there are "causal steps between the [law] and the alleged burden on protected speech." *See id*. If a law's focus is unrelated to expression, and any burden on speech arises only if other events occur—such as a business choosing to engage in "unlawful conduct"—then the law is not "directed at" expression and does not trigger heightened scrutiny. *Arcara*, 478 U.S. at 707; *TikTok*, 145 S. Ct. at 65.

*TikTok* and the Eleventh Circuit's decisions in *Indigo Room* and *Gary* are illustrative. In *TikTok*, TikTok and some of its users challenged a federal statute that required TikTok to either divest U.S. operations from Chinese control or effectively cease operating in the U.S. 145 S. Ct. at 62. Although the Court ultimately did not decide whether the statute imposed a disproportionate burden on expression, it declined to endorse the D.C. Circuit's conclusion that it did, because the statute was "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First Amendment scrutiny." *Id.* at 65. The law's "focus" was TikTok's corporate ownership, not users' speech. *Id.* at 66. And because TikTok would be banned only if it failed to divest, the failure to divest was a "causal step[]" between the law and the alleged burden on speech. *Id.*

In *Indigo Room* and *Gary*, the Eleventh Circuit held that laws prohibiting persons under 21 from entering alcohol-serving establishments do not disproportionately burden speech even if they have the effect of preventing young people from engaging in nude dancing or attending political rallies. *Indigo Room*, 710 F.3d at 1299–1300; *Gary*, 311 F.3d at 1340. Those laws did not implicate the First Amendment because they were focused on exposure to alcohol, not expression, and there were causal steps between the laws and the burden on expression—the speech forums' decisions to serve alcohol.

On the flip side, if a law regulating commercial activity on its face singles out speech and has the effect of burdening it with no intervening causal steps, it more likely imposes a disproportionate burden on expression. For example, in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, the Supreme Court held that a tax on the use of paper and ink that was crafted to apply to only "a few of the largest newspapers" in the state triggered First Amendment scrutiny. 460 U.S. 575, 592 (1983). Even though taxing paper and ink is not a direct regulation of expression, it was apparent that the regulation was focused on expression. *Id.* at 585. The gerrymandered nature of the tax, which was "without parallel in [Minnesota's] tax scheme," was not "justified by some special characteristic of the press" and thus applied to certain newspapers just because they were newspapers. *Id.* at 582, 585.

The Act, like the laws in *TikTok*, *Indigo Room*, and *Gary*, does not disproportionately burden expression. First, its focus is not speech but platforms' use of contracts that children lack the capacity to understand and evaluate. If two social-media platforms were identical in all respects except that one required users to enter contracts and the other did not, the Act would impose no restrictions on the latter even though both platforms provide the same speech to children. So just like the law in *TikTok* "focus[ed]" on TikTok's corporate control by "a foreign government," 145 S. Ct. at 66, and the laws in *Gary* and *Indigo Room* focused on exposure to alcohol, HB3 focuses on a particular business practice.

Second, there are "causal steps between [the Act] and the alleged burden on protected speech." *Id.* The alleged burden here, as in *TikTok*, is that users will not be able to speak and access speech on covered platforms. But in both cases, any limit on access results from the platforms' chosen business practices, not the law. Because the law in *TikTok* barred access only if TikTok chose not to divest from Chinese control, the failure to divest was a "causal step" between the law and the alleged burden on expression. *Id.* Similarly, a child will be prevented from accessing a platform under the Act only if the platform chooses to condition access on users' contracting for an account and the child's parent does not consent to the child entering the contract. Platforms are thus "punished" for their "nonexpressive

*conduct*"—contracting with kids—"not [their or their users'] speech." *Virginia v. Hicks*, 539 U.S. 113, 123 (2003).

All that makes the Act "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First Amendment scrutiny." *TikTok*, 145 S. Ct. at 66. The Act is not "directed at" any expression. *Arcara*, 478 U.S. at 707. Instead, it is directed at a problem as old as time: Children, who "lack[] reason and judgment," being taken advantage of by sophisticated parties that seek to exploit them for financial gain. *NRA*, 133 F.4th at 1117.

