# In the United States Court of Appeals for the Sixth Circuit

NetChoice, LLC,
*Plaintiff-Appellee,*

v.

Dave Yost,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Ohio, No. 2:24-cv-00047

## APPELLEE NETCHOICE'S BRIEF

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Counsel for Plaintiff-Appellee NetChoice

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

NetChoice makes the following disclosure under Sixth Circuit Rule 26.1:

**1. Is NetChoice a subsidiary or affiliate of a publicly owned corporation?**

No. NetChoice is a nonprofit trade association organized under the laws of the District of Columbia.

**2. Is there a publicly owned corporation, not a party to the appeal or an amicus, that has a financial interest in the outcome?**

None known.

/s/ *Scott A. Keller*
Scott A. Keller
*Counsel of Record for Plaintiff-Appellee*
*NetChoice*

# TABLE OF CONTENTS

Table of Authorities ............................................................. v

Statement in Support of Oral Argument ........................................ xii

Introduction .................................................................... 1

Statement of Issues ............................................................. 3

Statement of the Case ........................................................... 4

    A.  Factual background ....................................................... 4

        1.  NetChoice members' websites curate, disseminate, and enable vast amounts of speech protected by the First Amendment. ............................................................ 4

        2.  Parents already have many tools to oversee how their children use the internet. .......................................... 5

    B.  Ohio's Parental Notification by Social Media Operators Act (2023) ............................................................ 7

        1.  The Act's vague and broad coverage provisions discriminate based on content and speaker. .......................... 7

        2.  The Act requires covered websites to deny "access" to minors younger than 16 unless they obtain parental consent. ................................................................ 9

        3.  The Act imposes large daily penalties based on minors' access to covered websites. ...................................... 11

    C.  Procedural History ...................................................... 12

Summary of the Argument ........................................................ 15

Argument ........................................................................ 19

  I.  NetChoice has standing to raise the First Amendment rights and interests of both its regulated member websites and their users. .................................................................. 19

    A.  NetChoice has associational standing to challenge the Act's speech restrictions on behalf of its covered member websites, and Defendant does not contest this. ..................... 20

B. NetChoice also has prudential standing to raise the First Amendment rights of social media website users when challenging laws restricting users' access to protected speech. ...............................................................25

II. The Act's parental-consent requirement for minors to create accounts for accessing speech on covered websites is facially unconstitutional. ........................................................................29

A. The Act's parental-consent requirement restricts accessing and disseminating protected speech in all of its applications........................................................................29

1. The Act's parental-consent requirement for minors to create accounts to access speech infringes websites' and users' First Amendment rights. .......................................29

2. This Act restricts speech by requiring parental consent to create accounts for engaging in protected speech, so it is not merely a regulation of unprotected "contracts" and rational-basis review does not apply. .............................33

B. The Act's parental-consent requirement triggers strict scrutiny in all of its applications. ....................................................41

C. The Act's parental-consent requirement fails strict scrutiny or any form of heightened First Amendment scrutiny............................................................................52

1. Defendant's stated governmental interests cannot support the Act's parental-consent requirement for minors to access fully protected speech. .................................53

2. The Act's parental-consent requirement is improperly tailored for any interest Defendant asserts. ...........................56

a. The Act is not properly tailored to further any interest the government might assert. .............................57

b. The Act has further tailoring flaws for each of Defendant's asserted governmental interests.................60

D.   The district court properly declared the Act facially unconstitutional. ...............................................................65

III.  The district court correctly concluded that the Act's central "operator" coverage provisions are unconstitutionally vague. ....................................................................................71

IV.  The district court correctly permanently enjoined Defendant's enforcement of the Act's parental-consent requirement. ..........................................................................73

Conclusion.............................................................................................76

Certificate of Compliance ..................................................................77

Certificate of Service ..........................................................................78

Designation of District Court Record.................................................79

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023)......................................................................38

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021)......................................................................74

*Am. Amusement Mach. Ass'n v. Kendrick,*
  244 F.3d 572 (7th Cir. 2001).......................................................30

*Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n,*
  389 F.3d 536 (6th Cir. 2004).............................................20, 21, 22

*Amato v. Wilentz,*
  952 F.2d 742 (3d Cir. 1991).....................................................27, 28

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021)....................................................52, 57, 67, 70

*Barr v. Am. Ass'n of Pol. Consultants,*
  591 U.S. 610 (2020)........................................................43, 46, 47

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001)......................................................................72

*Belle Maer Harbor v. Charter Twp. of Harrison,*
  170 F.3d 553 (6th Cir. 1999).......................................................71

*Blick v. Ann Arbor Pub. Sch. Dist.,*
  105 F.4th 868 (6th Cir. 2024).....................................................35

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)
  ......................2, 15-16, 24, 29, 31, 33, 35, 37, 40-41, 51, 53-56, 58, 60, 62-64, 71

*Brown v. Yost*,
  133 F.4th 725 (6th Cir. 2025)........................................25, 31, 47, 56

*Burson v. Freeman*,
  504 U.S. 191 (1992)....................................................................54

*Byrd v. Tenn. Wine & Spirits Retailers Ass'n*,
  883 F.3d 608 (6th Cir. 2018)......................................................45

*Charlton-Perkins v. Univ. of Cincinnati*,
  35 F.4th 1053 (6th Cir. 2022).....................................................29

*Citizens United v. FEC*,
  558 U.S. 310 (2010)....................................................................30

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022).............................................................44, 48, 49

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993)....................................................................43

*City of Houston v. Hill*,
  482 U.S. 451 (1987)....................................................................73

*City of L.A. v. Patel*,
  576 U.S. 409 (2015)....................................................................69

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
  747 F. Supp. 3d 1011 (W.D. Tex. 2024).............................1, 20, 25, 43, 44, 70

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
  2025 WL 1570007 (N.D. Fla. June 3, 2025)................1, 16, 20, 25, 32, 34, 57

*Connection Distrib. Co. v. Reno*,
  154 F.3d 281 (6th Cir. 1998)......................................................75

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*,
  274 F.3d 377 (6th Cir. 2001)................................................21, 74

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)................................................................19

*Elk Grove Unified Sch. Dist. v. Newdow*,
  542 U.S. 1 (2004)..............................................................27, 28

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)...............................................................71

*FEC v. Cruz*,
  596 U.S. 289 (2022)......................................................53, 68, 69

*Fischer v. Thomas*,
  52 F.4th 303 (6th Cir. 2022).....................................................73

*Free Speech Coalition, Inc. v. Paxton*,
  145 S. Ct. 2291 (2025)............................................33, 34, 50, 51, 52

*Hayward v. Cleveland Clinic Found.*,
  759 F.3d 601 (6th Cir. 2014).................................................65, 68

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)...............................................................22

*Int'l Outdoor, Inc. v. City of Troy*,
  974 F.3d 690 (6th Cir. 2020).....................................................19

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
  329 F.3d 954 (8th Cir. 2003).....................................................30

*Keene Grp., Inc. v. City of Cincinnati,*
  998 F.3d 306 (6th Cir. 2021)..............................................22

*Kentucky v. Yellen,*
  54 F.4th 325 (6th Cir. 2022)..............................................21

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004)........................................................26

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)........................................................21

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
  460 U.S. 575 (1983)........................................................36

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024)................................... 4, 5, 65, 66, 67, 68, 69, 70

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024)........................................................35

*Nat'l Rifle Ass'n v. Bondi,*
  133 F.4th 1108 (11th Cir. 2025)..........................................40

*Neighborhood Action Coal. v. City of Canton,*
  882 F.2d 1012 (6th Cir. 1989)............................................22

*NetChoice v. Carr,*
  2025 WL 1768621 (N.D. Ga. June 26, 2025)
  ........................... 1, 16, 20, 25, 32, 34, 35, 37, 43, 44, 57, 62

*NetChoice, L.L.C. v. Fitch,*
  134 F.4th 799 (5th Cir. 2025)......................................3, 20, 25, 26, 28

*NetChoice, LLC v. Bonta,*
  113 F.4th 1101 (9th Cir. 2024)...........................................57

*NetChoice, LLC v. Bonta*,
  2025 WL 2600007 (9th Cir. Sept. 9, 2025) .................................................44, 45

*NetChoice, LLC v. Bonta*,
  770 F. Supp. 3d 1164 (N.D. Cal. 2025) .......................................................1, 42

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............... 20, 25, 26, 28, 62, 63

*NetChoice, LLC v. Griffin*,
  2025 WL 978607 (W.D. Ark. Mar. 31, 2025).....................1, 32, 43, 44, 57, 67

*NetChoice, LLC v. Reyes*,
  748 F. Supp. 3d 1105 (D. Utah 2024)............................................1, 20, 32, 42

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................................74

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)...................................... 2, 5, 7, 32, 33, 47, 53, 58, 65, 71, 76

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).................................................................41, 42, 43, 44

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020).................................................................................74

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)................................................................................72

*Sable Commc'ns of Cal., Inc. v. FCC*,
  492 U.S. 115 (1989)................................................................................66

*Suster v. Marshall*,
  149 F.3d 523 (6th Cir. 1998)...................................................................41

*Thomas v. Bright*,
  937 F.3d 721 (6th Cir. 2019)...................................................................43

*TikTok Inc. v. Garland,*
  604 U.S. 56 (2025)......................................................................51, 52

*Tipp City v. Dakin,*
  929 N.E.2d 484 (Ohio Ct. App. 2010)..........................................45

*Turner Broadcast Systems, Inc. v. FCC,*
  512 U.S. 622 (1994).........................................................................50

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
  517 U.S. 544 (1996).........................................................................21

*United States v. Edge Broad. Co.,*
  509 U.S. 418 (1993).........................................................................59

*United States v. Lierman,*
  2025 WL 2371034 (4th Cir. Aug. 15, 2025) ..................................69

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000)...................................................................57, 58

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976).........................................................................24

*Van Buren v. United States,*
  593 U.S. 374 (2021).........................................................................38

*Video Software Dealers Ass'n v. Schwarzenegger,*
  2007 WL 2261546 (N.D. Cal. Aug. 6, 2007) ................................24

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988)................................................15, 25, 28, 60

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989).........................................................................59

*Warth v. Seldin,*
  422 U.S. 490 (1975).........................................................................25

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024)......................................................................67, 68

**Statutes and Rules**

Fed. R. Civ. P. 56.............................................................................................19

Ohio Rev. Stat. § 1349.09
  ................................ 1-3, 7-12, 16-17, 30, 36, 39, 43-46, 48, 61, 63-64, 66, 71-72

Ohio Rev. Stat. § 3109.01 ...................................................................................39

**Other Authorities**

Bluesky, Our Response to Mississippi's Age Assurance Law,
  Bluesky Blog (Aug. 22, 2025), https://perma.cc/6FGB-JYFF ......................75

Denise, Mississippi Site Block, Plus a Small Restriction on
  Tennessee New Accounts, Dreamwidth (August 31, 2025),
  https://perma.cc/E8V9-3L28 ...........................................................................75

Nextdoor, Member Agreement, https://perma.cc/E53P-TAHD ...................75

Restatement (Second) of Contracts § 14 (1981) .................................................39

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Although the district court correctly granted summary judgment to Plaintiff NetChoice, NetChoice agrees with Defendant that the important First Amendment issues in this case warrant oral argument.

