**No. 25-3371**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

NETCHOICE, LLC,

*Plaintiff-Appellee,*

v.

DAVID YOST, in his official Capacity as Ohio Attorney General,

*Defendant-Appellant.*

On appeal from an order granting summary judgment
and issuing a permanent injunction

United States District Court for the
Southern District of Ohio Eastern Division
No. 2:24-CV-00047-ALB-EPD
Honorable Algenon L. Marbley Presiding

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## IN SUPPORT OF APPELLEE AND AFFIRMANCE

Robert Corn-Revere
D Gill Sperlein
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE,
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
gill.sperlein@thefire.org

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in the *amicus*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES ......................................................... iv

INTEREST OF *AMICUS CURIAE* ............................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 4

ARGUMENT ........................................................................ 7

I.    The Act Regulates Speech in Every Application, Clearing the
      Way for NetChoice's Facial Challenge ............................................. 7

II.   The Act Is a Content-Based Speech Regulation That Cannot
      Satisfy Strict Scrutiny. .................................................................. 13

      A.    The Act is Content-Based Because Review of a
            Website's Expressive Elements Is Necessary to
            Determine If It Is Subject to the Act. .................................... 13

      B.    Ohio Fails in Its Attempts to Reclassify Speech as
            Something Different. ................................................................. 17

            1.    The Act Regulates Speech, Not Conduct ..................... 18

            2.    Minors Have Free Speech Rights. ................................. 20

      C.    The Act Fails Strict Scrutiny Because It Is Not
            Narrowly Tailored to Serve a Compelling Interest. ............. 22

            1.    Ohio Has Not Demonstrated a Compelling
                  Interest ............................................................................. 23

            2.    The Act Either Imposes Unacceptable Age
                  Verification Requirements or It Is Wholey
                  Ineffectual. ....................................................................... 26

            3.    For Additional Reasons, the Act Is Not Narrowly
                  Tailored. ............................................................................ 29

III.    The Act's Vague Terms Fail to Give Fair Notice of What
        Speech Violates the Law. ...............................................................30

CONCLUSION ..................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Gonzales,*
   478 F. Supp. 2d 775 (E.D. Pa. 2007) ....................................................27

*ACLU v. Mukasey,*
   534 F.3d 181 (3d Cir. 2008) ....................................................................27

*Am. Booksellers Found. v. Dean,*
   342 F.3d 96 (2d Cir. 2003) .....................................................................27

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004) .........................................................................26, 27

*Baggett v. Bullitt,*
   377 U.S. 360 (1964) ...............................................................................31

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
   591 U.S. 610 (2020) ...............................................................................16

*Bates v. Pakseresht,*
   146 F.4th 772 (9th Cir. 2025) ...............................................................22

*Brown v. Ent. Merchs. Ass'n,*
   564 U.S. 786 (2011) .......................................................................passim

*Butler v. Michigan,*
   352 U.S. 380 (1957) ...............................................................................26

*Edenfield v. Fane,*
   507 U.S. 761 (1993) ...............................................................................25

*Erznoznik v. Jacksonville,*
   422 U.S. 205 (1975) ......................................................................5, 20, 29

*Free Speech Coal., Inc. v. Paxton,*
   606 U.S. 461 (2025) .........................................................................26, 27

*Free Speech Coal., Inc. v. Skrmetti,*
   No. 24-6158, 2025 WL 512049 (6th Cir. Jan. 13, 2025) .........................9

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ...............................................................25

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ...........................................................31, 33

*Joseph Burstyn, Inc. v. Wilson,*
  343 U.S. 495 (1952) .................................................................5

*KenAmerican Res., Inc. v. United States Sec'y of Lab.,*
  33 F.4th 884 (6th Cir. 2022) ..................................................22

*Mahanoy Area Sch. Dist. v. B. L.,*
  594 U.S. 180 (2021) ...........................................................20, 21

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) .......................................................6, 10, 11

*NAACP v. Button,*
  371 U.S. 415 (1963) ................................................................18

*Near v. Minnesota ex rel. Olson,*
  283 U.S. 697 (1931) ...........................................................18, 19

*NetChoice, LLC v. Bonta,*
  770 F. Supp. 3d 1164 (N.D. Cal. 2025).........................passim

*NetChoice, LLC v. Bonta,*
  113 F.4th 1101 (9th Cir. 2024) ..............................................18

*NetChoice, LLC v. Fitch,*
  No. 1:24-cv-170-HSO-BWR, 2025 WL 1709668 (S.D. Miss.
  June 18, 2025) ......................................................8, 14, 16, 19

*NetChoice, LLC v. Reyes,*
  748 F. Supp. 3d 1105 (D. Utah 2024)...........................passim

*Norris v. Baxter Healthcare Corp.,*
  397 F.3d 878 (10th Cir. 2005).................................................24

*Project Veritas v. Schmidt,*
  125 F.4th 929 (9th Cir. 2025) ..................................................9

*PSINet Inc. v. Chapman*,
  167 F. Supp. 2d 878 (W.D. Va. 2001) ....................................................27

