No. 25-3371

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NETCHOICE, LLC,

PLAINTIFF-APPELLEE,

v.

DAVID ANTHONY YOST, in his official capacity as Ohio Attorney General,

DEFENDANT-APPELLANT.

On Appeal from the United States District Court for the
Southern District of Ohio at Columbus
Case No. 2:24-cv-00047
Honorable Algenon L. Marbley, U.S. District Judge

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF OHIO, CENTER FOR DEMOCRACY & TECHNOLOGY, ELECTRONIC FRONTIER FOUNDATION, FREEDOM TO READ FOUNDATION, LGBT TECH, AND WOODHULL FREEDOM FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

David J. Carey
ACLU OF OHIO FOUNDATION,
INC.
1108 City Park Ave.,
Ste. 203
Columbus, OH 43206
Email: dcarey@acluohio.org
Tel.: (614) 586-1972

Freda J. Levenson
ACLU OF OHIO FOUNDATION,
INC.
4506 Chester Avenue
Cleveland, OH 44103
Email: flevenson@acluohio.org
Tel.: (614) 586-1972

Vera Eidelman
Lauren Yu
AMERICA CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email:
veidelman@aclu.org
Tel.: (212) 549-2500

Aaron Mackey
  *Counsel of Record*
David Greene
ELECTRIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: amackey@eff.org
Tel.: (415) 436-9333

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3371          Case Name: NetChoice, LLC v. Dave Yost

Name of counsel: Aaron Mackey

Pursuant to 6th Cir. R. 26.1, American Civil Liberties Union, ACLU of Ohio, Center for Democracy & Technology, Electronic Frontier Foundation, Freedom to Read Foundation, LGBT Tech, and Woodhull Freedom Foundation

*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

## CERTIFICATE OF SERVICE

I certify that on _____ October 10, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Aaron Mackey

Electronic Frontier Foundation

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AND FINANCIAL INTERESTS ......................i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES....................................................................iv

STATEMENT OF INTEREST ............................................................... 1

INTRODUCTION.................................................................................4

ARGUMENT .......................................................................................6

    I.    THE ACT REGULATES PROTECTED SPEECH. ....................................6

        A.    MINORS AND ADULTS RELY ON SOCIAL MEDIA TO ENGAGE IN A DIVERSE RANGE OF PROTECTED EXPRESSION. .....................................................................6

        B.    THE FIRST AMENDMENT PROTECTS THE VAST MAJORITY OF SOCIAL MEDIA ACTIVITY FOR MINORS AND ADULTS ALIKE. ....................................................11

    II.    THE ACT VIOLATES MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS. .........................................................14

        A.    THE ACT IMPERMISSIBLY PROHIBITS MINORS FROM ACCESSING AND ENGAGING IN PROTECTED SPEECH. ........14

        B.    THE ACT ALSO BURDENS THE FIRST AMENDMENT RIGHTS OF ADULTS AND MINORS BY EFFECTIVELY IMPOSING AGE AND IDENTITY VERIFICATION.......................18

            1.    Many verification requirements will either chill or entirely block access to lawful speech. ....................................19

            2.    Online age-verification impermissibly burdens the right to be anonymous online. ..............................................22

            3.    Many age-verification systems put internet users' sensitive data at risk. ................................................................23

CONCLUSION ...................................................................................26

CERTIFICATE OF COMPLIANCE ..........................................................28

CERTIFICATE OF SERVICE................................................................29

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Gonzales*,
478 F. Supp. 2d 775 (E.D. Pa. 2007) ...........................................................23, 24

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008).................................................................................24

*ACLU v. Reno,*
31 F. Supp. 2d 473 (E.D. Pa. 1999) ....................................................................2

*ACLU v. Reno*,
929 F. Supp. 824 (E.D. Pa. 1996) ........................................................................2

*American Amusement Machine Association v. Kendrick*,
244 F.3d 572 (7th Cir. 2001)...............................................................................14

*American Booksellers Foundation  v. Dean*,
342 F.3d 96 (2d Cir. 2003)............................................................................20, 22

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .............................................................................................19

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) ........................................................6, 12, 13, 15, 16, 17, 18

*Carey v. Population Services International*,
431 U.S. 678 (1977) .............................................................................................13

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ................................................................................13, 14, 18

*Free Speech Coalition, Inc. v. Paxton*,
145 S. Ct. 2291 (2025) ..............................................................1, 5, 12, 16, 19

*In re Anonymous Online Speakers*,
661 F.3d 1168 (9th Cir. 2011)..............................................................................22