## III. IN ANY EVENT, NETCHOICE LACKS PRUDENTIAL STANDING TO ASSERT CHILDREN'S FIRST AMENDMENT RIGHTS.

NetChoice—a trade association that has nothing to do with social-media users—does not have prudential standing to assert the rights of children. *See* Op. & Or., R.56, PageID#1339 (relying on "minors' rights" in enjoining the Act). NetChoice is already relying on a different prudential-standing exception—associational standing. *See* Op. & Or., R.56, PageID#1316. In also invoking third-party standing, NetChoice asks this Court to bless what the Third Circuit has dubbed "derivative standing," where an association uses associational standing to satisfy Article III and then invokes third-party standing to assert the rights of nonmembers with whom only its members have a relationship. *See Pa. Psychiatric Soc. v. Green Spring Health Servs.*, 280 F.3d 278, 291–93 (3d Cir. 2002). This Court should reject that invitation.

An association cannot string together associational and third-party standing to assert the rights of parties who are multiple "steps removed" from the association. *Id.* at 294–95 (Nygaard, J., dissenting); *see also Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1013 (6th Cir. 2006) (McKeague, J., concurring); Init. Br. 19–20. Associational standing is a vehicle only for enforcing "the rights of . . . members." *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 539 (6th Cir. 2021). It is a "strand" of "representational standing" that allows an association to enforce the rights of members—even though they are "absent third parties"—because the association has a "particular," "recognized" "relationship[]" with them. *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 557 (1996). Given the close relationship between an association and its members, the "concrete adverseness" that federal courts require is presumed when an association brings a claim "on behalf of its directly affected members." *UAW v. Brock*, 477 U.S. 274, 289 (1986) (citation omitted). That presumption stretches to its breaking point when an association seeks to represent members who would, in turn, be representing the interests of nonmembers—here, child social-media users—if they sued. *Cf. Ass'n of Am. Physicians*, 13 F.4th at 538 (explaining that allowing associations to assert even *members'* rights raises Article III concerns under the Supreme Court's recent precedent); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 400 (2024) (Thomas, J., concurring) (agreeing with *Ass'n of Am. Physicians*).

If NetChoice can string together two prudential-standing exceptions to assert the rights of persons with whom it concededly has no relationship, there would be no logical stopping point. A plaintiff could assert the rights of persons three, four, or five steps removed as long as it could stack enough prudential-standing exceptions to get there. Allowing plaintiffs to game prudential standing like that would flip the doctrine on its head.

## CONCLUSION

This Court should reverse.


August 26, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

*/s/ Kevin A. Golembiewski*
JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 414-2672 (fax)
kevin.golembiewski@
  myfloridalegal.com

*Counsel for Amici Curiae*

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
*Attorney General of Alabama*

TREG TAYLOR
*Attorney General of Alaska*

KRIS MAYES
*Attorney General of Arizona*

TIM GRIFFIN
*Attorney General of Arkansas*

PHILIP J. WEISER
*Attorney General of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*

KATHLEEN JENNINGS
*Attorney General of Delaware*

BRIAN L. SCHWALB
*Attorney General for the District of Columbia*

CHRIS CARR
*Attorney General of Georgia*

ANNE E. LOPEZ
*Attorney General of Hawaii*

RAUL R. LABRADOR
*Attorney General of Idaho*

THEODORE E. ROKITA
*Attorney General of Indiana*

BRENNA BIRD
*Attorney General of Iowa*

KRIS W. KOBACH
*Attorney General of Kansas*

RUSSELL COLEMAN
*Attorney General of Kentucky*

LIZ MURRILL
*Attorney General of Louisiana*

AARON M. FREY
*Attorney General of Maine*

DANA NESSEL
*Attorney General of Michigan*

KEITH ELLISON
*Attorney General of Minnesota*

MICHAEL T. HILGERS
*Attorney General of Nebraska*

AARON D. FORD
*Attorney General of Nevada*

DREW H. WRIGLEY
*Attorney General of North Dakota*

GENTNER DRUMMOND
*Attorney General of Oklahoma*

DAN RAYFIELD
*Attorney General of Oregon*

MARTY JACKLEY
*Attorney General of South Dakota*

KEN PAXTON
*Attorney General of Texas*

STANFORD PURSER
*Utah Solicitor General*

CHARITY R. CLARK
*Attorney General of Vermont*

JASON S. MIYARES
*Attorney General of Virginia*

JOHN B. MCCUSKEY
*Attorney General of West Virginia*

KEITH G. KAUTZ
*Attorney General of Wyoming*

# CERTIFICATE OF COMPLIANCE

1.      This amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b), it contains 4,494 words.

2.      This amicus brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29 and 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font using Microsoft Word.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on August 26, 2025, I electronically filed this amicus brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ Kevin A. Golembiewski
Senior Deputy Solicitor General