Ohio's Parental Notification by Social Media Operators Act ("Act"), § 1349.09, violates the First Amendment and Due Process Clause.[1] So the district court correctly granted NetChoice summary judgment, declaring facially unconstitutional the Act's parental-consent requirement for minors to create accounts on "social media" websites. This decision joined courts nationwide that have preliminarily or permanently enjoined enforcement of similar laws. *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

The First Amendment protects minors' "right to speak or be spoken to," and governments lack the "power to prevent children from hearing or

---

[1] All statutory citations are to the Ohio Revised Code. This Brief refers to any "online web site, service, or product," § 1349.09(A)(1), as a "website."

saying anything *without their parents' prior consent.*" *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Every court that has resolved whether similar laws violate the First Amendment on the merits has concluded that States cannot require minors to secure parental consent before accessing some of "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

Ohio's parental-consent requirement is no different. Defendant fails to grapple with *Brown*'s holding or minors' First Amendment rights. And the district court correctly rejected Defendant's argument that the Act's command to "*deny* the [minor] *access* to or *use of* the" covered website without parental consent does not regulate speech and instead regulates contracts. § 1349.09(E) (emphases added).

NetChoice also indisputably has standing. Defendant does not question NetChoice's associational standing to assert its regulated member websites' rights, which suffices to support the district court's judgment. Defendant argues only that NetChoice cannot raise the interests of its member websites'

minor users. But NetChoice has "prudential standing" to raise its members' "users' First Amendment rights." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 805-07 (5th Cir. 2025).

The district court's judgment should be affirmed.

## STATEMENT OF ISSUES

1. Whether NetChoice's associational standing to challenge the Act also allows NetChoice to assert the interests of its member websites' users.

2. Whether the Act's parental-consent requirement for minors younger than 16 to access and engage in protected speech online violates the First Amendment.

3. Whether the Act's definition of regulated "operators" is unconstitutionally vague, because it relies on a non-exhaustive 11-factor test and subjective exclusions—like "established and widely recognized media outlet[s]." § 1349.09(O).

## STATEMENT OF THE CASE

### A. Factual background

> **1. NetChoice members' websites curate, disseminate, and enable vast amounts of speech protected by the First Amendment.**

NetChoice is a leading internet trade association. Szabo Decl., R.2-1, Page ID ## 64-65. This Act regulates some websites operated by NetChoice members: (1) Dreamwidth; (2) Facebook; (3) Instagram; (4) Nextdoor; (5) Pinterest; (6) X; and (7) YouTube. Szabo Decl., R.2-1, Page ID # 71; Paolucci Decl., R. 2-2, Page ID ## 75-76, 78.[2]

The Act regulates NetChoice members, and other covered websites, based on their shared speech-facilitating functions. It targets websites that "allow users to upload content . . . to share [it] with others," where those "viewing the content can" "react to it, comment on it, or share it themselves." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). Each of these websites also "engage[s] in expression" by "curat[ing]" and "display[ing]" protected

---

[2] Since summary-judgment briefing, new members have joined NetChoice that likely also have covered websites. These new members do not affect the facial First Amendment analysis.

"third-party speech" in "distinctive expressive offering[s]," according to their respective "community guidelines." *Id.* at 710-11, 716-17.

As a result, covered websites "allow[] users to gain access to information and communicate with one another." *Packingham*, 582 U.S. at 107. They disseminate "staggering" amounts of speech across "billions" of "posts" that is protected for both adults and minors. *Moody*, 603 U.S. at 719, 734.

## 2. Parents already have many tools to oversee how their children use the internet.

"Defendant concedes that 'parents have certain parental-control options for overseeing how their minor children use the internet.'" MSJ Order, R.56, Page ID # 1343.

The undisputed evidence demonstrates that parents have numerous overlapping and complementary tools to oversee their minor children online. Szabo Decl., R.2-1, Page ID ## 67-70. At the threshold, parents can control what *devices* minors can access—and when. Szabo Decl., R.2-1, Page ID ## 67-68. Not all devices are internet-enabled, so not all of them allow minors to access covered websites. Szabo Decl., R.2-1, Page ID ## 67-68.

For parents that allow their minor children to use internet-enabled devices, those devices themselves come with built-in parental-control options. Szabo Decl., R.2-1, Page ID ## 68-69. Using those tools, parents can lock or limit apps and features, limit content, limit access to only approved websites, and set overall or time-of-day usage limits. Szabo Decl., R.2-1, Page ID ## 68-69.

Parents also have control over the *networks* that minors use. Szabo Decl., R.2-1, Page ID # 68. Wireless routers allow parents to manage which network minors can connect to. Szabo Decl., R.2-1, Page ID # 68. They also allow parents to limit which websites minors can use and when. Szabo Decl., R.2-1, Page ID # 68. Many internet service providers offer similar tools. Szabo Decl., R.2-1, Page ID # 68.

Parents can also control *software*. Szabo Decl., R.2-1, Page ID ## 68-70. Many web browsers offer parental controls. Szabo Decl., R.2-1, Page ID # 69. Third-party parental control software is also available for many devices. Szabo Decl., R.2-1, Page ID # 69.

Many NetChoice members have developed their own suite of parental controls and other protections for minors. Szabo Decl., R.2-1, Page ID ## 69-70. These controls supplement the resources that members spend crafting and enforcing "content-moderation" policies that aim to prevent harmful or objectionable speech from reaching users. Szabo Decl., R.2-1, Page ID # 67.

## B. Ohio's Parental Notification by Social Media Operators Act (2023)

### 1. The Act's vague and broad coverage provisions discriminate based on content and speaker.

The Act uses content-based provisions to target a subset of websites that "allow[]" their users to "[i]nteract socially" and "[c]reate or post content viewable by others." § 1349.09(A)(1). These are the kinds of websites that people have a First Amendment right to "access." *Packingham*, 582 U.S. at 107.

Specifically, the Act regulates "operator[s]," which are any "business, entity, or person that operates" any "web site" that has "users in [Ohio]" and that "allows those users to do all of the following":

> (a) Interact socially with other users within the confines of the [website];
>
> (b) Construct a public or semipublic profile for the purpose of signing into and using the [website];
>
> (c) Populate a list of other users with whom an individual shares or has the ability to share a social connection within the [website];
>
> (d) Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

§ 1349.09(A)(1).

Within those kinds of websites, the Act further singles out "operator[s]" that "target[]" or are "reasonably anticipated to be accessed by" minors younger than 16. § 1349.09(B). The Act creates a non-exhaustive, 11-factor analysis for determining whether a website meets this vague standard:

> (1) Subject matter; (2) Language; (3) Design elements; (4) Visual content; (5) Use of animated characters or child-oriented activities and incentives; (6) Music or other audio content; (7) Age of models; (8) Presence of child celebrities or celebrities who appeal to children; (9) Advertisements; (10) Empirical evidence

regarding audience composition; and (11) Evidence regarding the intended audience.

§ 1349.09(C).

In addition, the Act "does not apply" to any website where "interaction between users is limited to the following" content-based categories:

(1) Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; [or]

(2) Comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events.

§ 1349.09(O).

**2. The Act requires covered websites to deny "access" to minors younger than 16 unless they obtain parental consent.**

The Act requires covered websites to obtain parental consent before allowing minors younger than 16 to "use" or "access" covered websites. § 1349.09(E).

Covered websites must "[o]btain verifiable consent for any contract with a child ['under the age of sixteen'], including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the [website]." § 1349.09(A)(2), (B)(1). The Act provides five means of providing consent. § 1349.09(B).

9

If "a child's parent or legal guardian does not affirmatively consent to the terms of service or other contract, the operator *shall deny* the child *access* to or *use of* the [website]." § 1349.09(E) (emphases added).

The Act designates a broad range of actions as "contract[s]"—"including" things like "register[ing]," "sign[ing] up," and "creat[ing] a unique username." § 1349.09(B)(1). Such actions are often necessary to access some or all of the fully protected speech and speech-facilitating functions on covered websites. *E.g.*, Szabo Decl., R.2-1, Page ID ## 71-72; Paolucci Decl., R.2-2, Page ID ## 82-83, 86. For instance, users often need accounts or usernames to post content on the service. *E.g.*, Szabo Decl., R.2-1, Page ID # 71.

In connection with securing parental consent, covered websites also must "[p]resent to the child's parent or legal guardian a list of the features offered by [the website] related to censoring or moderating content," and "[p]rovide to the child's parent or guardian a web site link at which the parent or legal guardian may access and review th[is] list of features." § 1349.09(B)(2)-(3). The parties and the district court treated these disclosure

provisions as inherently part of the Act's parental-consent requirement. *E.g.,*

NetChoice MSJ, R.43, Page ID # 635.[3]

### 3. The Act imposes large daily penalties based on minors' access to covered websites.

The Act imposes large daily penalties when covered websites allow minors access to the website "without consent." § 1349.09(I).

Specifically, a "court shall impose a civil penalty on the operator as follows": (1) "Up to one thousand dollars for each of the first sixty days the operator failed to comply with this section"; (2) "up to five thousand dollars for each subsequent day the operator failed to comply with this section . . . [through] the ninetieth day"; and (3) "up to ten thousand dollars for each subsequent day the operator failed to comply with this section, commencing with the ninety-first day." *Id.*

The Act also provides a purported "safe harbor," which only applies if the website complies with the Act's unconstitutional restriction. If a covered

---

[3] Defendant's summary judgment briefing did not even cite Sections 1349.09(B)(2)-(3).

website is in "substantial compliance," then Defendant "shall not commence a civil action" if the website "[c]ures the violation" and "[p]rovides the attorney general with written documentation that . . . the operator has taken measures sufficient to prevent future violations." § 1349.09(M).