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).............................................................................passim

*Reno v. ACLU*,
  521 U.S. 844 (1997)...................................................................5, 26, 31

*Sorrell v. IMS Health*,
  564 U.S. 552 (2011)...........................................................13, 14, 18, 21

*Speiser v. Randall*,
  357 U.S. 513 (1958)...............................................................................31

*Students Engaged in Advancing Texas v. Paxton*,
  765 F. Supp. 3d 575 (W.D. Tex. 2025)...........................................16, 32

*Tinker v. Des Moines Sch. Dist.*,
  393 U.S. 503 (1969)...............................................................................20

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)........................................................................16, 22

*United States v. Hansen*,
  599 U.S. 762 (2023)........................................................................11, 12

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000)..........................................................................passim

*United States v. Stevens*,
  559 U.S. 460 (2010).............................................................................12

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988).............................................................................32

**Statutes**

OHIO REV. CODE ANN.
  § 1349.09(A)(1) ..........................................................................18, 31, 32
  § 1349.09(A)(1)(a)................................................................................14

§ 1349.09(A)(1)(c) ................................................................14
§ 1349.09(A)(1)(d) ...............................................................14
§ 1349.09(B) ................................................................14, 31
§ 1349.09(B)(1) ...................................................................4
§ 1349.09(C) ...........................................................15, 17, 31
§ 1349.09(O) ...........................................................16, 33

## Other Authorities

JACOB MCHANGAMA,
   FREE SPEECH: A HISTORY FROM SOCRATES TO SOCIAL MEDIA (2022) .....4

ITHIEL DE SOLA POOL,
   TECHNOLOGIES OF FREEDOM (1983) .......................................4

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights without regard to speakers' views through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights.

FIRE's work includes litigating to protect expressive rights in the digital realm—ensuring that courts apply the First Amendment's protections consistently, regardless of the means used for expression, and that expressive rights are not subverted or weakened based on misunderstandings or fears about emerging technologies. *See, e.g.*, *NetChoice, LLC v. Bonta* (*Bonta I*), 113 F.4th 1101 (9th Cir. 2024); *Volokh v. James*, 656 F. Supp. 3d 431 (S.D.N.Y. 2023), 148 F.4th 71 (2d Cir. 2025), *certifying questions to* N.Y. Ct. App., 44 N.Y.3d 963 (N.Y. 2025) *accepting certified question*; *Students Engaged in Advancing Texas v.*

---

[1] All parties consent to filing this brief. No counsel for a party authored this brief in whole or in part. No person other than FIRE, its members, or its counsel contributed money intended to fund this brief's preparation or submission.

*Paxton (SEAT)*, 765 F. Supp. 3d 575 (W.D. Tex. 2025), *appeal docketed*, No. 25-50096 (5th Cir. Feb. 11, 2025); *see also* Brief for FIRE et al. as *Amici Curiae* Supporting Petitioners, *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (No. 24-656); Brief for FIRE as *Amicus Curiae* Supporting Respondents, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Nos. 22-555, 22-277). FIRE has also participated as *amicus* and as counsel for prevailing parties in significant First Amendment litigation in this Court. *See, e.g.*, Brief for FIRE as *Amicus Curiae* Supporting Appellant, *Cunningham v. Blackwell*, 41 F.4th 530 (6th Cir. 2022) (No. 21-6172); Brief for FIRE & Manhattan Institute as *Amici Curiae* Supporting Appellant, *Parents Defending Education v. Olentangy Local Sch. Dist.*, 120 F.4th 536 (6th Cir. 2024) (No. 23-3630); *Diei v. Boyd*, 116 F.4th 637, 649 (6th Cir. 2024) (representing student disciplined for "off-campus, online, pseudonymous social media posts").

Particularly relevant here, FIRE has been on the front lines of resisting unconstitutional governmental efforts to restrict speech on social media. In addition to the *Diei* case in this Court, FIRE attorneys represented NetChoice in its challenge to the California Age-Appropriate Design Code Act, *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D.

Cal. 2025), *appeal filed*, No. 25-2366 (9th Cir. Apr. 14, 2025), and individual social media users in challenging Utah's Minor Protection in Social Media Act. *Zoulek v. Hass*, 2024 WL 3650645, No. 2:24-cv-00031-RJS-CMR (D. Utah Aug. 5, 2024). FIRE is particularly concerned with governmental attempts to disguise content-based restrictions as regulations of conduct subject to intermediate or lesser scrutiny. *See, e.g.*, Brief for FIRE as *Amicus Curiae* Supporting Appellants, *Alario v. Knudsen*, No. 24-34 (9th Cir. 2024).

With decades of experience combating censorship, including state censorship of minors' speech online, FIRE is well acquainted with the negative consequences of governmental overreach, and well positioned to serve as *amicus curiae* here.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When the government attempts to regulate minors' access to speech, its burden to establish the legislation will demonstrably cure a proven harm is high and "ambiguous proof will not suffice." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 800 (2011); *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818–19 (2000). Despite the Supreme Court's clear holdings that minors enjoy the full protection of the First Amendment, in July 2023 Ohio signed into law the Ohio Parental Notification by Social Media Operators Act (the "Act"), which requires certain online platforms to obtain verifiable parental consent before any unemancipated minor below the age of sixteen agrees to the platform's terms of service to access or utilize the service. OHIO REV. CODE ANN. § 1349.09(B)(1).