*Lamont v. Postmaster General of United States*,
381 U.S. 301 (1965) ...............................................................................................7

*Mahanoy Area School District v. B.L.*,
    594 U.S. 180 (2021) .......................................................................1, 7

*Martin v. City of Struthers*,
    319 U.S. 141 (1943) ............................................................................7

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995) ..........................................................................22

*NetChoice LLC v. Carr*,
    No. 23-5105, 2025 WL 1768621 (N.D. Ga. June 26, 2025) ...............6

*NetChoice, LLC v. Bonta*,
    770 F. Supp. 3d 1164 (N.D. Cal. 2025) ............................................6

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ..................................6

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024) ..............................................6

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025)..........................................6, 15

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ..............................................................1, 4, 7, 17

*PSINet, Inc. v. Chapman*,
    167 F. Supp. 2d 878 (W.D. Va. 2001) ............................................24

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004)........................................................20, 23

*Red Lion Broad. Co. v. FCC*,
    395 U.S. 367 (1969) ............................................................................7

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..........................................................................15

*Reno v. ACLU*,
    521 U.S. 844 (1997) .............................................1, 13, 17, 20, 23

v

*Snyder v. Phelps*,
 562 U.S. 443 (2011) ...................................................................13

*Stanley v. Georgia*,
 394 U.S. 557 (1969) .....................................................................7

*State v. Weidner*,
 235 Wis. 2d 306, 611 N.W.2d 684 (2000) .......................................23

*Tinker v. Des Moines Indepent Community School District*,
 393 U.S. 503 (1969) ......................................................................1

*West Virginia. State Board of Education  v. Barnette*,
 319 U.S. 624 (1943) ...................................................................13

## Statutes

Driver Priv. Prot. Act, 18 U.S.C. §§ 2721–25........................................25

Ohio Revised Code § 1349.09.................................................................4, 15

## Other Authorities

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed'*,
 (BBC, Nov. 28, 2020) ...................................................................11

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror:
 A Deep Dive into the Technology of Corporate Surveillance*,
 EFF Deeplinks Blog (Dec. 2, 2019)..................................................24

Brooke Auxier, *Social Media Continue to Be Important Political Outlets
 for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020)........................10

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their
 Cultures*, Travel & Leisure (Oct. 21, 2022) .......................................10

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*,
 Pew Rsch. Ctr. (Sep. 17, 2024) ...........................................................8

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a
 Clear Net Benefit*, N.Y. Times (May 24, 2023) ................................11

*Digital Advertising in the United States – Statistics & Facts*,
 Statista (May 20, 2025) ..................................................................24

Douglas A. Blackmon et al., *Birth of a Movement*,
Wall St. J. (Oct. 29, 2010)..................................................................8

Elizabeth Dias, *Facebook's Next Target: The Religious Experie*nce,
N.Y. Times (July 25, 2021)...............................................................9

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media:*
*Key Findings From Pew Research Center Surveys*,
Pew Rsch. Ctr. (Apr. 24, 2023) .........................................................9

Erica Chen et al., *Online Social Networking and Mental Health Among*
*Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26 (2022).............11

Eur. Digit. Rights, *Position Paper: Online Age Verification and Children's*
*Rights* (2023)...................................................................................21

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the*
*Reality of Being Sick*, Teen Vogue (Sep. 22, 2022) .........................10

Identity Theft Resource Centre, *2023 Data Brach Report* (2024).........................25

J.L. Heinze, *Online Communities for Survivors: Websites and Resources*
*Offering Support and Health*, Nat'l Sexual Violence Res. Ctr.
(Mar. 1, 2022) ...............................................................................10

*Jackie Snow, Why Age Verification Is So Difficult for Websites*,
Wall St. J. (Feb. 27, 2022) ..............................................................21

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online*
*Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog
(Mar. 15, 2024) ...............................................................................9

Javelin, *Child Identity Fraud: A Web of Deception and Loss* (2021)....................26

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use*
*and Socioemotional Well-Being Through the Lens of the COVID-19*
*Pandemic*, 17 Persp. Psych. Sci. 662 (May 2022) ............................11

Jillian Andres Rothschild et al., University of Maryland Centre for
Democracy & Civic Engagement, *Who Lacks ID in America Today?*
*An Exploration of Voter ID Access, Barriers, and Knowledge* (2024)..............20

Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016) ....................................9

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021)..............................................................................10

Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626 (Apr. 2023) ......................................................10

Kenneth P. Brevoort et al., Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* (2015)................................................................................................21