## C. Procedural History

NetChoice sued Defendant for declaratory and injunctive relief on January 5, 2024. Complaint, R.1, Page ID ## 1-34. The same day, NetChoice moved for a temporary restraining order and preliminary injunction preventing Defendant's enforcement of the Act before the Act's January 15, 2024, effective date. PI/TRO Motion, R.2, Page ID ## 39-40.

After a January 8, 2024, conference, the district court granted NetChoice a temporary restraining order. TRO Order, R.27, Page ID # 168, 181. Following full briefing and a hearing, on February 12, 2024, the court granted NetChoice a preliminary injunction. PI Order, R.33, Page ID ## 332-60.

The parties agreed to forgo discovery, relying instead on the record developed in connection with the preliminary-injunction motion. Rule 26(f) Report, R.36, Page ID # 418. The summary-judgment record included: (1) a

declaration from NetChoice's general counsel; (2) two declarations from NetChoice-member services; (3) a declaration from the operator of another potentially regulated website; (4) 30 publicly available sources cited in NetChoice's declarations; (5) Defendant's two declarations; and (6) six reports offered by Defendant. *See* NetChoice MSJ, R.43, Page ID # 615; Defendant MSJ, R.42, Page ID # 432.

After the parties concluded summary-judgment briefing, NetChoice submitted four notices of supplemental authority. Those notices informed the district court about *Moody* and other courts' application of *Moody*'s facial-challenge standard. Notice, R.49, Page ID ## 1075-76; Notice, R.50, Page ID ## 1176-77; Notice, R.51, Page ID ## 1219-20; Notice, R.52, Page ID ## 1253-54. Defendant did not respond to any of those notices. At a March 12, 2025, hearing, in a response to a question about whether the record was sufficient to analyze NetChoice's facial challenge, counsel for Defendant tentatively said: "It may not be, Your Honor." MSJ Hearing Transcript, R.63, Page ID # 1366; *contra* Br.13.

In a 49-page opinion, the district court granted NetChoice summary judgment on April 16, 2025. MSJ Order, R.56, Page ID ## 1300-48. The district court first ruled that NetChoice has both associational standing for Article III jurisdiction *and* prudential standing to "raise the First Amendment interests of its members' minor users." MSJ Order, R.56, Page ID ## 1315-26; *contra* Br.19 (suggesting NetChoice's standing relies solely on the rights of users).

Then, the district court concluded that the Act's parental-consent requirement is facially unconstitutional under the First Amendment. MSJ Order, R.56, Page ID ## 1326-44. The district court rejected Defendant's core argument that the Act regulates mere contracts and not protected speech. MSJ Order, R.56, Page ID ## 1329-32. This decision applied *Moody*'s two-step First Amendment facial-challenge standard. MSJ Order, R.56, Page ID ## 1309-10, 1326-28. Finally, the district court concluded that the Act's central "operator" coverage definition is unconstitutionally vague. MSJ Order, R.56, Page ID ## 1309-10, 1344-46.

## Summary of the Argument

**I.** NetChoice has Article III associational standing to raise its member websites' rights *and* prudential standing to raise the interests of members' users.

**A.** NetChoice's unquestioned associational standing to challenge the Act is sufficient to support the district court's judgment.

**B.** NetChoice also has prudential standing to raise the interests of its members' users, as multiple courts have held. Under binding Supreme Court precedent, speech disseminators (like covered websites) can raise the First Amendment interests of their viewers (like website users). *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).

**II.** The Act's parental-consent requirements violate the First Amendment.

**A.** "[M]inors" have the "right to speak or be spoken to," and governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. This Act violates that right by preventing covered websites from disseminating

protected speech to minors unless the minors first secure parental consent. So the Act's parental-consent requirement is virtually identical to other enjoined social media parental-consent requirements in other States.

Defendant's argument that the Act regulates mere contracts and not speech was correctly rejected by the district court—just as it has been correctly rejected by other courts. *See Carr*, 2025 WL 1768621, at *11; *Uthmeier*, 2025 WL 1570007, at *11.

**B.** The Act's parental-consent requirement triggers strict scrutiny for the additional reason that the Act's central "operator" coverage definition is content-based on multiple grounds. The Act both includes websites for regulation based on a content-based 11-factor test and excludes websites on content-based grounds, such as "established and widely recognized media outlet[s]." § 1349.09(O).

**C.** The Act's parental-consent requirement does not satisfy even intermediate First Amendment scrutiny—let alone strict scrutiny. The government lacks a sufficient interest in requiring minors to obtain parental consent before accessing protected speech. *Brown*, 564 U.S. at 802. And there

is no evidence in the record that justifies the Act's breadth or the burdens it imposes on minors' access to the vast amount of fully protected speech on regulated websites. This is especially true given the array of tools already available for parents to oversee their children online.

**III.** The Act's central "operator" definition is unconstitutionally vague. The Act applies to websites that "target[] children, or [are] reasonably anticipated to be accessed by children." § 1349.09(B). To make that determination, the Act imposes a non-exhaustive, 11-factor test with broad considerations such as "[d]esign elements" and "[l]anguage." § 1349.09(C). Other vague terms feature prominently in the Act's content-based exceptions—such as what it means for a website to qualify as a "widely recognized media outlet," § 1349.09(O)(2), or allowing their users to "[i]nteract socially," § 1349.09(A)(1)(a).

**IV.** The district court correctly permanently enjoined Defendant's enforcement of the Act. If left enforceable, the Act and its escalating daily penalties would cause websites to stop disseminating protected speech to minors in Ohio—as some websites have done in other States when similar

laws were not enjoined. It is in the public interest to prevent the balkanization of the internet and secure First Amendment rights to disseminate and access fully protected speech.

NetChoice is entitled to summary judgment: "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).

In addition, NetChoice is entitled to a permanent injunction because: (1) its members and their users would suffer "irreparable injury" without an injunction; (2) "remedies available at law . . . are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## I. NetChoice has standing to raise the First Amendment rights and interests of both its regulated member websites and their users.

The district court correctly concluded that NetChoice has (A) Article III associational standing to challenge the Act on behalf of its regulated members; *and* (B) prudential standing to raise the First Amendment interests of members' websites' minor users. *See* MSJ Order, R.56, Page ID ## 1315-26.

Defendant does not contest the former, which independently suffices to support the judgment. Defendant contests only the latter, but NetChoice has prudential standing to raise users' First Amendment interests under binding Supreme Court precedent.

**A. NetChoice has associational standing to challenge the Act's speech restrictions on behalf of its covered member websites, and Defendant does not contest this.**

**1.** NetChoice has uncontested "associational" standing "to sue on behalf of its members" in this facial challenge. MSJ Order, R.56, Page ID ## 1312-17. Other courts nationwide have unanimously held the same. *See Fitch*, 134 F.4th at 804-05; *Carr*, 2025 WL 1768621, at *4-6; *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *Paxton*, 747 F. Supp. 3d at 1029-31; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *10 (W.D. Ark. Aug. 31, 2023) ("*Griffin I*").

NetChoice's: "[1] members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to [NetChoice's] purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Canoe Ass'n v. City*

*of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004) (citation omitted). The first two prongs of this analysis are jurisdictional, and the third is "prudential." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546, 555 (1996) (citation omitted).

First, NetChoice's "members would otherwise have standing to sue in their own right." *Am. Canoe*, 389 F.3d at 540 (citation omitted). Regulated parties have standing to challenge laws that regulate them. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, there is no dispute that multiple NetChoice members operate websites regulated by the Act. *E.g.*, Szabo Decl., R.2-1, Page ID # 71; Paolucci Decl., R.2-2, Page ID # 78.

NetChoice's members face two other injuries further qualifying as Article III injuries. "A mere threat to First Amendment interests is a legally cognizable injury." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 399 (6th Cir. 2001). Regulated members also would need to expend unrecoverable funds to comply with the Act. *E.g.*, Szabo Decl., R.2-1, Page ID ## 71-73; Paolucci Decl., R.2-2, Page ID ## 82-83, 86; *see Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022).

Second, challenging the Act's restrictions on the dissemination of online speech is "germane to [NetChoice's] purpose," *Am. Canoe*, 389 F.3d at 540 (citation omitted); of "preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas," Szabo Decl., R.2-1, Page ID # 64.

Third, as district court litigation demonstrated, "neither the claim asserted nor the relief requested require[d] the participation of individual members." *Am. Canoe*, 389 F.3d at 540 (citation omitted). By not raising this prudential issue "in his opening brief," Defendant has forfeited it. *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 317 (6th Cir. 2021).

Regardless, NetChoice's request for "declaratory and injunctive relief" does not "require[] individualized proof" from specific websites, so these claims are "properly resolved in a group context." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). "[S]eek[ing] injunctive relief" does "not require participation by the individual members." *Neighborhood Action Coal. v. City of Canton*, 882 F.2d 1012, 1017 (6th Cir. 1989).

**2.** NetChoice's associational standing to challenge the Act on behalf of its covered members' websites sufficiently supports the district court's judgment. "The Act violates the First Amendment rights of both NetChoice's covered members and those members' current and prospective users." Complaint, R.1, Page ID # 20. So NetChoice does not only "bring this case on behalf of Ohio's children," as Defendant claims. Br.4. Nor did the district court "largely ground[] its analysis in the First Amendment rights of children." Br.60.

The Act's parental-consent requirement imposes two interrelated First Amendment injuries for both websites and users: "(1) it regulates operators' ability to publish and distribute speech *to minors* and speech *by minors*; and (2) it regulates minors' ability to both *produce speech* and *receive speech*." MSJ Order, R.56, Page ID # 1329.

NetChoice can therefore challenge the Act's parental-consent requirement to vindicate both its members' dissemination of speech *and* users' ability to receive that speech. These are two sides of the same coin, as "the protection afforded is to the communication, to its source and to its

recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). So it is not necessary to conclude that NetChoice may assert the rights of members' users as a matter of prudential standing. *Contra* Amici States Br.19-21. Rather, NetChoice can raise the interests of those users when users and regulated websites have a shared interest in the protected "communication." *Va. State Bd. of Pharmacy*, 425 U.S. at 756.