Ohio's overreaction is nothing new. Throughout history, new communications technologies have been viewed as a threat to the established order—and governments' initial impulse has been to suppress them. *E.g.*, JACOB MCHANGAMA, FREE SPEECH: A HISTORY FROM SOCRATES TO SOCIAL MEDIA 6 (2022); ITHIEL DE SOLA POOL, TECHNOLOGIES OF FREEDOM 14–15 (1983). This is all the more true when new technology

is perceived to impact children. Dime novels and penny dreadfuls glorifying crime were blamed for juvenile delinquency in the nineteenth century, for example. These moral panics gave way to similar overreactions in the twentieth and twenty-first centuries to movies, radio dramas, comic books, television, and violet video games. *Brown*, 564 U.S. at 797.

In the face of such challenges, the Supreme Court has reaffirmed repeatedly that "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Id.* at 790 (quoting *Joseph Burstyn, Inc.* v. *Wilson*, 343 U.S. 495, 503 (1952)); *see also Reno v. ACLU*, 521 U.S. 844, 870 (1997). And, as for the potential impact on children, Justice Scalia's opinion for the Court in *Brown* confirmed "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown*, 564 U.S. at 794 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–13 (1975)). Permeating all of Ohio's arguments is a total

failure to acknowledge the significant protections the First Amendment provides minors.

Ohio argues NetChoice's facial challenge fails for failure to show the "law's unconstitutional applications substantially outweigh its constitutional ones," a test Ohio argues all First Amendment facial challenges must meet. Appellant's Br. at 24. But that argument misapplies *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). Courts apply that balancing only when considering substantial overbreadth facial challenges, a theory the district court did not need to consider because the Act fails under traditional First Amendment analysis.

The Act's central coverage-defining provisions, which make it applicable only to social media platforms targeted at children or that reasonably anticipate being accessed by them, are content-and speaker-based in every application and therefore must survive strict scrutiny, the highest level of First Amendment review. But Ohio cannot demonstrate the Act employs the least restrictive means available to achieve a compelling government interest and to solve a real problem.

Ohio's claimed interests in protecting children and parental rights to supervise their children mirror those the Supreme Court rejected in

*Brown.* Further, Ohio claims children's access to social media can potentially cause them harm, but offers no reliable evidence to support that claim. And it has not demonstrated how the Act will address any of its stated concerns. Ohio fares no better on narrow tailoring given the Act's over-inclusiveness and under-inclusiveness. Separately, it uses a series of vague terms that fail to provide adequate notice to the platforms and users it regulates. For all these reasons, this Court should affirm.

## ARGUMENT

## I.    The Act Regulates Speech in Every Application, Clearing the Way for NetChoice's Facial Challenge.

The district court correctly granted NetChoice summary judgment primarily under strict scrutiny on a "traditional" First Amendment challenge to the Act. S.J. Order, R. 56, PageID##1340–44. In doing so, it avoided the trap of overapplying the Supreme Court's decision in *Moody* into which various courts have fallen, and into which the Attorney General invites the Court here.[2] Addressing *Moody*'s issuance between

---

[2] NetChoice advanced several significantly different facial challenges: a traditional First Amendment challenge and, in the alternative, a substantial overbreadth challenge, along with a vagueness challenge. The district court granted a permanent injunction on the first and last of those bases. S.J. Order, R.56, PageID##1340–46.

granting a preliminary injunction and considering summary judgment, the district court held strict scrutiny applies here, because, unlike the laws in *Moody*, the instant Act raises the same First Amendment issues in every application to websites that offer social interactivity and target minors or are likely to have minors access them. S.J. Order, R. 56, PageID##1327–28.

That is correct, as the Act applies *only* to social media, the very purpose of which is to facilitate communication between individuals. Its every application thus regulates protected speech in the same ways as similar laws enjoined by other courts. *See NetChoice, LLC v. Bonta* (*Bonta II*), 770 F. Supp. 3d 1164, 1186 (N.D. Cal. 2025), *appeal filed*, No. 25-2366 (9th Cir. Apr. 14, 2025) (a law with a similar "coverage definition [was] content-based in every application"); *see also NetChoice, LLC v. Fitch*, No. 1:24-cv-170-HSO-BWR, 2025 WL 1709668, at *7–9 (S.D. Miss. June 18, 2025), *appeal filed*, No. 25-60348 (5th Cir. June 26, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1121–23 (D. Utah 2024).

In so proceeding, the district court correctly bypassed "figuring out *which* applications of [the Act] violate the First Amendment … then measuring those … against the full universe of possible applications," as

Appellant suggests *Moody* requires. Appellant's Br. 25 (emphasis added). Arguing that *every* First Amendment facial challenge requires substantial overbreadth-styled balancing fundamentally misunderstands First Amendment facial challenges both before and after *Moody*.