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Research Centre (Sep. 5, 2013) .................................................................................22

Mary Madden et al., Common Sense & Hopelab*, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* (2024) .............................................................................................................8

Michael J. Hanmer & Samuel B. Novey, University of Maryland Centre for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* (2023)........................20

*Number of Internet and Social Media Users Worldwide as of February 2025*, Statista ..........................................................................................8

Press Release, Identity Theft Resource Centre, *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023) ................................................................................................25

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020) ...........................................................................................11

Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1 (May 2020)....................................................................................................8

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sep. 18, 2020)........................................9

Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* (2011) ....................................................................25

Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023) .................................................8

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98 (Feb. 2017) .....................................................23

Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024) .............................21

*The Robloxian Christians*, Exponential .................................................10

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, Int'l J. for Crime, Just. & Soc'y Democracy, Mar. 2018 .....................10

U.S. Census Bureau, CB 25-58, Quarterly Residential Vacancies and Homeownership: First Quarter 2024 (July 28, 2025) ......................................21

Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* (2021) ........................................................9

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization. The ACLU of Ohio is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. They frequently advocate for First Amendment rights online, *see, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025) (counsel), and the free speech rights of young people, *see, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel).

The Center for Democracy & Technology (CDT) is a non-profit public interest organization. For thirty years, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of First Amendment rights on the Internet, including limits on

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(c), *amici* certify that no person or entity, other than *amicus*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties consent to the filing of this brief.

1

governmental authority to compel or silence speech, and in support of privacy protections for online users.

The Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization with more than 30,000 active donors that has worked since 1990 to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights by requiring online services to verify users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824, 825–27 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno,* 31 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The Freedom to Read Foundation ("FTRF") is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

LGBT Tech is a nonprofit organization dedicated to promoting technology

2

adoption and advocacy within the lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") community. LGBT Tech encourages the adoption and use of cutting-edge, new  and  emerging technologies by providing information, education, and strategic outreach. An important function of LGBT Tech is to advocate for policies that benefit the LGBTQ+ community, including by filing amici curiae briefs. LGBT Tech has a significant interest in the outcome of this case and believes that LGBTQ+ individuals, including LGBTQ+ youth, should be able to engage  in  fully  protected  expression,  free  from  governmental interference. Specifically, LGBT Tech recognizes that online platforms are crucial for LGBTQ+ individuals, especially youth, to access vital information, community support, and resources that may not be available in their immediate physical environments.

The Woodhull Freedom Foundation ("Woodhull") is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull has participated in litigation as a party or amicus in cases across the country dealing with free expression. Woodhull is particularly focused on governmental attempts to censor or burden access to online speech, as sexually-themed expression is often a target of such efforts. Woodhull is concerned that if the challenged law is not enjoined, the First

Amendment will be weakened, and the government will be permitted to engage in unlawful censorship of protected expression.

## INTRODUCTION

People rely on social media to keep up to date on the news, engage with elected officials and religious leaders, connect with friends, create art, and build movements. Social media allows children and adults to discover new perspectives, discuss social and political issues, and develop a better understanding of others' beliefs and opinions. In the words of the Supreme Court, social media holds "vast democratic forums" with the "potential to alter how we think, express ourselves, and define who we want to be." *Packingham v. North Carolina*, 582 U.S. 98, 105–06 (2017).

By requiring that social media companies obtain "verifiable parental consent" before allowing any unemancipated minor below the age of sixteen to access or engage in speech on their platforms, Ohio Revised Code § 1349.09 ("the Act") violates the First Amendment. As the Supreme Court made clear in *Brown v. Entertainment Merchants Association*, the project of requiring parental consent before a minor can access protected speech is constitutionally flawed—and the Act's specific methods of implementing that requirement vis-à-vis social media only highlight the constitutional defects. The Act allows verifiable consent to be obtained by mail, fax, e-mail, online payment, phone, videoconference, or cross-

checking government ID—methods that are likely to be easily bypassed, invasive, ineffective, inaccurate, or all the above. Moreover, it is not at all clear how the Act could be enforced without requiring social media platforms to implement age verification for all users (to determine who must satisfy the consent requirement), not to mention more explicit identity verification for minors under 16 and their parents (to prove the requisite parental relationship), thereby violating the First Amendment rights of both minors and adults.