That is why the Supreme Court's discussion in *Brown* is often framed in terms of minors' First Amendment rights, even though it was a case brought by "associations of companies in the video game industry." *Video Software Dealers Ass'n v. Schwarzenegger*, 2007 WL 2261546, at *1 (N.D. Cal. Aug. 6, 2007). As *Brown* explained, "only in relatively narrow and well-defined circumstances may government bar public *dissemination* of protected materials to minors." *Brown*, 564 U.S. at 802 (emphasis added) (cleaned up). And laws that impose parental-consent requirements bar such protected "dissemination" at the same time they violate minors' rights to receive this protected speech. *Id.* at 795 & n.3.

**B. NetChoice also has prudential standing to raise the First Amendment rights of social media website users when challenging laws restricting users' access to protected speech.**

**1.** In any event, NetChoice has prudential standing to assert the First Amendment interests of its members' users. MSJ Order, R.56, Page ID ## 1315-26. Multiple courts have recognized this as well. *See Fitch*, 134 F.4th at 805-07; *Carr*, 2025 WL 1768621, at *6-7; *Yost*, 716 F. Supp. 3d at 550-51; *Uthmeier*, 2025 WL 1570007, at *9; *Paxton*, 747 F. Supp. 3d at 1031; *Griffin I*, 2023 WL 5660155, at *10-12.

Parties have prudential "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510 (1975). Particularly in "the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Am. Booksellers*, 484 U.S. at 392-93 (cleaned up); *see Fitch*, 134 F.4th at 806 (Fifth Circuit quoting

same). The Supreme Court has held that the prudential-standing analysis is "quite forgiving . . . . [w]ithin the context of the First Amendment." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (cleaned up).

Here, this challenged Act targets the shared First Amendment interests of NetChoice members' and their users' rights to disseminate and access fully protected speech. As the Fifth Circuit held, "it is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least *when the violation of those rights adversely affects the platform*." *Fitch*, 134 F.4th at 807 (emphasis added). And the Western District of Arkansas ruled that "NetChoice—like the booksellers' association in the *Virginia* case—is in a unique position to advocate for the rights of Arkansas users and may appropriately do so[.]" *Griffin I*, 2023 WL 5660155, at *12.

**2.** No "conflicts" exist between regulated websites and their users seeking to disseminate and access fully protected speech in this First Amendment challenge. *Contra* Br.4, 15-16, 20-23, 54-55. Defendant contends that "social-media platforms impose lopsided contract terms on their users" and thus "NetChoice's interests conflict with children's interests." Br.22-23.

This claim is both incorrect and an improper attempt to inject merits issues into the standing analysis.

NetChoice members' and users' interests align in this First Amendment challenge about accessing and disseminating speech. The district court correctly concluded that "the relationship between the third party and Plaintiff 'only counts insofar as it is linked to the right asserted'—here, the right of minors to access social media platforms without obtaining parental consent." MSJ Order, R.56, Page ID # 1323 (emphasis omitted) (quoting *Amato v. Wilentz*, 952 F.2d 742, 752 (3d Cir. 1991)).

The central case Defendant cites is inapposite. *See* Br.21-23 (discussing *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004)). *Newdow* concerned "[o]ne of the principal areas in which [the Supreme] Court has customarily declined to intervene[:] . . . the realm of *domestic relations*." 542 U.S. at 12 (emphasis added). By that, the Court meant situations in which parents disagree about the upbringing of their children, where federal courts "strong[ly]" "defer[] to state law." *Id.* So one parent lacked prudential standing to assert the child's rights in a lawsuit where the parents' disagreements meant that

the "interests of the affected persons . . . are in many respects antagonistic"—and where a federal court weighing in on standing could intrude on the state's exclusive regulation of "domestic relations." *Id*. at 15-16. There are no such analogous conditions here.

Defendant also attempts to shift the inquiry to members' contractual terms of service when arguing that NetChoice members' interests are adverse to those of their users. But the prudential-standing analysis does not ask whether a litigant shares *all* interests with third parties. Rather, this analysis focuses on the nature of the claim asserted. *Amato*, 952 F.2d at 752. That is why bookstores are allowed to raise the First Amendment rights of their patrons to purchase books. *Am. Booksellers*, 484 U.S. at 392-93. It is also why vendors can raise the interests of their customers when a law targets their shared interest in a transaction. *See Fitch*, 134 F.4th at 807; *Griffin I*, 2023 WL 5660155, at *11-12. Those entities do not have prudential standing to raise their patrons' rights for *all* purposes. But where First Amendment interests overlap, a speaker has the right to raise its audience's interests.

Finally, Defendant's argument improperly conflates standing with the merits of the case. It is a "basic principle" that these two inquiries are "distinct analyses [that] must be conducted separately." *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058-59 (6th Cir. 2022). The standing question here is whether, assuming NetChoice is right about the First Amendment merits, its members can properly raise the rights of their minor users. NetChoice can, under longstanding precedent described above.

## II. The Act's parental-consent requirement for minors to create accounts for accessing speech on covered websites is facially unconstitutional.

The Act's parental-consent requirement for websites to disseminate fully protected speech to minors is facially unconstitutional under binding precedent. *Brown*, 564 U.S. at 795 n.3.

### A. The Act's parental-consent requirement restricts accessing and disseminating protected speech in all of its applications.

#### 1. The Act's parental-consent requirement for minors to create accounts to access speech infringes websites' and users' First Amendment rights.

The Act violates the First Amendment by requiring minors to secure parental consent before creating accounts to access the staggering amount of

protected speech on covered websites. § 1349.09(B); *see* MSJ Order, R.56, PageID ## 1339-40.

"Laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). Here, the Act's parental-consent requirement operates "at the outset." *Id.* To access some or all of the fully protected speech and speech-enabling functions on covered websites, users must create accounts or usernames. *See supra* p.10. Thus, restrictions on account creation operate as restrictions on threshold access to countless pieces of fully protected speech. The Act's parental-consent requirement is akin to the government requiring bookstores and video game arcades—and *only* similar companies dedicated to disseminating speech—to verify parental consent before allowing minors to engage in protected speech activities.[4]

---

[4] *See Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 956 (8th Cir. 2003) (rejecting parental-consent law for violent video games); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578-79 (7th Cir. 2001) (similar, for arcades).

The Supreme Court in *Brown* held that minors have the "right to speak or be spoken to," and governments lack "the power to prevent children from hearing or saying anything *without their parents' prior consent*." 564 U.S. at 795 n.3. *Brown* invalidated a law prohibiting the "sale or rental" of "violent video games" to minors (even though minors could possess and play the same video games "so long as one parent . . . says it's OK"). *Id.* at 789, 802. After all, "minors are entitled to a significant measure of First Amendment protection." *Id.* at 794 (cleaned up) (citation omitted). And although "a State possesses legitimate power to protect children from harm, [] that does not include a free-floating power to restrict the ideas to which children may be exposed.'" *Id.* at 794-95 (cleaned up)."[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Id.* at 794 (cleaned up). Conditioning minors' ability to receive protected speech on first securing parental consent is impermissible, whether that speech is "political rall[ies]," "religious" services, or content the State disfavors. *Id.* at 795 n.3.

Since *Brown*, every court that has considered similar online parental-consent requirements and reached the First Amendment merits has enjoined those laws' enforcement. A parental-consent law in Arkansas was permanently enjoined. *Griffin II*, 2025 WL 978607, at *8, *17. And similar requirements are preliminarily enjoined in Georgia, *Carr*, 2025 WL 1768621, at *13, *22; Florida, *Uthmeier*, 2025 WL 1570007, *15, *21; and Utah, *Reyes*, 748 F. Supp. 3d at 1126 & n.135, 1134. These injunctions have ensured that minors in those States can access protected online speech. And they recognize that "social media" websites can be a prime outlet for minors' fully protected speech, as these websites are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107.

Ohio's materially identical parental-consent requirement violates the First Amendment for the same reasons. It would impose an unconstitutional hurdle for minors to access protected speech and outright prohibit access for some minors. "Minors' access to information is essential to their growth into productive members of our democratic public sphere." MSJ Order, R.56,

Page ID # 1302. Yet under the Act, minors would need to secure parental consent before, *e.g.*, discussing their faith on Reddit, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos" on Facebook, looking for work around the neighborhood on Nextdoor, or learning how to solve math problems on YouTube. *Packingham*, 582 U.S. at 104.

Defendant therefore wrongly asserts that the Act's parental-consent restrictions will have "limited incidental effects." Br.38. This Act "direct[ly] target[s]" threshold access to a staggering amount of "fully protected speech." *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025) ("*FSC*"). Because the Act is designed to impede minors' access to speech that they have the First Amendment right to view and engage in, the Act must satisfy strict scrutiny. *Brown*, 564 U.S. at 795 n.3.

> **2. This Act restricts speech by requiring parental consent to create accounts for engaging in protected speech, so it is not merely a regulation of unprotected "contracts" and rational-basis review does not apply.**

Defendant claims that the Act does not trigger heightened First Amendment scrutiny and instead merely "regulat[es] children's ability to contract." Br.3; *see* Br.16-17, 28-39; Amici States Br.12-19. That both incorrectly

describes how the Act works and fails to evade heightened First Amendment scrutiny. So the district court correctly rejected this argument, as have other courts. MSJ Order, R.56, PageID ## 1329-32; *Carr*, 2025 WL 1768621, at *11; *Uthmeier*, 2025 WL 1570007, at *11. A "law prohibiting minors from contracting to access to a plethora of protected speech cannot be reduced to a regulation of commercial conduct." MSJ Order, R.56, PageID # 1332 (cleaned up). Besides, even if the Act's parental-consent requirement were construed as just a contract regulation, its enormous "incidental effect on protected speech, mak[es] it subject to intermediate scrutiny." *FSC*, 145 S. Ct. at 2306 (cleaned up).

**a.** The State cannot merely insert the word "contract" into a law restricting speech to evade First Amendment scrutiny. "Defendant does not cite any case in which the regulation of a contract made for the purpose of accessing speech was found to lie outside the ambit of the First Amendment." *Uthmeier*, 2025 WL 1570007, at *11; MSJ Order, R.56, PageID ## 1329-32.