Since *Moody*, courts analyzing facial challenges, including the district court here, have synthesized *Moody* as holding "[a] proper First Amendment facial challenge […] proceeds in two steps. The 'first step' is to determine every hypothetical application of the challenged law. The second step is 'to decide which of the law['s] applications violate the First Amendment, and to measure them against the rest.'" S.J. Order, R. 56, PageID##1309–10 (citations to *Moody* omitted). Some courts have imported this two-step balancing into traditional First Amendment analysis. *See Project Veritas v. Schmidt*, 125 F.4th 929, 960–61 (9th Cir. 2025), *cert. denied sub nom. Project Veritas v. Vasquez*, No. 24-1061, 2025 WL 2823711 (U.S. Oct. 6, 2025) (applying traditional intermediate scrutiny to as-applied challenge but overbreadth balancing to facial challenge); *Free Speech Coal., Inc. v. Skrmetti*, No. 24-6158, 2025 WL 512049, at *2 (6th Cir. Jan. 13, 2025) ("Even assuming the district court was correct in applying strict scrutiny, it still did not establish that the

9

unconstitutional applications of the PTMA outweigh the constitutional ones."). Doing so, however, is a flawed application of *Moody*, which the court below correctly avoided here.

In *Moody*, the Supreme Court remanded decisions on facial challenges to state content-moderation laws because the district courts failed to "assess the … laws' scope" before balancing "which … applications violate the First Amendment" and "measur[ing] them against the rest." 603 U.S at 724–25. Even though courts often conflate substantial overbreadth and traditional First Amendment scrutiny, they are distinct claims requiring separate analyses. The latter have never required balancing, and the six-justice majority in *Moody* did not signal the Court intended to break new ground. *See id.* at 745 ("[T]he Court's opinion […] correctly articulates and applies our First Amendment precedent.") (Barrett, J., concurring).

*Moody*'s key holding was instead that First Amendment challenges must always commence with examining whether the challenged law regulates protected activity—either speech or expressive conduct. *Id.* at 724. ("The first step in the proper facial analysis is to assess the state laws' scope."). Fundamentally, courts must "determine what [the law]

covers." *Id.* at 725 (internal quotation marks omitted). On completion of this evaluation, various types of First Amendment challenges proceed differently.

Traditional First Amendment analysis next requires determination of whether the regulation relies on the content or viewpoint of speech to determine when it will apply. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). If a law is content-based, the court applies strict scrutiny, which requires the government to show it "furthers a compelling governmental interest and is narrowly tailored to that end." *Id.* at 171. Similarly, First Amendment vagueness challenges focus on whether the law gives sufficient notice to people of ordinary intelligence what it prohibits and historically did not include balancing. Significantly differing from these, substantial overbreadth "instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *United States v. Hansen*, 599 U.S. 762, 769 (2023). "[T]he question … is whether a law's unconstitutional applications are substantial compared to its constitutional ones." *Moody*, 603 U.S at 718.

Thus, while substantial overbreadth requires balancing constitutional to unconstitutional applications, traditional First Amendment analysis does not. For example, in *Playboy*, 529 U.S. at 827*,* without discussion of the substantial overbreadth doctrine*,* the Court held a content-based speech restriction facially invalid because it was not narrowly tailored. On the other hand, in *United States v. Stevens*, 559 U.S. 460, 477–80 (2010), the Court held a law criminalizing the commercial creation, sale, or possession of depictions of animal cruelty substantially overbroad with no analysis of First Amendment scrutiny.[3] Both approaches can facially invalidate statutes targeting speech, but they are doctrinally distinct and typically employ different analyses.

The correct reading of *Moody* is ultimately that while it remains necessary to balance constitutional versus unconstitutional applications in evaluating substantial overbreadth claims, that variety of balancing is *not* required in *all* First Amendment facial challenges, some of which apply strict scrutiny or vagueness analyses. The district court got that

---

[3] *Hansen* similarly involved an overbreadth claim with no discussion of First Amendment scrutiny, using fundamentally the same language. *See* 599 U.S. at 769–73.

right and, as explained next, correctly held the Act unconstitutional on those grounds.

## II.   The Act Is a Content-Based Speech Regulation That Cannot Satisfy Strict Scrutiny.

Despite Ohio's attempts to cast the Act as one that regulates only "contracting" with minors, in fact, it is a content-based speech regulation. Accordingly, the State must demonstrate the Act is the least restrictive means of achieving a compelling governmental interest. *Reed*, 576 U.S. at 163–64. This test also requires proving an "actual problem" exists. *Playboy*, 529 U.S. at 822. Ohio cannot meet this high bar.

### A.   The Act is Content-Based Because Review of a Website's Expressive Elements Is Necessary to Determine If It Is Subject to the Act.