In passing the law, the Legislature was understandably concerned with the wellbeing and safety of minors. But the Act will block minors and adults from accessing and engaging in speech they have every right to access and engage in online—minors when they cannot obtain parental consent, are unable to provide sufficient proof of it, or even with parental consent when the speech is deemed inappropriate by the government; and adults when they cannot verify their age or are unwilling to do so, thereby subjecting them to a parental consent requirement they cannot satisfy. It will also erase people's ability to speak anonymously online, and increase the risks of privacy invasions and data breaches.

The Act is content-based, triggers strict scrutiny, and falls far short of the narrow tailoring required for governmental intrusion into constitutionally protected speech. And because it applies to speech that is protected for both adults and minors, *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), does not

control. Central to the Supreme Court's analysis in that case was its assessment that the law at issue targeted sexual material that is "harmful to minors," a category of speech that minors have no First Amendment right to view. Minors suffer no such limitation when it comes to any other speech, including the plethora of political, religious, artistic, and educational content available on social media.

While Ohio has a legitimate interest in protecting minors from harm, "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011). Courts have repeatedly struck down similar social media restrictions around the country in part for this reason.[2] The same result is warranted here.

## ARGUMENT

### I.    THE ACT REGULATES PROTECTED SPEECH.

#### A.    Minors and Adults Rely on Social Media to Engage in a Diverse Range of Protected Expression.

The Internet, and social media in particular, play a dominant role in the exercise of First Amendment rights today. The "[f]reedom to distribute information

---

[2] *See NetChoice LLC v. Carr*, No. 25-2422, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025), *appeal docketed*, No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Griffin*, No. 23-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025), *appeal docketed*, No. 25-1889 (8th Cir. May 2, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025), *appeal docketed*, No. 25-2366 (9th Cir. Apr. 11, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024), *appeal docketed sub nom.*, *NetChoice, LLC v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024).

to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that . . . it must be fully preserved," *Martin v. City of Struthers*, 319 U.S. 141, 146–47 (1943), and, right now, social media platforms are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107. In addition, social media offers people a space to exercise their right to receive information—to listen to and learn from others. *See, e.g.*, *Martin*, 319 U.S. at 143 (right to receive literature); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307–08 (1965) (right to receive mail); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). Social media creates "places where [people] can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104; *see also Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021) (minors have a right to engage in and receive unpopular, off-campus speech).

Valuable, positive expression and connection regularly take place on social media. At the same time, people can share distressing or upsetting information or engage in negative interactions. That problem is not unique to social media and, just as the government could not ban minors from reading newspapers (which contain distressing news) or showing up at town hall meetings (which might have heated public debate) without parental consent, the same holds online.

An estimated 5.24 billion people use social media for everything from

expressing themselves politically and engaging with elected representatives to learning new dances and finding community.[3]

Users routinely flock to online forums to get their news. For instance, 80% of Black young people, 69% of Latino young people, and 65% of white young people rely on social media to stay informed.[4] And 54% of American adults "at least sometimes" get their news from social media.[5]

Social media is also central to organizing and participating in political movements, from the Tea Party[6] to #MeToo.[7] Nearly half of American social media users say they have been politically active on social media, whether by participating in a political group, encouraging others to act, looking up information about rallies or protests, or using hashtags to show support for a cause.[8]

---

[3] *Number of Internet and Social Media Users Worldwide as of February 2025*, Statista, https://perma.cc/WHU7-9REA.

[4] Mary Madden et al., Common Sense & Hopelab*, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* 17 (2024), https://perma.cc/4FXU-664F.

[5] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sep. 17, 2024), https://perma.cc/Y8FW-FLVA.

[6] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), https://perma.cc/DX44-R46A.

[7] Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn from Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (May 2020), https://perma.cc/V2KA-JFF2.

[8] Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://perma.cc/CQF7-E6DE.

Social media is also a forum for artistic creation. In one study, 71% of teens reported that social media is "a place where they can show their creative side."[9] "In any given day, about one in 10 tweens and teens will use their digital devices to create some type of art or music."[10] In addition, minors and young adults report that the internet helps them learn about art and music history.[11]

Places of worship use social media to share information about events, livestream services, and foster community.[12] Social media is a vital source of religious and spiritual community and information for young people.[13] One young person even created "The Robloxian Christians" as a place for kids on the Roblox gaming platform to pray for one another and talk about their faith.[14] It is now a "youth-led virtual church ministry serving upwards of 40,000 young people from

---

[9] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://perma.cc/6FC6-L3MA.

[10] Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* 41 (2021), https://perma.cc/2MUC-WT78.

[11] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog (Mar. 15, 2024), https://perma.cc/SGL7-3YY7.