In fact, "the notion that regulations of speech can withstand strict scrutiny when disguised as regulations of contract—even if those contracts are

34

being entered into by minors—has been rejected by the Supreme Court."
*Carr*, 2025 WL 1768621, at \*11 (citing *Brown*, 564 U.S. at 786). *Brown* invalidated a law facially regulating a commercial transaction: "the *sale* or *rental* of 'violent video games' to minors." 564 U.S. at 789 (emphases added). And it rejected the suggestion that "punish[ing] the sale or rental" of protected speech somehow altered the First Amendment analysis. *Id.* at 792 n.1. "It would make permissible the prohibition of printing or selling books—though not the writing of them. Whether government regulation applies to creating, distributing, or consuming speech makes no difference." *Id.* As this Court has said, the "First Amendment right to the 'freedom of speech' protects against not just regulations that directly suppress speech but also those that target activities useful for speaking." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 882 (6th Cir. 2024); *see* MSJ Order, R.56, PageID # 1330.

More generally, governments cannot exercise their otherwise-valid authority to specifically target speech. The State "cannot do indirectly what [it] is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). For instance, governments have unquestioned power to tax. But

governments cannot levy taxes on only specific publishers. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting tax law that "target[ed] a small group of newspapers").

Here, the Act targets only those "contracts" necessary to access and engage in protected speech on websites defined by their facilitation of user speech. The statute says as much, singling out actions to "register," "sign up," and "create a unique username" on covered websites as "contract[s]." § 1349.09(B)(1). It makes no sense to regulate these "contracts" *only when* they provide access to protected speech, and otherwise leave them unregulated. If anything, it should be the other way around. And that distinguishes this law from generally applicable laws regulating the non-expressive acts of hiring discrimination, "outdoor fires," camping, minors entering bars, prostitution, absentee-voting applications, and auctioneering practices. *Contra* Br.33, 37-38 (collecting cases).

Defendant also suggests that websites can avoid regulation by not "contract[ing] with children." Br.11, 35, 56. If Defendant means to suggest these websites should just outright ban minors, that government compulsion is

just as unconstitutional. *See Brown*, 564 U.S. at 795 n.3. Plus, if these websites dispensed with account creation and terms of service altogether, both they and their users would be worse off—which would fail to advance any rational interest. The reason these contracts are ubiquitous is because they are important for websites to function. For example, to publish user-generated speech (which is users' intellectual property), websites must secure a license to disseminate that user-generated speech. *See, e.g.*, Exhibit, R.43-3, PageID # 926. Moreover, if covered websites abandoned their terms of service, that may make websites less secure. For example, terms of service require users to agree to "content-moderation" policies that provide a contractual right for websites to remove inappropriate content. *See, e.g.*, Szabo Decl., R.2-1, PageID # 67. "The idea that social media would be safer for children if companies imposed fewer guardrails . . . defies logic." *Carr*, 2025 WL 1768621, at *17 n.16.

At bottom, Defendant's theory would extend far beyond parental-consent requirements. Protected speech in a market economy is often the result of some kind of commercial exchange. The fact that covered

websites have terms of service just makes them like nearly every other website on the internet. *E.g.*, Exhibits, R.43-3, PageID ## 901-52 (terms of Service for New York Times, CNN, and Washington Post); *Van Buren v. United States*, 593 U.S. 374, 394 (2021) ("Many websites . . . authorize a user's access only upon his agreement to follow specified terms of service."). Every day, people accept "contracts" to purchase concert tickets, sign up for streaming services, and subscribe to online newsletters. The First Amendment's protections apply all the same. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) ("[T]he First Amendment extends to all persons engaged in expressive conduct, including those who seek profit[.]"). Were the rule otherwise, governments would have broad authority to restrict access to speech. The First Amendment allows no such thing.

**b.** The Act's text and structure refute Defendant's argument that this law does not regulate speech and merely imposes economic regulations on contracts. *Contra* Br.35-36.

The Act directly and inescapably targets minors' threshold ability to access speech. Specifically, the Act requires parental consent for minors to

create the accounts ("register," "sign up," and "create a unique username") that are necessary to speak on websites specifically chosen for regulation because they allow users to "[i]nteract socially" and "[c]reate or post content viewable by others." § 1349.09(A)(1)(a), (d). Otherwise, the website must "deny the child *access to* or *use of* the online web site, service, or product." § 1349.09(E) (emphases added).

There are yet more reasons that this Act regulates speech and not just contracts. For one, Defendant acknowledges (Br.31) that separate Ohio law already regulates minors' capacity to contract. § 3109.01. This generally applicable regulation starkly contrasts with the Act's targeted regulation for accessing specific kinds of websites.

The Act's *remedy* for lack of parental consent also demonstrates how this law diverges from typical contractual regulations. The Act requires websites to "deny" minors' "access" to protected speech, rather than providing any sort of contract-based remedy like voidability. § 1349.09(E); *see* Restatement (Second) of Contracts § 14 (1981).

Defendant repeatedly refers to purportedly objectionable terms of service in these contracts, but the Act does *nothing* to regulate those. So the Act does not "strike at the commercial aspect of the relationship between covered websites and their users"—it aims at "the speech aspect of" the relationship. MSJ Order, R.56, PageID # 1332. For instance, the Act does not regulate licensing agreements, forum-selection, indemnification, data-collection, or any of the other contractual provisions Defendant identifies. Br.8; *see* Amici States Br.12-13.

Defendant's long recitation of States' historical authority to regulate contracts is therefore immaterial. Br.29-31, 34-35, 37-38.[5] Neither NetChoice nor the district court disputes that the State can regulate contracts in ways that do not violate the First Amendment. Likewise, Defendant cannot rely on federalism to violate constitutional rights. Br.34, 37. "[S]tates have no greater

---

[5] To the extent Defendant suggests this history means "persons under 18 [lack] any constitutional right to speak or be spoken to without their parents' consent," *Brown* rejected that proposition. 564 U.S. at 795 n.3; *contra* Br.30 (citing *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025), in turn citing *Brown*, 564 U.S. at 831-32 (Thomas, J., dissenting)).

power to restrain an individual's freedoms protected by the First Amendment than does . . . Congress." *Suster v. Marshall*, 149 F.3d 523, 530 (6th Cir. 1998).

## B. The Act's parental-consent requirement triggers strict scrutiny in all of its applications.

The district court correctly concluded that the Act triggers strict scrutiny for the additional reason that it contains at least three content-based coverage provisions. *See* MSJ Order, R.56, Page ID ## 1332-39; *contra* Br.40-47. Defendant's reliance on *Turner*, *FSC*, and *TikTok* is misplaced.

**1.** The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). A law is content based when it regulates speech based on "subject matter." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Content-based laws . . . are presumptively unconstitutional" and trigger "strict scrutiny." *Id.* at 163-64. Plus, if "a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in

all applications of the statute." *Bonta*, 770 F. Supp. 3d at 1191 (collecting cases); *Reyes*, 748 F. Supp. 3d at 1120.

When a law is "content based on its face," it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (citation omitted). So courts cannot ignore facially content-based distinctions when the State posits purportedly content-neutral justifications. *Contra* Br.40-41.

**2.** The district court correctly held that this Act makes content-based distinctions in at least three different ways. Whether these provisions are construed as content-based distinctions or speaker-based distinctions that "reflect[] a content preference," strict scrutiny applies all the same. *Reed*, 576 U.S. at 170 (citation omitted).

**a.** The Act's content-based exclusions demonstrate that the "State is [] favoring engagement with certain topics, to the exclusion of others." MSJ Order, R.56, PageID # 1339. Specifically, the Act excludes websites where "interaction between users is limited to": (1) "[c]omments incidental to

content posted by an established and widely recognized media outlet, the primary purpose of which is t*o report news and current events*"; and (2) "[*r*]*eviewing products* offered for sale by electronic commerce or commenting on reviews posted by other users." § 1349.09(O)(1)-(2) (emphases added).

Under these exclusions, the Act will restrict access to speech based on the "topic[s]" generally "discussed" on the website. *Reed*, 576 U.S. at 163. "[W]hether any particular [website] falls within the ban is determined by the content of the posts resting inside that" website. *Griffin II*, 2025 WL 978607, at *9 (cleaned up). For instance, the Supreme Court has held that "'news[]'" is a "'content based'" category. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993); *see Carr*, 2025 WL 1768621, at *10-11; *Paxton*, 747 F. Supp. 3d at 1032.

These content-based exclusions alone render the entire Act content-based. *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 620-21 (2020) (controlling plurality op.) (content-based exceptions render entire statute content-based); *Thomas v. Bright*, 937 F.3d 721, 728 (6th Cir. 2019) ("The fact that this content-based aspect is in the *exception* to the general restriction,

rather than the restriction itself, does not save it from this analysis."), *abrogated on other grounds by City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 68 (2022); *Carr*, 2025 WL 1768621, at *11-12; *Griffin II*, 2025 WL 978607, at *9; *Paxton*, 747 F. Supp. 3d at 1032.

Defendant ignores that "news and current events" and "reviewing" certain "products" are plainly content-based categories. Defendant says these exceptions "merely drive home that the statute covers social-media platforms." Br.43; *see* Br.57. But whatever the "motive" for these exclusions, the Act uses facially content-based terms to define which websites are covered. *Reed*, 576 U.S. at 163.

The Ninth Circuit's recent decision in *NetChoice, LLC v. Bonta*, 2025 WL 2600007 (9th Cir. Sept. 9, 2025), is distinguishable and incorrect. It is distinguishable because the California law there did not include an exception for "established and widely recognized media outlet[s]." § 1349.09(O)(2). That exception alone independently renders *this* Act content-based. *Bonta* also incorrectly held that a statutory exception for websites with "consumer reviews" was content neutral. *Bonta*, 2025 WL 2600007, at *8 (citation

44

omitted). Singling out "[r]eviewing products offered for sale by electronic commerce," § 1349.09(O)(1), is necessarily content-based. As Goodreads' declarant explained, Goodreads would appear to qualify for this exception because "the purpose of [Goodreads] is to facilitate reviews and related discussion on books." Roin Decl., R.2-3, PageID # 92. Discussions about books on Goodreads are not commercial "solicitation." *Bonta*, 2025 WL 2600007, at *8.

Nor can this Court sever the Act's content-based exceptions. *Contra* Br.43. Severing these exceptions (1) is unsupported by Ohio law; (2) would *extend* the Act's unconstitutional applications; and (3) does not make the Act content-neutral.