The Act is facially content-based and subject to strict scrutiny because it divides speech into categories based on its communicative content and treats each category differently. *Reed*, 576 U.S. at 163–64. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* (citing *Sorrell v. IMS Health,* 564 U.S. 552 (2011)). Laws that are "facially content neutral[] will be considered content-based

13

regulations of speech [if they] cannot be 'justified without reference to the content of the regulated speech.'" *Id.* at 164.

Ohio's Act requires examination of speech in multiple ways. Most telling is its core purpose of regulating minors' access to social media. The Act applies only to operators of websites where users can "[i]nteract socially with other users," OHIO REV. CODE ANN. § 1349.09(A)(1)(a), "share a social connection," *id.* at (c), or "post content viewable by others," *id.* at (d). One must examine the content of the speech to determine if it fits within these provisions.

The Act also necessarily relies on the content of speech to determine if an "online web site, service, or product [...] targets children, or is reasonably anticipated to be accessed by children." *Id.* at § 1349.09(B); *see Bonta II*, 770 F. Supp. 3d at 1186–90; *see also Fitch*, 2025 WL 1709668, at *9; *Reyes*, 748 F. Supp. 3d at 1121–23. Where "[t]he overriding justification for the regulation is concern for the effect of the subject matter on young viewers," the law "is not justified without reference to the content of the regulated speech." *Playboy*, 529 U.S. at 811 (cleaned up).

Determining what targets children inherently requires examining a website's content. *Bonta II*, 770 F. Supp. 3d at 1186. The Act's list of factors to consider in making the determination touches on virtually every expressive element of a website including: "(1) [s]ubject matter; (2) [l]anguage; (3) [d]esign elements; (4) [v]isual content; (5) [u]se of animated characters or child-oriented activities and incentives; (6) [m]usic or other audio content; (7) [a]ge of models; [and] (8) [p]resence of child celebrities or celebrities who appeal to children…" OHIO REV. CODE ANN. § 1349.09(C). "Application of these criteria to determine whether a particular business's online offerings are likely to be accessed by children unavoidably requires an evaluation of content." *Bonta II*, 770 F. Supp. 3d at 1187.

The Act also requires examining expressive elements of an "online web site, service, or product" to determine whether it might fall within one of the Act's several exceptions.[4] Thus, while the Act singles out the

---

[4] The Act "does not apply to an online web site, service, or product respecting which interaction between users is limited to the following: (1) [r]eviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; [or] (2) [c]omments incidental to content posted by an established and widely recognized

category of social communications for regulation, it exempts providers of other categories of speech. Such distinctions are hallmarks of content-based regulations. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618–21 (2020) (plurality op.); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) ("[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages ….").

Other courts have reached the same conclusion about the content-based nature of social media regulation. *See Bonta II*, 770 F. Supp. 3d at 1187 (provision applying law's requirements to websites "likely to be accessed by children" is content-based); *Reyes*, 748 F. Supp. 3d at 1121 ("distinctions between websites that allow users to interact socially and websites that serve another function or purpose, such as those that allow users to shop, read the news, access entertainment, educate themselves, or conduct business" are content-based); *Fitch*, 2025 WL 1709668, at *8 (distinctions between websites serving news and sports verses social interaction are content-based); *SEAT*, 765 F. Supp. 3d at 592 (same).

---

media outlet, the primary purpose of which is to report news and current events." OHIO REV. CODE ANN. § 1349.09(O).

Like other recently enacted and challenged state statutes regulating minors' access to social media, Ohio's Act is content-based.

## B. Ohio Fails in Its Attempts to Reclassify Speech as Something Different.

Ohio's claims that it seeks to regulate only minors' contractual relationships and that the Act regulates conduct, not speech, Appellant's Br. at 29–39, cannot obscure the law's obvious purpose of regulating content. "[D]efining regulated speech by its function or purpose" may be more subtle than "defining regulated speech by particular subject matter," but such definitions still draw distinctions "based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 576 U.S. at 163–64. Ohio's regulations apply according to functions such as "[c]reat[ing] or post[ing] content viewable by others" or purposes such as "[i]nteract[ing] socially" or "shar[ing] social connections" and are thus content-based distinctions requiring strict scrutiny. OHIO REV. CODE ANN. § 1349.09(C). And Ohio's stated reason for enacting the legislation is to protect children from harms supposedly caused by social media, including mental health issues, data privacy issues, and sexual predation; to the extent such harms exist, they tie to social media's speech-related functions and purposes.

The district court rejected the Attorney General's arguments, correctly holding the Act "does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers." Summ. J. Order, R.56, PageID#1331 (quoting *Sorrell*, 564 U.S. at 567) (internal quotation marks omitted).

### 1.    The Act Regulates Speech, Not Conduct.

While the Attorney General claims the Act regulates only the "conduct" of contracting with minors, Appellant's Br. at 32–39, the Act is steeped in content-based distinctions. Government officials often try to redefine speech as conduct to avoid First Amendment scrutiny. The Act defines a "operator," in part, as "any business, entity, or person that operates an online web site, service, or product." § 1349.09(A)(1). However, "[c]haracterizing the publication as a business … does not permit an invasion of the constitutional immunity against restraint." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 720 (1931). Nor does defining the output of a website as a "product." *Bonta I*, 113 F.4th at 1119 (applying strict scrutiny to law purporting to regulate online "products, services, or features"); *see also NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere

18

labels."). "[I]n passing upon constitutional questions," courts look to "substance, and not to mere matters of form," and test a regulation "by its operation and effect." *Near*, 283 U.S. at 708. Here, the entire point of the law is to shield minors' exposure to expression online.