[12] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sep. 18, 2020), https://perma.cc/36HP-CVC3.

[13] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (July 25, 2021), https://perma.cc/8HEX-JJAY.

[14] Joely Johnson Mork, *Teen's Online Church Draws Young People from Around the World*, Faith & Leadership (Aug. 23, 2016), https://perma.cc/63CJ-VCS3.

over 85 countries."[15]

Finally, social media enables individuals whose voices would otherwise not be heard to make vital and even lifesaving connections, and to share their unique perspectives.[16] For example, people with disabilities use social media to build community, reduce isolation and stigma, and educate others.[17] Survivors of domestic violence rely on the accessibility and anonymity of online communities to seek advice and resources.[18] Social media use has been shown to reduce loneliness, social isolation, and depression in rural and elderly populations, both of which face limited mobility and decreased ability to socialize in person.[19] And

---

[15] *The Robloxian Christians*, Exponential, https://perma.cc/T3DH-HDFB.

[16] *See*, *e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://perma.cc/DT56-RGG5; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://perma.cc/N7PT-Z784.

[17] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sep. 22, 2022), https://perma.cc/3SBJ-4K5R; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://perma.cc/9AWZ-9QDA.

[18] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, Int'l J. for Crime, Just. & Soc'y Democracy, Mar. 2018, at 44, 44–45, https://perma.cc/8ZS7-UV77; *see also*, *e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr. (Mar. 1, 2022), https://perma.cc/7J6K-2HTW.

[19] Keith N. Hampton et al. , *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626

many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community and support.[20]

Social media thus helps minors develop their own ideas, learn to express themselves, and engage productively with others in our democratic public sphere.[21]

### B. The First Amendment Protects the Vast Majority of Social Media Activity for Minors and Adults Alike.

Though Ohio seeks to justify the Act through its concerns about the impact of social media on minors, outside of the narrow category of sexually-explicit content that is "harmful to minors," people under the age of 18 generally enjoy the same First Amendment rights and protections as adults. The Supreme Court has expressly held that the government cannot "create a wholly new category of content-based regulation that is permissible only for speech directed at children."

---

(Apr. 2023), https://perma.cc/YHH8-VQC7; Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26, 26–27 (2022), https://perma.cc/J7NL-3UKZ.

[20] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://perma.cc/A4TK-ED3R; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed',* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

[21] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://perma.cc/C434-65F4; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 17 Persp. Psych. Sci. 662, 671 (May 2022), https://perma.cc/N8VQ-8A4N ("Social media provides readily-accessible tools for teens to share developing thoughts and experiment with new social identities, particularly without access to traditional methods.").

*Brown*, 564 U.S. at 793–94 (rejecting government's argument that it can regulate violent speech communicated to minors just as it can sexual speech).

The Supreme Court's recent decision in *Paxton* is not to the contrary and does not save the Act. There, the Supreme Court held that a law that aimed to block minors' access to content that is obscene as to minors was subject to intermediate scrutiny only because minors have no First Amendment right to access such speech. The law was thus "an exercise of Texas's traditional power to prevent minors from accessing speech that is obscene from their perspective" and its "burden [on] adults' rights to access such speech . . . ha[d] 'only an incidental effect on protected speech.'" *Paxton,* 145 S. Ct. at 2306. The government has no comparable "traditional power" to prevent minors from accessing any other category of speech, and the Court repeatedly disclaimed any application of its decision to regulations of "fully protected speech." *Id.* at 2310, 2315 n.12, 2316 n.13. Highlighting the narrowness of its ruling, the Court left open the question of whether the Texas law violated the First Amendment as applied to websites that host not only content that is obscene as to minors, but also speech that is protected for both minors and adults. *Id*. at 2308 n.7.

Critically, strict scrutiny remains "the standard for reviewing the direct targeting of fully protected speech." *Id.* at 2310. For that reason, and as explained in further detail below, strict scrutiny is the governing standard here,

notwithstanding the fact that "the protection of children is the object." *Brown*, 564 U.S. at 804–05. Indeed, that a speaker or listener is young is reason not for the diminution of their rights, but "for scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

As the examples in Section I.A demonstrate, socially valuable speech is abundant on social media. But bedrock First Amendment principles provide that access to social media is protected even if its social value is not obvious, or even when a state deems it to be harmful. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977); *Reno v. ACLU*, 521 U.S. 844, 874–75 (1997). And First Amendment principles apply to new forms of communication regardless of their esthetic and moral value. *See Brown*, 564 U.S. at 790.