"Whether a portion of a state's statute is severable is determined by the law of that state." *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018). In Ohio, courts "cannot sever an unconstitutional exemption when doing so would extend [a law's] reach beyond what a legislative body intended." *Tipp City v. Dakin*, 929 N.E.2d 484, 503 (Ohio Ct. App. 2010). Here, severing the Act's exemptions would extend the Act to "news" outlets

and other websites that the Legislature intentionally excluded from the Act's speech restrictions.

Even if severability were an option, it would not solve the First Amendment violations: the Act's restrictions on access to protected speech. Requiring minors to secure parental consent to post product reviews, post comments on news sites, or even read the stories on news websites, § 1349.09(O), would place *more* protected speech behind state-imposed barriers. In fact, two declarants cited the Act's content-based exceptions as reasons their websites may not fall within the Act's scope. *See* Roin Decl., R.2-3, PageID ## 91-92; Masnick Decl., R.2-4, PageID ## 101-02.

The *remedy* of severing content-based statutory provisions also cannot avoid the logically prior *merits* determination of whether the law triggers and fails strict First Amendment scrutiny. In *Barr*, a controlling plurality of the Supreme Court analyzed severability as a *remedy* for a content-based law that failed strict scrutiny. 591 U.S. at 623. There, the Court considered a law that generally prohibited robocalls to cell phones, but made content-based exceptions for collecting debts owed to the federal government. *Id.* at 616.

Only after (1) determining the law was content based, and (2) concluding the law failed strict scrutiny did the plurality decide to sever the content-based exception. *Id.* at 621. In other words, severability was the final remedial step, not a mechanism to avoid the First Amendment merits strict-scrutiny analysis.

*Barr*'s severability analysis was unique because a "generally applicable robocall restriction would be permissible under the First Amendment" on the merits. *Id.* at 633. So the injury in *Barr* was not the robocall ban itself (*i.e.*, the restriction on speech), but rather the "[un]equal-treatment" of different kinds of robocalls. *Id.* at 623. Severability eliminated that unequal treatment, leaving in place an otherwise-valid speech restriction. Here, in contrast, the Act's parental-consent requirement to access billions of posts of online speech violates the First Amendment. *See Packingham*, 582 U.S. at 107; *Brown*, 564 U.S. 795 n.3. The content-based exceptions are just *one* reason those speech restrictions trigger strict scrutiny. So there is nothing this Court could sever here that would make the Act's parental-consent requirement constitutionally valid.

**b.** The Act's coverage provisions are also content-based because they regulate only websites that "target[]" minors or that "reasonably anticipate[]" being accessed by minors. § 1349.09(B). For example, the Act covers websites that publish child-related "[s]ubject matter" or "[v]isual content," such as "animated characters" or "celebrities who appeal to children," § 1349.09(B)-(C)—while ignoring other websites.

This test means that the Act is necessarily *not* "agnostic as to content," as the Supreme Court's precedent requires for content neutrality. *Reagan*, 596 U.S. at 69. The State *favors* expression and websites that do *not* appeal to minors, as the State has exempted those websites from the Act's onerous requirements. *E.g.*, *Thomas*, 937 F.3d at 728 ("[F]avor[ing] certain content (i.e., the excepted content) over others . . . discriminates against that other content.").

Whether on its face or by using § 1349.09(B)'s multi-factor test as a "proxy," *Reagan*, 596 U.S. at 74, the Act imposes content-based speech restrictions. For example, many professional networking websites may not "target[]" minors. To the extent that such websites are therefore excluded

under the Act, the Act would *favor* the content-based category of professional networking discussions. By "g[iving] the most favorable treatment" to this kind of content, the Act's requirement that a website "target[] children" is content-based. *Id.* at 70.

**c.** The Act is also content-based because "covered websites' choices about whether and how to disseminate user-generated expression convey a message about the type of community the platform seeks to foster." MSJ Order, R.56, PageID # 1338 (cleaned up). So "[a]mong the messages the Act regulates are the ideas that: (1) user-generated content is not less valuable than speech authored by the websites themselves; and (2) social interactions and connections (as compared to other types of interactions, such as business interactions) have unique value for online communities." MSJ Order, R.56, PageID # 1338.

**3.** Defendant incorrectly relies on *Turner*, *FSC*, and *TikTok*. These cases did not involve laws with content-based coverage provisions restricting fully protected speech, like this Act does. *Contra* Br.44-48; Amici States Br.15-18.

The Act's content-based coverage provisions distinguish this case from *Turner Broadcast Systems, Inc. v. FCC*, 512 U.S. 622 (1994). There, "Congress . . . required cable operators to provide carriage to broadcast stations." *Id.* at 659. *Turner* held that law's coverage provision singling out cable television operators (*i.e.*, speakers) *without* reference to the content they transmitted was "content neutral." *Id.* at 655. That holding cannot apply here because this Act covers websites by reference to the content they disseminate. *See supra* pp.41-49. The law in *Turner* would have been content-based if Congress had privileged broadcast channels dedicated to particular content like news—which is precisely what this Act does.

*FSC* supports NetChoice, not Defendant. That case held that even "incidental" burdens on access to protected speech trigger at least intermediate scrutiny. 145 S. Ct. at 2306 (citation omitted). Here, the Act "directly regulate[s]" access to "fully protected speech," so it triggers "strict scrutiny." *Id.* at 2309-10. By contrast, the Texas law's coverage provisions in *FSC* targeted "pornography," which is a "content-based restriction [that] does not require strict scrutiny." *Id.* at 2314-15. Pornography, or "obscenity for minors," is a

unique category of speech that is simultaneously protected for adults and *un*protected for minors. *Id.* at 2302-04, 2315. So any coverage provision targeting pornography "is content based in the same way that prohibitions of [unprotected] 'defamation,' 'fraud,' and 'incitement' are." *Id.* at 2315 (citation omitted). These are "well-defined and narrowly limited classes of speech." *Brown*, 564 U.S. at 791 (citation omitted). But the Act here restricts billions of posts of "fully protected speech." *FSC*, 145 S. Ct. at 2310. And "for *fully protected speech*, the distinction between bans and burdens makes no difference to the level of scrutiny." *Id.* at 2315 n.12 (internal quotation marks omitted). So, as *FSC* recognized would be the case, the Act here requires First Amendment "strict scrutiny." *Id.* at 2310.

Similarly, this Act is far different from the law addressing unique national security issues in *TikTok Inc. v. Garland*, 604 U.S. 56 (2025). That case rejected a challenge to a law covering an expressly identified website (TikTok) based on "a *foreign adversary's control* over a communications platform." *Id.* at 69 (emphasis added). In that unique national-security context about a congressionally designated "foreign adversary's control" over a website, the

Supreme Court applied "intermediate scrutiny." *Id.* at 73. *TikTok* thus held it did not have to analyze whether a *separate* coverage provision analogous to the Act's here was content-based because that it was not implicated by the case. *Id.* at 67-68 (coverage exception for websites whose "primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews" (cleaned up)). The Court certainly did not hold that intermediate scrutiny applies whenever content-based laws target "social media." *Conta* Br.47.

### C. The Act's parental-consent requirement fails strict scrutiny or any form of heightened First Amendment scrutiny.

Because the Act's parental-consent requirement "target[s] . . . fully protected speech" based on content, it triggers and fails "[s]trict scrutiny." *FSC*, 145 S. Ct. at 2310. Strict scrutiny, "as a practical matter, [] is fatal in fact absent truly extraordinary circumstances." *Id.* To satisfy strict scrutiny, Defendant must show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (cleaned up).

Even if strict scrutiny did not apply, governmental restrictions on "access to" social media websites are "enough" to raise—at minimum—"intermediate" First Amendment scrutiny. *Packingham*, 582 U.S. at 105-06. The Act cannot satisfy intermediate scrutiny either, because it is not "narrowly tailored to serve a significant governmental interest." *Id.* (citation omitted). Under either form of scrutiny, "[w]hen[ever] the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

1. **Defendant's stated governmental interests cannot support the Act's parental-consent requirement for minors to access fully protected speech.**

Defendant asserts three governmental interests, none of which supports the Act's restrictions on minors' access to fully protected speech.

*Child welfare (Br.48).* The Supreme Court has held that, although the "State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

In the context of this Act restricting access to fully protected speech, the government must show, "a *direct causal link* between" covered websites "and harm to minors." *Id.* at 799 (emphasis added).[6]

After analyzing the record here, the district court correctly concluded that Defendant had failed to show "that the full range of 'thousands' of websites covered by the Act *cause* harms to minors sufficient to suppress those minors' access to protected speech." MSJ Order, R.56, Page ID # 1342 & n.10 (collecting authorities). Much like the insufficient record in *Brown*, "nearly all of the research" showing any harmful effects here "is based on correlation." 564 U.S. at 800 (cleaned up) (citation omitted); *contra* Br.5-6.

For example, Defendant relies heavily on the Surgeon General's Advisory. *E.g.*, Br.3, 5-7, 59. Nothing in this Advisory suggests its discussion of

---

[6] Defendant's assertion that "common sense" suffices to justify speech restrictions must yield to *Brown*'s more recent and more relevant precedent. Br.58 (citing *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.)). In any event, *Burson* considered an inapposite time-place-manner regulation prohibiting solicitation of votes within 100 feet of polling places, which was subject to the "exacting scrutiny" applicable to "political speech in a public forum." 504 U.S. at 198. That is a far cry from this Act's restriction on access to fully protected online speech.

what *it* calls "social media" matches the Act's coverage provisions. Put another way, there is no evidence that the "social media" discussed in the Advisory—or any of Defendant's other cited sources—maps on to the websites regulated by the Act here. And that same Advisory highlights that "[s]ocial media *can provide benefits* for some youth by providing positive community and connection with others who share identities, abilities, and interests." SG Advisory, R.42-2, PageID # 495 (emphasis added); *see* MSJ Order, R.56, Page ID # 1302. For the narrow range of websites the Advisory considered, it noted that "[m]ost prior research to date has been *correlational*, focused on young adults or adults, and generated a range of results." SG Advisory, R.42-2, PageID # 500 (emphasis added). Such "correlation" studies are insufficient under *Brown*. 564 U.S. at 800.