Courts around the country have reached the same conclusion as the district court below in the face of governmental efforts to deflect judicial scrutiny. Prelim. Inj. Order, R.33, PageID#344 ("[T]his Court does not think that a law prohibiting minors from contracting to access to a plethora of protected speech can be reduced to a regulation of commercial conduct."); *see also Fitch*, 2025 WL 1709668, at *9 ("The Attorney General argues that [a similar social media law] regulates not speech but non-expressive conduct … The Court is not persuaded."). When NetChoice challenged California's similar Age-Appropriate Design Code Act (CAADCA), the court rejected California's argument that "the CAADCA is not content-based if its sole purpose is to regulate businesses that serve children." *Bonta II*, 770 F. Supp. 3d at 1188; *see also Reyes*, 748 F. Supp. 3d at 1120 ("[T]he speech social media companies engage in when they make decisions about how to construct and operate their platforms—is protected speech."). The law is clear: Statutes intended to regulate

children's access to non-obscene online speech implicate speech protected by the First Amendment.

### 2. Minors Have Free Speech Rights.

Minors possess "robust First Amendment protections." *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 193 (2021). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 794 (citation omitted). "In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik*, 422 U.S. at 214 (citing *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503 (1969)). These protections prohibit states from mandating that speakers obtain proof of parental consent before providing minors access to non-obscene speech. *See Brown*, 564 U.S. at 795 n.3.

"A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (citation omitted). "No doubt a

State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citations omitted). Those are decisions families may make, but they are not for the government—and that is especially true of laws that require parental consent, which do not "enforce *parental* authority over children's speech and religion" but rather "impose *governmental* authority, subject only to a parental veto." *Id*. at 795 n.3.

Social media's popularity with young people does not diminish those rights. "That the State finds expression too persuasive," or "catchy," *Sorrell*, 564 U.S. at 578, or too engaging for young people, *Brown*, 564 U.S. at 798, "does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 578. Nor may the State abridge minors' access to protected speech believing it may distress some audiences. *See Mahanoy* at 185, 190–91 (2021) (profane criticism protected despite upsetting classmates). The government's "general conception of [a] child's best interest does not create a force field against the valid operation of other constitutional rights," or automatically justify any policy enacted

"to promote children's safety and wellbeing." *Bates v. Pakseresht*, 146
F.4th 772, 783, 785 (9th Cir. 2025).

### C.    The Act Fails Strict Scrutiny Because It Is Not Narrowly Tailored to Serve a Compelling Interest.

The Act also fails strict scrutiny because Ohio failed to demonstrate
a compelling interest and narrow tailoring, *KenAmerican Res., Inc. v.
United States Sec'y of Lab.*, 33 F.4th 884, 893 (6th Cir. 2022); *Reed*, 576
U.S. at 171, and provided no evidence the Act actually and demonstrably
*serves* its stated interest. "When the Government defends a regulation on
speech as a means to redress past harms or prevent anticipated harms,
it must do more than simply posit the existence of the disease sought to
be cured. It must demonstrate that the recited harms are real, not merely
conjectural, and that the regulation will in fact alleviate these harms in
a direct and material way." *Turner,* 512 U.S. at 664 (cleaned up). "The
State must specifically identify an actual problem in need of solving, and
the curtailment of free speech must be actually necessary to the solution."
*Brown,* 564 U.S. at 799 (cleaned up). Ohio's legislation fails to meet any
of these requirements.

### 1.    Ohio Has Not Demonstrated a Compelling Interest.

The district court was properly skeptical about the State's asserted interest. It observed early in the case that whether Ohio has established "a compelling [interest]—or even an important one—may turn on how the government chooses to frame that interest going forward." TRO, R.27, PageID#181. Nonetheless, Ohio's summary judgment brief focused more on social media companies' profit motives and the success the platforms have had attracting users, Def.'s Mot. for Summ. J., R.42, PageID#441–44, than it did clarifying the nature of the interest the Act intends to address. *Id*. at PageID##466–67.

Ohio "toggle[d] between several different interests" in arguing "both that [the Act] seeks to regulate the ability of operators to contract with minors, not to limit [their] access to expressive content," while at the same time asserting "the State's compelling interest is in protecting minors from harms associated with covered operators' platforms, including mental health issues, data privacy issues, and sexual predation." Summ. J. Order, R.56, PageID#1341. Additionally, the Attorney General argued the Act served to protect and advance "parents' ability to make decisions about their children's care and upbringing." *Id*.;

23

*accord* Appellant's Br. at 48–49 (Attorney General's continued reliance on child welfare, parental information, and child contracting).