For these reasons, the Supreme Court has struck down legislation seeking to protect minors from purported dangers, from violent video games, *see Brown*, 564 U.S. at 789, to indecent communications online, *Reno*, 521 U.S. at 874, to drive-in movies, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). The Court has struck down these laws nearly every time they are introduced, notwithstanding societal fears about new technologies and mediums and their purported dangers—

including the ideas they might expose children to. Even where the laws are only "intended to regulate expression accessible to minors," they are "overbroad" if they reach beyond speech that is obscene as to minors. *Id.* at 214.

Lower courts have agreed. As the Seventh Circuit explained in striking down a ban on violent video games, "[minors] must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). Otherwise, they "are unlikely to become well-functioning, independent-minded adults and responsible citizens," for "[t]o shield children right up to the age of 18 from exposure to [troubling or potentially harmful ideas] would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Id*.

## II. THE ACT VIOLATES MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS.

### A. The Act Impermissibly Prohibits Minors from Accessing and Engaging in Protected Speech.

Ohio cannot only allow access to protected speech with express parental consent, as the Act does for anyone under 16. And it especially cannot do so in a content-based way.

The Act is content-based and therefore subject to strict scrutiny. *See Brown*,

564 U.S. at 799. As the court below explained, a website's "choices about whether and how to disseminate user-generated expression 'convey a message about the type of community the platform seeks to foster,'" including "the ideas that: (1) user-generated content is not less valuable than speech authored by the websites themselves; and (2) social interactions and connections . . . have unique value for online communities." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 953 (S.D. Ohio 2025) (citation omitted). The Act's exclusions—exempting interactive sites if they are limited to product reviews or comments about news, § 1349.09(O)— further highlight the extent to which the law's application depends on "the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

The State's own briefing belies the idea that the government's interest in regulating social media is about the terms of a contract, rather than the content minors may encounter online. *See, e.g.*, Br. at 3 (highlighting "dangers of social media," including "social media's negative effects on young people," not impact of contract terms); *id.* at 4 (describing interest in "ensur[ing] that parents have at least some awareness of their children's social-media use); *id.* at 11–12 (noting Act's requirements that platform must give parents a list of features about "censoring or moderating content").

"Strict scrutiny—which requires a restriction to be the least restrictive means

of achieving a compelling governmental interest—is the most demanding test known to constitutional law." *Paxton*, 145 S. Ct. at 2310 (cleaned up). The Act cannot satisfy it.

*Brown* is particularly instructive. In that case, the Supreme Court struck down a law that prohibited selling or renting violent video games to minors—in effect barring minors' access without parental consent. The state had "claim[ed] that the Act is justified in aid of parental authority: By requiring that the purchase of violent video games can be made only by adults, the Act ensures that parents can decide what games are appropriate." *Brown*, 564 U.S. at 802. While recognizing that both this aim, and the legislature's goal of "addressing a serious social problem," were "legitimate," the Court held that where First Amendment rights are involved, such aims "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive"—and that the statute failed to do. *Id.* at 805.

"As a means of protecting children from portrayals of violence, the legislation is seriously underinclusive, not only because it excludes portrayals other than video games, but also because it permits a parental . . . veto." *Id.* If the material is indeed "dangerous [and] mind-altering," the Court explained, it does not make sense to "leave [it] in the hands of children so long as one parent . . . says it's OK." *Id.* at 802.

Equally, "as a means of assisting concerned parents," the Court held that the regulation "is seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime." *Id.* at 805. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought to* want." *Id.* at 804; *cf. Reno*, 521 U.S. at 878 (holding that law prohibiting online distribution of certain materials to minors was overbroad in part because it would override parents who wanted their kids to "obtain information on the Internet that [they], in [their] parental judgment, deemed appropriate"). The Court thus rejected the idea "that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent,*" for "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.[22]

The Court also expressed "doubts that punishing third parties for conveying

---

[22] Even if the Court concludes that the law is subject only to intermediate scrutiny, the parental consent requirement flunks the First Amendment. If the state's concern is the danger of social media platforms' contract terms, "specific, narrowly tailored laws that prohibit" any harmful contract terms or practices, rather than minors' ability to access social media more broadly, "must be the State's first resort." *Cf. Packingham*, 582 U.S. at 107 (holding that ban on social media for certain users fails intermediate scrutiny where harmful conduct that motivated the state could be better targeted through restrictions on the conduct itself).

protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. "Accepting that position would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik,* 422 U.S. at 212–13).