*Parental oversight (Br.48-49).* Defendant has "fail[ed] to distinguish the State's purported interest from an analogous—and rejected—state interest in *Brown*." MSJ Order, R.56, Page ID # 1343. Parental-consent requirements do not further an interest "in aid of parental authority." *Brown*, 564 U.S. at 802. They "impose *governmental* authority, subject only to a parental veto."

*Id.* at 795 n.3. *Brown* "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. Accepting the State's argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (citation omitted) (alteration in original). Those same principles apply here.

*Contracts (Br.49).* This interest relies on Defendant's erroneous argument that the Act does not restrict speech and regulates only contracts. That is incorrect for the reasons explained above in Part II.A.2.

### 2. The Act's parental-consent requirement is improperly tailored for any interest Defendant asserts.

Even assuming Defendant can show a sufficient governmental interest, this Act is not properly tailored. Some of the Act's tailoring flaws apply regardless of the asserted governmental interest. And more tailoring flaws exist for each particular interest Defendant has asserted.

### a. The Act is not properly tailored to further any interest the government might assert.

The Act has numerous cross-cutting tailoring flaws *regardless* of whatever interest the State asserts.

This Act is not the "least restrictive means" to satisfy any possible governmental interest. *AFP*, 594 U.S. at 607 (citation omitted). The district court found that parents have many existing private tools to help them oversee their minor children online. MSJ Order, R.56, Page ID # 1343. Courts nationwide have agreed. *E.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Carr*, 2025 WL 1768621, at *18; *Uthmeier*, 2025 WL 1570007, at *18; *Griffin II*, 2025 WL 978607, at *14. Defendant contends that "many parents may be unaware of these tools." Br.51 (cleaned up) (citation omitted). But Ohio could give "parents the information" about these tools instead of imposing speech restrictions. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

These private tools are better suited to provide parents with ongoing oversight over their minor children's online activities, compared to a one-time parental consent requirement. *Contra* Br.51. "It is no response that

[these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815.

Plus, covered websites' *self-regulation* can be extensive, as many NetChoice members already engage in content moderation over objectionable speech, while providing parental controls and other tools. *See supra* pp.5-7. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to governmental regulation, even if the government does not believe those efforts are perfect in all cases. *Brown*, 564 U.S. at 803 & n.9 (crediting video game industry's self-regulation).

In addition, the Act fails strict scrutiny because it "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." MSJ Order, R.56, PageID # 1344; *see Brown*, 564 U.S. at 805. And it fails intermediate scrutiny because it "burden[s] substantially more speech than is necessary." *Packingham*, 582 U.S. at 106.

The Act is overinclusive in the range of websites it regulates. There is a fundamental mismatch between the broad range of "social media" websites the Act regulates and the sparse record of purported harms that Defendant assembled in the district court. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Defendant has pointed to the alleged problems with "social media." Br.5-9, 49-50; *see* Amici States Br.5-11. But Defendant relies on a handful of examples and studies about a handful of websites. The Act applies to all sorts of websites beyond the handful that Defendant's record addresses. So Defendant cannot carry his burden, because "the validity of [a] regulation depends on the relation it bears to the *overall problem* the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case." *United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) (emphasis added).

Relatedly, the Act is overinclusive in the range of protected speech it regulates. The Act prohibits minors from accessing *any* speech on covered

websites absent parental consent, whether it is educational, religious, political, or otherwise protected. Minors use covered websites for all those laudable purposes. Szabo Decl., ECF R.2-1, PageID # 71. Worse, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396.

Thus, the Act here sweeps far more broadly than the laws upheld under intermediate scrutiny in *FSC* (addressing websites with large amounts of pornography) and *TikTok* (addressing a single website controlled by a congressionally designated foreign adversary). *See supra* pp.50-52.

### b. The Act has further tailoring flaws for each of Defendant's asserted governmental interests.

The Act has yet more tailoring flaws for each of Defendant's asserted governmental interests. "And the overbreadth in achieving one goal is not cured by the underbreadth in achieving the other." *Brown*, 564 U.S. at 805.

*Child welfare.* The Act is not tailored to addressing purportedly harmful aspects of "social media" to minors. As the district court recognized, the Act is a "breathtakingly blunt instrument for reducing social media's harm to children." MSJ Order, R.56, PageID # 356. As an initial matter, Defendant's

sources focus on only a small handful of websites. *E.g.*, Exhibit, R.28-1, PageID # 233 ("six major social media platforms"); Exhibit, R.28-2 at PageID # 244 (similar).

Consequently, Defendant's cited sources cannot support the Act's restriction on "access to" the staggering range of protected speech covered by the Act. § 1349.09(E). For example, Defendant contends the Act "pulls in only platforms with interactive features that contribute to user addiction." Br.51. Defendant cites the Surgeon General's Advisory, which discusses functions such as "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms." Advisory, R.42-2, PageID # 498. But none of those features is a necessary element in the Act's coverage provisions. *Cf.* § 1349.09(A)(1). That is why websites like Dreamwidth—which lacks such features—are covered. *See* Paolucci Decl., R. 2-2, PageID # 76. In fact, the Act will likely regulate far more websites *without* these features than *with* them. *See* Szabo Decl., R. 2-1, PageID # 71.

Assuming for the sake of argument that Defendant's cited sources somehow established that covered websites were harmful to minors, the

parental-consent requirement does not further the State's goals in protecting minors from harm on these websites. The "Legislature is perfectly willing to leave" purportedly harmful websites "in the hands of children so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802.

*Parental oversight*. Even assuming the Act's parental-consent requirement were a permissible way for the government to further parental oversight, the Act here does not sufficiently further it. The Act does not account for the difficulty of verifying a parent-child relationship to process parental consent. *Carr*, 2025 WL 1768621, at *18; *Griffin I*, 2023 WL 5660155, at *4. "Disputes about . . . the legal relationship between [a user] and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common." Paolucci Decl., R.2-2, PageID ## 84-85.

Regardless, the Act's parental-consent requirement is overinclusive to furthering parental control. Defendant cannot "show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to [covered websites] but cannot do so." *Brown*, 564 U.S. at

803. "[S]ome parents" simply may not "care" about their minor children's access to covered website, yet the Act requires those parents to consent. *Id.* at 804.

Furthermore, as the *Griffin I* court found, a lack of parental *consent* will not always reflect a lack of parental *approval*: "[P]arents and guardians who otherwise would have freely given consent to open an account will be dissuaded by the red tape [of the parental-consent process] and refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." 2023 WL 5660155, at *15. Parents may simply grow weary of the constant paperwork barrage that the Act imposes.

*Contracts.* The Act is both underinclusive and overinclusive as a purported regulation of mere contracts. As explained above at p.39, the Act's overinclusive "remedy" for lack of parental consent requires websites to "deny the child *access to* or *use of* the online web site." § 1349.09(E) (emphases added). A tailored remedy—and one aligned with true contractual regulations—is voidability of contracts with minors. *Cf.* Br.51 (noting "infancy" doctrine).

Similarly, the State did not even attempt to regulate specific contractual *terms* it considers problematic. Defendant claims that regulating specific contractual terms "would not solve the root problem—unsupervised children entering binding contracts." Br.59. Other parts of Defendant's brief suggest that Defendant takes exception with individual provisions of the contracts. *E.g.*, Br.8. Nevertheless, if minors entering into *any* online contracts at all is itself the problem, the Act is far too underinclusive to furthering that interest. It makes no sense to exempt otherwise-covered websites that allow minors to post comments incidental to "news" or "products," § 1349.09(O), when those websites have contractual terms of service too. Nor does it make sense to leave the rest of the internet unregulated, which further undermines the State's purported goal of regulating mere contracts. This "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than" attempting to restrict minors' access to "social media." *Brown*, 564 U.S. at 802.

**D. The district court properly declared the Act facially unconstitutional.**

The district court correctly ruled that the Act should "be struck down in its entirety" because its "unconstitutional applications substantially outweigh its constitutional ones" when "judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (citation omitted).

**1.** This facial-challenge inquiry "first" asks what "actors" and "activities" are regulated by the Act. *Id.* at 724. Defendant did not argue in the district court or here on appeal that any of the issues about the scope of coverage identified in *Moody* are relevant here, and Defendant has forfeited those arguments. *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014) ("[A]n argument not raised before the district court is waived on appeal." (citation omitted)).

As explained above, the Act singles out a content-based subset of the kinds of "social media" websites that people have a First Amendment right to access, because these websites disseminate and allow people to engage in protected speech and expressive interaction. *Packingham*, 582 U.S. at 108. Specifically, the Act regulates only websites that allow users to "[i]nteract

socially with other users within the confines of the [website]" and "[c]reate or post content viewable by others." § 1349.09(A)(1)(a), (d). Or, as *Moody* put it, the Act regulates websites that "allow users to upload content . . . to share [it] with others." 603 U.S. at 719.[7] These websites are defined by the way they allow their users to interact with and engage in protected expression. Defendant agrees, asserting that "the statute covers social-media platforms and not other types of media." Br.43.

If there were any doubt, the Act's exceptions obviate any need for a nuanced analysis of different "kinds of websites" (or "actors") identified by *Moody*, which might "fall on different sides of the constitutional line" in considering different First Amendment theories. *Moody*, 603 U.S. at 718, 726. Based on its coverage provisions, the Act does not apply to "email," "online marketplace[s]," "payment service[s]," or "ride-sharing service[s]." *Id.* at 725. Defendant has never suggested otherwise.

---

[7] Even if some of those communications are private, such private communications are fully protected from governmental restriction too. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-31 (1989) (invalidating restriction on telephone messages).

So the Act's "scope is largely not in dispute" and "there is no dispute that users engage in protected speech on all the platforms that are arguably within the Act's proscription." *Griffin II*, 2025 WL 978607, at *7. Because the Act targets a subset of what the Supreme Court and others have called "social media," this Court "need not speculate" about "hypothetical or imaginary cases" for purposes of NetChoice's facial challenge. *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up).

The "pertinent facts" are therefore "the same across the board." *AFP*, 594 U.S. at 618. On these "social media" websites, the Act's regulated "activities" are plain on the law's face. *Moody*, 603 U.S. at 724. The Act uses content-based coverage criteria to regulate access to the websites through parental-consent requirements. So "the Act imposes a platform-wide burden on users' right to engage in [] speech" that does not "differ between the platforms regulated." *Griffin II*, 2025 WL 978607, at *7.