But the Attorney General's evidence focused almost entirely on the first interest, "child welfare," *i.e.*, social media's alleged harms—leaving "parental information" and "child contracting" as no more than fig leaves for the unavoidable fact that Ohio's sole interest is controlling minors' access to speech. And regarding "child welfare," the court correctly observed that the record the Attorney General presented "is much like the deficient record in *Brown*," where "nearly all of the research" showing harmful effects "is based on correlation, not evidence of causation." Summ. J. Order, R.56, PageID#1342.[5] "[C]orrelation does not equal causation," *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005), so courts properly exclude studies that do not reliably support

---

[5] For example, the Attorney General relies heavily on a 2023 United States Surgeon General Advisory. Def.'s Mot. for Summ. J., Ex. B, R.42-2, PageID##490–514. But the Advisory included statements that the research is inconclusive and that social media can have positive effects on young people. *Id.* at 495, 500. Utah offered the same report as evidence in *Reyes* and the court was equally unimpressed. *See Reyes*, 748 F. Supp. 3d at 1125. Another exhibit included a disclaimer that "[t]he study has multiple limitations that need to be considered." Def.'s Mot. for Summ. J., Ex. C., R.42-3, PageID#520.

the latter. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)*; Brown*, 564 U.S. at 800–01 ("ambiguous proof will not suffice" to justify restrictions on minors' speech). The district court properly did so here.

Ohio must not only demonstrate existence of real harms the Act addresses, but also that its law "will in fact alleviate them to a material degree." *Playboy*, 529 U.S. at 817 (quoting *Edenfield v. Fane,* 507 U.S. 761, 770–771 (1993)). Ohio made no attempt to explain, much less prove, that the Act's provisions will have any effect on its stated interests. Ohio's only discussion of how the Act serves its interest consists of one sentence: "Parental consent thus ensures that children will not bind themselves to social-media contracts without parental oversight." Appellant's Br. at 51. The Attorney General does not explain how the Act ensures parental oversight or consider how easy it might be for enterprising teenagers to avoid the Act's requirements by simply claiming to be over sixteen. *See Reyes*, 748 F. Supp. 3d at 1126 (comparable evidence failed to establish any benefits).

### 2.    The Act Either Imposes Unacceptable Age Verification Requirements or It Is Wholey Ineffectual.

In addition to burdening minors' speech, the Act imposes unconstitutional burdens on adult access to protected speech. To comply with the Act, operators must verify the age of each user to determine if parental consent is required. Requiring all users to produce proof of age in the name of protecting minors "is to burn the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). Courts have consistently invalidated laws requiring age verification to access online content, due to the burden it imposes on all users without the required narrow tailoring. A law that "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another … is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purposes that the statute was enacted to serve." *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (quoting *Reno v. ACLU*, 521 U.S. 844, 874 (1997)).[6]

---

[6] The Supreme Court recently upheld under intermediate scrutiny a state age verification requirement for online obscene-to-minors content, on a rationale dependent on it being the only speech category unprotected for minors but protected for adults. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 466, 474, 481–82 & n.7 (2025). But the Court also reaffirmed

Age verification schemes also "require that website visitors forgo the anonymity otherwise available on the internet," *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003), and trigger other "privacy and security concerns." *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008). That significantly deters many users due to concerns about security such as fraud and identity theft. *ACLU v. Gonzales,* 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007), *aff'd sub nom. Mukasey*, 534 F.3d 181*; see also PSINet Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access [identifying information] … may chill the willingness of some adults to participate in the 'marketplace of ideas.'").

The availability of effective but less-restrictive means is fatal to the Act. "Filters … impose selective restrictions on speech at the receiving end, not universal restrictions at the source." *Ashcroft*, 542 U.S. at 667. "Under a filtering regime, adults … may gain access to speech they have a right to see without having to identify themselves[.]" *Id.* It would also

---

minors' First Amendment rights generally, *see id*. at 481, 485–86 (citing *Brown*, 564 U.S. at 799–800), and did not overrule *Ashcroft*, which remains applicable to all other content, including social media.

be less restrictive for Ohio to provide "parents the information needed to engage in active supervision." *Playboy*, 529 U.S. at 826.

Knowing courts frequently invalidate age verification schemes, the Attorney General—with stunning dexterity—argues the Act does not require age verification, stating at oral argument, "[t]his is a self-reporting statute. So, if the child fibs and says that they're over the age of 16, the Act is not requiring these companies to go through and verify the age of all of its users." Hr'g Tr., R.63, PageID#1399 (noting "I think it's an example of its tailoring").

If these assurances are accurate and age verification is not required, the Act is performative and utterly ineffective. To avoid obtaining parental consent, minors merely need affirm they are over sixteen then may access any website the Act proports to restrict. If Ohio can meet its interests simply by offering "online safety suggestions" without enforcement mechanisms, the law is unnecessary. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Playboy*, 529 U.S. at 815.