Each of those holdings governs here: To the extent the Act is an attempt to protect minors from harm, it is "seriously underinclusive . . . because it permits a parental . . . veto." *Id.* at 805. To the extent that the Act is an attempt to "assist[ ] concerned parents," it is "seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think [social media use is] a harmless pastime." *Id.* And it also raises First Amendment concerns because it seeks to punish third parties "*just in case* their parents disapprove." *Id.* at 802.

The Act's parental-consent provision also introduces additional burdens on minors and parents—who must prove both that they have the requisite parent or guardian relationship and that the parent has indeed given consent—that fail to pass constitutional muster. As described in the next section, the types of evidence that will be necessary to prove identity inevitably carry privacy and security risks, and those are likely to only expand when it comes to proof of a legal relationship.

### B.    The Act Also Burdens the First Amendment Rights of Adults and Minors by Effectively Imposing Age and Identity Verification.

To the extent that the Act requires social media platforms to impose age and

identity verification to determine which users are subject to, and satisfy, the

parental consent requirement, the Act also violates the First Amendment rights of

all social media users. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Paxton*,

145 S. Ct. at 2309 (recognizing that "submitting to age verification is a burden on

the exercise of [First Amendment] rights").[23] Indeed, it is hard to fathom how a

parent or guardian could verify their relationship to their child on a social media

service for purposes of providing their consent without, at a minimum, providing

government-issued documentation. To the extent that the Act allows for consent by

mail, phone, email, or video *without* proving parental relationship, it cannot

possibly satisfy strict scrutiny because it does not advance any of the government's

asserted interests in informing and supporting parents or protecting children

through their parents.

> **1.    Many verification requirements will either chill or entirely block access to lawful speech.**

Should social media companies implement age verification via government-

---

[23] Though *Paxton* upheld an age-verification scheme, its holding does not govern the Act's age-verification requirement for two reasons. First, as discussed above, unlike the law at issue in *Paxton*, the Act is a content-based regulation of speech that is protected for everyone, thus triggering strict scrutiny. Second, even if the Court were somehow to hold that intermediate scrutiny applies, age verification to access harmful-to-minors content, as in *Paxton*, satisfies that scrutiny only because First Amendment rights to access such content differ by age. *Paxton*, 145 S. Ct. at 2317. Where, as here, the regulated content is protected for all ages, both the significance of the government's interest in burdening access to it *and* age verification's ability to in fact advance any interest are both far more suspect.

issued identification or similar means, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Reno*, 521 U.S. at 856; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). The same will be true for any child of such an adult, who will struggle to prove their relationship to their parents or guardian.

About 15 million adult U.S. citizens do not have a driver's license, and about 2.6 million do not have any form of government-issued photo ID.[24] Estimates show another 28.6 million adult citizens use government IDs that lack their current names or addresses.[25]

Non-ID-based methods also burden First Amendment rights. Age or identity verification based on public or private transactional data will exclude many adults

---

[24] Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024), https://perma.cc/DL9A-5T8L.

[25] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 5 (2023), https://perma.cc/X7JS-J7R7 ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

(and their children). For example, a service relying on mortgage documents would exclude the nearly 35 percent of Americans who do not own a home.[26] Should credit data be used, 26 million Americans—including over 80 percent of 18- and 19-year-olds—are "credit invisible," meaning they do not have a credit record for age-verifying vendors to check.[27]

Should social media services be permitted to use data brokers and commercial services to verify their users' ages or their parents' identities and relationship to them, similar problems would arise. These entities purchase and collect massive amounts of private data.[28] But the data often contains inaccurate or outdated information, which could mistakenly block people from accessing social media.[29]

---

[26] See U.S. Census Bureau, CB 25-58, *Quarterly Residential Vacancies and Homeownership: First Quarter 2024* 5 (July 28, 2025), https://perma.cc/CEE5-SW3U.

[27] Kenneth P. Brevoort et al., Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* 12 (2015), https://perma.cc/N9HQ-F76C.

[28] See Eur. Digit. Rights, *Position Paper: Online Age Verification and Children's Rights* 16–17 (2023), https://perma.cc/E4QM-VFTK; Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J. (Feb. 27, 2022), https://perma.cc/6DC2-3FYW.

[29] Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024), https://perma.cc/LD9Y-ZHQY.

**2.    Online age-verification impermissibly burdens the right to be anonymous online.**

Having to provide identifying information to services seeking to comply with the Act—whether for age verification or to check parental relationships and consent—would also impermissibly burden the First Amendment right to anonymity. *See Am. Booksellers Found.*, 342 F.3d at 99 (age verification "require[s] that website visitors forgo the anonymity otherwise available on the internet").