For the first time on appeal, Defendant contends that the parental-*notification* provisions are separate from the parental-*consent* requirement, and must be judged separately. Br.15, 19. Defendant forfeited

these arguments by not raising them in the district court. *Hayward*, 759 F.3d at 615.

**2.** Having identified the "actors" and "activities" regulated by this Act, the facial-challenge analysis "next" compares the Act's unconstitutional applications to any constitutional applications, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 723-24. That inquiry here is straightforward "from the face of the law": All aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues." *X Corp.*, 116 F.4th at 899. Any time the Act restricts accessing or disseminating fully protected speech, it is presumptively unconstitutional. *E.g.*, *Cruz*, 596 U.S. at 305. For example, whenever the Act requires parental consent, it violates *Brown* and *Packingham*. *See supra* Part II.A.1.

That means this Court should analyze the circumstances only when the Act actually requires parental consent for minors to access or engage in protected speech on regulated websites. Defendant suggests that "many platforms do not require an account to" "access . . . speech." Br.38. The

undisputed record evidence here shows that account creation is necessary to access some or all of the speech and speech-facilitating functions on covered websites. Szabo Decl., R.2-1, Page ID # 71; Paolucci Decl., R.2-2, Page ID ## 82-83, 86. Regardless, for circumstances when account creation is *not* required for minors to access speech, "that just means" those instances "are not 'applications' of the" Act. *United States v. Lierman*, 2025 WL 2371034, at *9 (4th Cir. Aug. 15, 2025). More generally, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction." *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015). Here, the "actual applications of the statute" are when governmental requirements would restrict users from creating accounts to access covered websites. *Id.* at 419.

Because the Act is presumptively unconstitutional in all applications, those presumptively unconstitutional applications "substantially outweigh" any purportedly constitutional applications. *Moody*, 603 U.S. at 723-24. That shifts the "burden" to "the Government" to "prov[e] the constitutionality of its actions." *Cruz*, 596 U.S. at 305 (citation omitted). Specifically, *Defendant* must: (1) demonstrate that the Act can satisfy heightened First Amendment

scrutiny in any of its applications; *and* (2) show that those purportedly constitutional applications are not "substantially outweigh[ed]" by the Act's unconstitutional applications. *Moody*, 603 U.S. at 723-24. Yet Defendants cannot demonstrate that this Act satisfies strict scrutiny, so the Act is facially unconstitutional.[8] For example, "the law's overbroad tailoring does not vary between covered" websites. *Paxton*, 747 F. Supp. 3d at 1031; *see supra* pp.58-60. Likewise, the State's failure to "consider[] alternatives . . . is true in every case." *AFP*, 594 U.S. at 618; *see supra* pp.57-58.

Fundamentally, it is Defendant's burden under heightened First Amendment scrutiny to justify the Act's unfocused breadth. A law's breadth might make certain facial First Amendment challenges more difficult when that breadth captures distinct "kinds of" actors—for which the pertinent facts might differ, or distinct First Amendment doctrines could apply. *Moody*, 603 U.S. at 718. But that is not true here, and Defendant does not contend otherwise. Parental-consent speech restrictions violate the First Amendment.

---

[8] Defendant has not explained how the Act could constitutionally be applied in any specific application.

*Brown*, 564 U.S. at 795 n.3. And the First Amendment protects "access" to "social media" websites. *See Packingham*, 582 U.S. at 99. So this Act is facially unconstitutional.

## III. The district court correctly concluded that the Act's central "operator" coverage provisions are unconstitutionally vague.

The Act's central coverage provisions are unconstitutionally and "troublingly" vague. *See* MSJ Order, R.56, PageID # 1344-46. A law that implicates First Amendment freedoms is unconstitutionally vague if it "reaches a substantial amount of constitutionally protected conduct." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) (citation omitted). In other words, "[w]hen speech is involved, rigorous adherence to [the vagueness doctrine] is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

Defendant hardly attempts to rebut the district court's multi-faceted analysis, instead just asserting that "the statute uses plain terms." Br.52-53. But Defendant has never once explained how to identify an "established and widely recognized media outlet." § 1349.09(O). Perhaps that is because it grants Defendant authority to confer benefits on certain favored speakers,

even though government should draw "no distinction" between individuals and the institutional media. *Bartnicki v. Vopper*, 532 U.S. 514, 525 n.8 (2001). Or perhaps it is because any elaboration would likely discriminate based on viewpoint of the media outlet. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Or perhaps he cannot distill these vague standards because he does not yet know. Each of these explanations creates constitutional problems.

Nor has Defendant explained how covered websites are supposed to weigh the "eleven discretionary factors" for whether they are likely to be accessed by minors. Br.10.[9] Almost all these factors are vague, subjective, or so broad as to be meaningless. For example, "Subject matter," "Language," "Design elements," "Visual content," and "Music or other audio content" provide no fair notice to websites. § 1349.09(C). All of these terms grant Defendant "the

---

[9] These factors' similarity to factors under "federal law," Br.42, does not excuse their unconstitutional vagueness. The Act's multi-factor test determines which websites must deny threshold access to fully protected speech.

discretion" to identify regulated websites "selectively on the basis of the content of the speech." *City of Houston v. Hill*, 482 U.S. 451, 466 (1987).

Furthermore, nothing in the Act explains how to distinguish among websites that target or can reasonably anticipate being accessed by 15-year-olds versus 16-year-olds. And because this 11-factor list is non-exhaustive, websites lack certainty that even these broad, vague factors are the exclusive determinants of this Act's coverage.

## IV. The district court correctly permanently enjoined Defendant's enforcement of the Act's parental-consent requirement.

Because NetChoice prevailed on the merits, it is also entitled to a permanent injunction prohibiting Defendant's enforcement of the Act—at a minimum against NetChoice's covered members. *Cf.* Br.61. "[I]n First Amendment cases, only one question generally matters to the outcome: . . . success on the merits of the[] First Amendment claim." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

NetChoice's success on the merits of its First Amendment challenge suffices for irreparable injury. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (cleaned up). What is more, if a website misidentifies even a single 15-year-old, the Act would impose almost $3 million in penalties for just the year before the 15-year-old turns 16. *Supra* p.11 In part because of that liability risk, some covered websites will "err on the side of caution" and "restrict access to the site beyond the restrictions we wish to place." Paolucci Decl., R.2-2, PageID # 86.

In addition, covered websites' unrecoverable compliance costs are sufficient irreparable injury. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (irreparable injury includes compliance costs "with no guarantee of eventual recovery").

The balance of equities and the public interest also support a permanent injunction. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). On one side of the ledger, "no substantial harm to others can be said to inhere in [the] enjoinment" of an unconstitutional law. *Deja Vu*, 274 F.3d at 400. On the other, "it is always in the public interest to prevent the violation of a party's constitutional rights."

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citation omitted).

The district court's injunctions have helped prevent what has happened in other States where officials have been able to enforce similar laws: Some NetChoice members have had to deny their speech services to some or all users in the State. *See, e.g.*, Nextdoor, Member Agreement, https://perma.cc/E53P-TAHD ("[I]ndividuals who are under the age of 18 are not permitted to create an account . . . if they are residents of the State[s] of Texas, . . . Tennessee, and . . . Mississippi."); Denise, Mississippi Site Block, Plus a Small Restriction on Tennessee New Accounts, Dreamwidth (August 31, 2025), https://perma.cc/E8V9-3L28. And NetChoice members are not alone. One of the fastest-growing social media websites (Bluesky) announced that it will "block access from" Mississippi. Bluesky, Our Response to Mississippi's Age Assurance Law, Bluesky Blog (Aug. 22, 2025), https://perma.cc/6FGB-JYFF.

Affirming the district court's judgment would prevent the further balkanization of access to "what for many are the principal sources for . . .

exploring the vast realms of human thought and knowledge." *Packingham*,

582 U.S. at 107.

## Conclusion

This Court should affirm the district court's judgment.

Dated: October 3, 2025

Respectfully submitted,

*/s/ Scott A. Keller*

Jared B. Magnuson
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

Joshua P. Morrow
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
Lehotsky Keller Cohn LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Counsel for Plaintiff-Appellee NetChoice

## CERTIFICATE OF COMPLIANCE

The foregoing complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(g) because it contains 12,999 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF SERVICE

I certify that on October 3, 2025, the foregoing was served via CM/ECF

on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Scott A. Keller*
Scott A. Keller

Appellee NetChoice designates the following filings from the District

Court's electronic records under Sixth Circuit Rule 30(g):

| Date Filed | R.No.;<br>Beginning Page ID # | Description of Document |
|---|---|---|
| January 5, 2024 | R.1; Page ID # 1 | NetChoice's Complaint for Declaratory and Injunctive Relief |
| January 5, 2024 | R.2; Page ID # 539 | NetChoice's Motion for Temporary Restraining Order and Preliminary Injunction |
| January 5, 2024 | R.2-1; Page ID # 63 | Declaration of Carl Szabo (NetChoice) |
| January 5, 2024 | R.2-2; Page ID # 75 | Declaration of Denise Paolucci (Dreamwidth) |
| January 5, 2024 | R.2-3; Page ID # 88 | Declaration of Libby Roin (Goodreads) |
| January 5, 2024 | R.2-4; Page ID # 96 | Declaration of Michael Masnick (TechDirt) |
| January 9, 2024 | R.27; Page ID # 165 | Order Granting Temporary Restraining Order |
| February 12, 2024 | R.33; Page ID # 332 | Order Granting Preliminary Injunction |
| March 7, 2024 | R.36; Page ID # 416 | Parties' Rule 26(f) Report |
| May 3, 2024 | RR.43-2 to -3;<br>Page ID ## 676, 838 | Additional Exhibits in Support of NetChoice's Motion for Summary Judgment |
| July 10, 2024 | R.49; Page ID # 1075 | NetChoice's Notice re *Moody* |
| September 9, 2024 | R.50; Page ID # 1176 | NetChoice's Notice re *Paxton* |

| September 11, 2024 | R.51; Page ID # 1219 | NetChoice's Notice re *X Corp.* |
|---|---|---|
| September 17, 2024 | R.52; Page ID # 1253 | NetChoice's Notice re *Reyes* |
| April 16, 2025 | R.56, Page ID # 1318 | Order Granting NetChoice Summary Judgment |