### 3. For Additional Reasons, the Act Is Not Narrowly Tailored.

The district court correctly identified other examples of how Ohio has not sufficiently tailored its regulation, which must use the least restrictive means to achieve its goal. Summ. J. Order, R.56, PageID#1341. The Act's broad speech restrictions are, if anything, the opposite of narrow tailoring: They restrict and burden enormous swathes of speech on social media on the theory that some of it is potentially harmful for some minors.

The Supreme Court has rejected such dragnet approaches to protecting minors, observing that "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech" is of dubious propriety as a means of "aiding parental authority." *Brown*, 564 U.S. at 802. "Accepting that position would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212–13). By this measure, the Act is vastly overinclusive. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks

29

parents *ought* to want. This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.* at 804.

Like California's unconstitutional attempt to restrict access to violent video games, the Act here is also "seriously underinclusive" because the state "is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent … says it's OK." *Id.* at 802. "That is not how one addresses a serious social problem." *Id.*[7] Even if Ohio could prove social media causes significant problems the Act is capable of alleviating—which it cannot—the Act would nonetheless fail strict scrutiny because it is not narrowly tailored to serve its stated interests.

## III.   The Act's Vague Terms Fail to Give Fair Notice of What Speech Violates the Law.

The Act is also unconstitutional for the independent reason that it violates due process in relying on terms that fail to give operators fair notice of what it prohibits. *Grayned v. City of Rockford*, 408 U.S. 104, 108

---

[7] Regarding Ohio's claimed interest in protecting minors from oppressive contracts, the Act is underinclusive in that it regulates only contracts with social media companies and not with other websites that require acceptance of terms and conditions. Summ. J. Order, R.56, PageID#1341.

(1972). Because the Act regulates speech, the lack of such notice "raises special First Amendment concerns because of its obvious chilling effect." *Reno*, 521 U.S. at 871–872. The Act's vague terms will force operators to "'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

Vagueness permeates the Act, including the terms that govern what websites it covers. For example, the Act applies only to "an online web site, service, or product" that allows users to "[i]nteract socially with other users" and "[p]opulate a list of [their] … social connection[s]." OHIO REV. CODE ANN. § 1349.09(A)(1). Similarly, to understand what websites the Act covers, an operator must know what it means to be "an online web site, service, or product that *targets children*, or is *reasonably anticipated to be accessed by children*." OHIO REV. CODE ANN. § 1349.09(B) (emphasis added). Section 1349.09(C) lists factors the Attorney General or a court "may" consider in determining whether a website qualifies but offers no guidance on which of those factors will apply, how to apply them, or whether and what other factors might bear on the matter. Courts have routinely held that terms defining restrictions

of minors' access to online speech must be more precise. *See SEAT*, 765 F. Supp. 3d at 601 (finding "promotes" to be vague when regulating First Amendment activity).

The difficulty of determining whether a website targets children is further complicated because by defining "child" as "under the age of sixteen" in Section 1349.09(A)(2), the Act replicates the defect in the video game regulation the Supreme Court rejected in *Brown*. 564 U.S. at 812 (Alito, J., concurring). Ohio's "decision to lump all minors together" builds in vagueness because it "draws no distinction between young children and adolescents who are nearing the age of majority." *Id.*; *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 396 (1988). Material interesting to fifteen-year-olds is more likely to resemble material interesting to young adults than material interesting to a ten-year-old, leaving website operators to guess at their inclusion under the Act.

Even giving weight to the factors listed in section (C), such as the "age of models" or "use of animated characters," it is well-nigh impossible for operators to determine if the Act covers their websites unless the website caters to very young children. Those factors—which are broad yet undefined, and neither mandatory nor exclusive—are not only

unhelpful to website operators, but also raise selective enforcement concerns. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108.

The law's exclusions render its reach even more ambiguous. Exemptions for websites where interaction between users is limited to "comments incidental to content posted by an *established and widely recognized media outlet*, the primary purpose of which is to report news and current events," OHIO REV. CODE ANN. § 1349.09(O) (emphasis added), leave the law indecipherable. The Act neither defines nor provides guidance on what qualifies as an "established and widely recognized" media outlet, or how regulators will determine a website's "primary purpose," or the threshold for "news and current events." It is impossible to predict under this exception whether the law will regulate a service like X, where news organizations such as the Associated Press and others publish, and where breaking news often appears first. And if it does not, what services *are* covered? That and the Act's other imponderables make it unconstitutionally vague under the First and Fourteenth Amendments.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order granting NetChoice's motion for summary judgment and permanently enjoining enforcement of the Act.

Dated: October 10, 2025

/s/ *D Gill Sperlein*

Robert Corn-Revere
D Gill Sperlein
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE,
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
gill.sperlein@thefire.org

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This *amicus* brief complies with Federal Rule of Appellate Procedure 29(a)(5) and Sixth Circuit Rule 29(a)(5) because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b), it contains 6,490 words.

2. This *amicus* brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29 and 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

/s/ *D Gill Sperlein*

D Gill Sperlein
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION

Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on October 10, 2025, I electronically filed this amicus brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *D Gill Sperlein*
D Gill Sperlein
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION

Counsel for *Amicus Curiae*