A reported 86 percent of internet users have taken steps online to minimize their digital footprints, and 55 percent have done so to "avoid observation by specific people, organizations, or the government."[30] Anonymity is a time-honored, historic tradition that is "an aspect of the freedom of speech protected by the First Amendment"—no matter whether its use is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

---

[30] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sep. 5, 2013), https://perma.cc/5BUP-J96F.

Without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236–37; *see also Reno*, 521 U.S. at 856. The same is true for minors who must obtain parental consent, and it may well deter parents who do not want to create a record of what kinds of social media their children want to access, or they are willing to allow. The absence of anonymity will chill users' ability to dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek help online.[31] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 235 Wis. 2d 306, 320, 611 N.W.2d 684, 690 (2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

### 3. Many age-verification systems put internet users' sensitive data at risk.

Even when users are comfortable foregoing anonymity, legitimate privacy and security concerns may dissuade them from accessing, or allowing their children to access, social media in the face of age or identity verification. "Requiring Internet users to provide . . . personally identifiable information," whether to verify age or parental relationship, will "significantly deter many users

---

[31] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98, 99 (Feb. 2017), https://perma.cc/B9Q4-RRNR.

from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *Gonzales*, 478 F. Supp. 2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas'" online).

Although Ohio enacted the Act out of concern for children's wellbeing, any online age-verification regime will make children and adults less safe given the realities of online advertising and data insecurity. Personal information collected online sells for astonishing profits.[32] Because all online data is transmitted through intermediaries, the information a user shares to verify identity or parental relationship can be transmitted beyond the site.[33] Moreover, third-party trackers managed by data brokers, advertisers, and other companies constantly collect data about a user's browsing activity on nearly every site.[34] And whereas usernames,

---

[32] *See Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://perma.cc/Y9P9-VZB7 (the U.S. digital advertising market boasted "a revenue of 317 billion dollars in 2024").

[33] See Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019), https://perma.cc/7B5F-S376.

[34] *Id.*

passwords, and even credit card information can easily be changed, the personal data that platforms may be required to collect (such as date of birth, name, and home address) is much more permanent. *See, e.g.*, Driver Priv. Prot. Act, 18 U.S.C. §§ 2721–25.

At a minimum, the data will present a potential target for data thieves. A record 3,205 data breaches occurred in 2023, up 78 percent from the year prior, and far exceeding the previous record of 1,860 breaches in 2021.[35] Over 350 million people—more than the entire population of the United States—have been affected, and 69 percent of consumers have been victims of identity crime more than once.[36]

Compounding this concern, children are attractive targets for identity theft due to their "uniquely valuable" unused Social Security numbers.[37] A 2021 study found that one in 50 U.S. children were victims of identity fraud, and one in 45

---

[35] Identity Theft Res. Ctr., *2023 Data Brach Report* 3 (2024), https://perma.cc/3VUZ-52YF.

[36] *Id.*; *see also* Press Release, Identity Theft Res. Ctr., *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023), https://perma.cc/26LK-ZRKU.

[37] Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3 (2011), https://perma.cc/RR56-VE2H ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

children had personal information exposed in a data breach.[38] The risk of data

breach is likely to chill constitutionally protected expression.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order

and maintain the injunction against the Act for violating the First Amendment.

Dated: October 10, 2025

By: Aaron Mackey
Aaron Mackey
  *Counsel of Record*
David Greene
ELECTRIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: amackey@eff.org
Tel.: (415) 436-9333

Vera Eidelman
Lauren Yu
AMERICA CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

David J. Carey
 ACLU OF OHIO FOUNDATION, INC.
1108 City Park Ave.,
Ste. 203
Columbus, OH 43206
Email: dcarey@acluohio.org
Tel.: (614) 586-1972

---

[38] Javelin, *Child Identity Fraud: A Web of Deception and Loss* 5 (2021),
https://perma.cc/Z9P4-2U4B.

Freda J. Levenson
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, OH 44103
Email: flevenson@acluohio.org
Tel.: (614) 586-1972

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief of *Amicus Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief is printed in proportionally spaced 14-point Times New Roman font, using Microsoft® Word 365 and there are 6,273 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).

Dated: October 10, 2025                 By:  Aaron Mackey

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on October 10, 2025.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.


Dated: October 10, 2025                 By:  Aaron Mackey

                                        *Counsel for Amici Curiae*