**No. 25-3371**
## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NETCHOICE, LLC, | : | |
| | : | On Appeal from the |
| Appellee, | : | United States District Court |
| | : | for the Southern District of Ohio |
| v. | : | Eastern Division |
| | : | |
| DAVE YOST, | : | District Court Case No. |
| | : | 2:24-cv-00047 |
| Appellant. | : | |

---

## REPLY BRIEF OF APPELLANT
## OHIO ATTORNEY GENERAL DAVE YOST

---

DAVE YOST
Attorney General of Ohio

MATHURA J. SRIDHARAN
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.sridharan@ohioago.gov

*Counsel for Appellant*
 *Dave Yost*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................ii

INTRODUCTION ........................................................................................... 1

ARGUMENT.................................................................................................. 2

I.      NetChoice lacks third-party standing to assert children's rights. .............2

II.      NetChoice has not justified facial relief...................................................5

III.     Ohio's parental-consent provision passes constitutional muster. ............8

     A.      Ohio's parental-consent provision regulates conduct, not speech. ......9

          1.      NetChoice misreads the text of Ohio's statute...............................9

          2.      NetChoice does not dispute the States' long history of regulating child contracting.......................................................... 12

          3.      NetChoice ignores this Court's recent, binding cases about distinguishing conduct and speech. ............................................... 15

          4.      NetChoice downplays federalism................................................. 17

     B.      If the parental-consent provision regulates speech, then intermediate scrutiny applies. .......................................................... 18

          1.      The parental-consent provision is content neutral. ...................... 18

          2.      The limited exceptions in Ohio's statute are severable. ...............22

     C.      The parental-consent provision is properly tailored. .........................24

     D.      The child-protection statute is not unconstitutionally vague.............27

IV.     NetChoice provides no persuasive rejoinder justifying the scope of the District Court's relief. ...........................................................................29

CONCLUSION.............................................................................................30

CERTIFICATE OF COMPLIANCE ................................................................ 31

CERTIFICATE OF SERVICE ........................................................................ 32

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Barr v. Am. Ass'n of Political Consultants*,
591 U.S. 610 (2020) ................................................................ 23, 24

*Blick v. Ann Arbor Public School District*,
105 F.4th 868 (6th Cir. 2024) ............................................................ 16

*Bond v. United States*,
572 U.S. 844 (2014) ........................................................................ 18

*Brown v. Entm't Merch. Ass'n*,
564 U.S. 786 (2011) ................................................................. *passim*

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC*,
596 U.S. 61 (2022) .................................................................... 19, 20

*Elk Grove Unified Sch. Dist. v. Newdow*,
542 U.S. 1 (2004) ...................................................................... 2, 4

*First Choice Chiropractic, LLC v. Dewine*,
969 F.3d 675 (6th Cir. 2020) .................................................... 12, 23

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................ 29

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ........................................................................ 21

*Free Speech Coal., Inc. v. Skrmetti*,
2025 WL 512049 (6th Cir. Jan. 13, 2025) .......................................... 7

*Geiger v. Geiger*,
117 Ohio St. 451 (1927) ................................................................... 24

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ........................................................................ 17

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ........................................................................ 27

ii

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ............................................................... 6

*Lichtenstein v. Hargett*,
    83 F.4th 575 (6th Cir. 2023) ......................................... *passim*

*McCoy v. BATFE*,
    140 F.4th 568 (4th Cir. 2025) ...................................... 12, 15

*McLemore v. Gumucio*,
    149 F.4th 859 (6th Cir. 2025) ....................................... *passim*

*Mills v. Barnard*,
    869 F.3d 473 (6th Cir. 2017) ............................................ 6

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ..................................................... *passim*

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ........................................................ 13, 14

*NetChoice, L.L.C. v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) ........................................ 4, 5

*NetChoice, L.L.C. v. Paxton*,
    121 F.4th 494 (5th Cir. 2024) ...................................... 5, 21

*NetChoice, LLC v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025) ............................... 5, 23, 27

*NRA of America v. Vullo*,
    602 U.S. 175 (2024) ...................................................... 17

*NRA v. Bondi*,
    133 F.4th 1108 (11th Cir. 2025) ................................. 12, 14

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ...................................................... 17

*Secretary of Maryland v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) ....................................................... 2, 4

*Snyder v. United States*,
    603 U.S. 1 (2024) ................................................................. 23

*Specht v. Netscape Communs. Corp.*,
    306 F.3d 17 (2d Cir. 2002) ................................................. 11

*State v. Bethel*,
    167 Ohio St. 3d 362 (2022) ............................................... 11

*State ex rel. Sunset Estate Props., LLC v. Vill. of Lodi*,
    142 Ohio St. 3d 351 (2015) .......................................... 23, 24

*TikTok Inc. v. Garland*,
    604 U.S. 56 (2025) ............................................................. 21

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ........................................................... 29

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) .............................................. 19, 20, 21

*United States v. Williams*,
    504 U.S. 36 (1992) ............................................................... 6

*United States v. Williams*,
    553 U.S. 285 (2008) ..................................................... 27, 28

*Vidal v. Elster*,
    602 U.S. 286 (2024) ........................................................... 13

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) ............................................................. 4

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015) ........................................................... 26

## Statutes, Rules, and Regulations

16 C.F.R. §312.2 ....................................................................... 27

15 U.S.C. §6502 ....................................................................... 27

6th Cir. R. 32.1 ..................................................................................................... 16

Ohio Rev. Code §1.50 ..................................................................................... 23, 24

Ohio Rev. Code §1349.09 ................................................................................*passim*

## INTRODUCTION

In arguing this case, NetChoice waffles between its supposed mission, to champion children's First Amendment rights, and its *true* mission, to keep social-media giants free from any regulation. The product is unsatisfying. Though NetChoice purports to litigate this case for children, its arguments show surprisingly little regard for the many dangers children face when using social-media platforms, which range from cyberbullying, to coercive contracts, to mental-health disorders, to sex predators. And, though NetChoice claims to advocate for the First Amendment, its arguments largely ignore classic considerations that inform the First Amendment's meaning—basics like text, structure, and history. The truth is that NetChoice is no champion of children or the First Amendment. Rather, NetChoice's real cause is transparent: it wants social-media companies left to "*self-regulation*." NetChoice Br.58. Self-regulation, however, benefits only the fox, not the henhouse.

Luckily, the First Amendment does not require the States to be hands off in this area. From this country's earliest years, the First Amendment has peacefully coexisted with state regulation of child contracting, a history that NetChoice has not refuted and, indeed, *cannot* refute. Ohio's child-protection statute continues this tradition. The statute's main provision requires social-media companies to obtain parental consent before contracting with children. Because that provision regulates

conduct (not speech), it does not offend the First Amendment.  For this and many other reasons, the Court should reverse.

## ARGUMENT

NetChoice's case has four crucial flaws.  *First*, NetChoice lacks standing to assert children's rights.  *Second*, NetChoice failed to build a record justifying facial relief.  *Third*, the parental-consent provision within Ohio's statute passes constitutional muster.  *Fourth*, the District Court awarded overbroad relief.  NetChoice's response does not cure these problems.

## I.    NetChoice lacks third-party standing to assert children's rights.

**A.**  Normally, litigants can only assert their own rights.  This rule has exceptions, including in the First Amendment context.  But to vindicate another person's First Amendment rights, a litigant must be able to "satisfactorily … frame" the issues to advance the *rightholder's* interests.  *Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984).   Indeed, even a father cannot pursue his child's rights when their interests "are potentially in conflict."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004).

These principles matter here.  For NetChoice to "satisfactorily frame" the issues to advance children's full interests, the interests of its members and children must align.  But those interests do not align.  Online platforms—including NetChoice's

members—enforce contracts against children when disputes arise. AG Br.9 (collecting examples). NetChoice does not dispute this conflict; it ignores it. But in effect, NetChoice's arguments preference its members' pro-contracting interests over children's opposing interests. NetChoice's maximalist First Amendment position willingly sacrifices contracting protections that Ohio's statute affords children. Thus, NetChoice *has not* satisfactorily framed this case for children.

**B.** NetChoice's response is unconvincing. Initially, NetChoice suggests that its associational standing—to assert its members' rights—"independently suffices" to support the District Court's judgment. NetChoice Br.20. That is wrong. As discussed below (at 7), if NetChoice asserts only the rights of social-media companies, then *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) squarely forecloses facial relief. To have a puncher's chance at such relief, NetChoice needs standing to assert *children's rights*.

Contrary to NetChoice's suggestion, NetChoice Br.28, the conflicts between NetChoice and children matter to this case's legal analysis. NetChoice's First Amendment claim is bound up with the issue of whether the States retain discretion to regulate child contracting. No clean path exists for separating the claim and the conflict. Recognizing as much does not "improperly conflate[]" the merits and standing. *Contra* NetChoice Br.29. This Court can appreciate that the conflicts

between NetChoice and children *relate to* the merits *without* deciding the merits. Said another way, to evaluate whether NetChoice "can be expected satisfactorily to frame the issues," the Court must consider what a merits analysis will entail. *See Munson*, 467 U.S. at 958.

NetChoice's position also fails under the Supreme Court's *Newdow* decision. That decision—which held that a father could not bring a First Amendment claim for his child—offers *a fortiori* support for Ohio here. If a father may not sue on behalf of his child, how can a trade association sue on behalf of all children? NetChoice dodges this alarming comparison. It assumes that the Supreme Court "meant" to strictly cabin *Newdow* to situations where parents disagree. *See* NetChoice Br.27–28. But *Newdow's* reasoning is not so narrow. And the cases are quite similar. Like *Newdow*, this case involves conflicts and antagonism between the plaintiff and the rightholder. *See* 542 U.S. at 15. Also like *Newdow*, this case "touch[es] upon family relations." *See id.* Whether children may enter binding online agreements without parental involvement presents a "hard question[] of domestic relations" that is "sure to affect" any constitutional analysis. *See id.* at 17.

The cases NetChoice relies upon do not help it. NetChoice cites third-party standing decisions that did not analyze conflicts between litigants and rightholders. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988); *NetChoice, L.L.C.*

*v. Fitch*, 134 F.4th 799, 806–07 (5th Cir. 2025).  Because those decisions did not address conflicts, they offer no assistance here.

## II.   NetChoice has not justified facial relief.

**A.**  NetChoice brought a facial challenge, but it did not build a facial record.  In the First Amendment context, facial analysis proceeds in two steps.  The first step "is to assess" the challenged law's "scope." *Moody*, 603 U.S. at 724.  That requires sorting out "the full range of activities" that a law covers. *Id.* at 724–25.  The second step is evaluating which applications violate the First Amendment; and then measuring unconstitutional applications against constitutional ones.  *Id.*  "Failing to carry" the burden "at either step … is fatal" to the plaintiff's claim. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1021 (9th Cir. 2025).

NetChoice did not meet its first-step burden.  It did not build a record addressing the challenged statute's full coverage.  The District Court, in turn, wrongly awarded relief "without a developed record." *See id.* at 1020.  This Court should thus join the Fifth and Ninth Circuits in concluding, after *Moody*, that NetChoice cannot win facial relief through an as-applied approach. *See, e.g.*, *id.* at 1019–22; *Fitch*, 134 F.4th at 807–09; *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 497–500 (5th Cir. 2024).

**B.**  NetChoice does not seriously argue that it met its first-step burden.  But it says Ohio forfeited the argument.  NetChoice Br.65.  That is wrong for three reasons.

*First*, even if a defendant can forfeit a plaintiff's burden, that did not happen here. The parties briefed summary judgment before *Moody* was decided. But the District Court held oral argument after *Moody*. And, during argument, defense counsel submitted that NetChoice had "a burden problem" given "what *Moody* tells us" about how to "succeed on a facial challenge." Argument Tr., R.63, PageID#1366. He further emphasized that *Moody* requires "granular" consideration of a challenged law's applications; considering "heartland applications" is not enough. *Id.*, PageID#1366–67. Noticeably, NetChoice offers the Court only the first few words from defense counsel's answers about *Moody*. *See* NetChoice Br.13. Ohio urges the Court to read the full exchange.

*Second*, parties forfeit claims, not legal theories "in support" of claims. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). Throughout this case, Ohio has argued that NetChoice has not justified facial relief. *E.g.*, Op. & Or., R.56, PageID#1310. Even if Ohio has refined a "strain of the argument" on appeal, that does not amount to forfeiture. *See Mills v. Barnard*, 869 F.3d 473, 483 (6th Cir. 2017).

*Third*, appellate courts may consider issues that were either "pressed or passed upon below." *United States v. Williams*, 504 U.S. 36, 41 (1992). Here, the District Court passed upon whether facial relief was proper under *Moody*. Op. & Or., R.56, PageID#1309–10, 1326–28. The issue is thus preserved.

**C.** Beyond forfeiture, NetChoice suggests that the first step of a facial analysis does not matter here because the constitutional analysis does not vary by application. *E.g.*, NetChoice Br.67, 69. *Moody* forecloses this argument. That decision explains that the first step in a facial analysis is mandatory: when presented with a facial challenge, courts "must" determine a law's full coverage before "do[ing] anything else." 603 U.S. at 725. Tellingly, this Court recently enforced *Moody*'s two-step framework even while assuming that "strict scrutiny" applied to a state law. *Free Speech Coal., Inc. v. Skrmetti*, 2025 WL 512049, at *2 (6th Cir. Jan. 13. 2025) (order).

*Moody* recognized, moreover, that constitutional analysis involving social-media companies is likely to vary based on what their platforms do. The decision noted that First Amendment "answers might differ" by application depending on how much "editorial choice" a platform is making. 603 U.S. at 725–26. The Court thus rejected the idea that social media's dissemination of information necessarily triggers a one-size-fits-all constitutional analysis. *Contra* NetChoice Br.29, 41, 69. That proves critical here: if NetChoice's standing is limited to its members' rights, *see above* 2–5, NetChoice's bid for facial relief necessarily fails under *Moody*.

Even if NetChoice may litigate children's rights, the Court cannot properly assume here that Ohio's statute raises the same First Amendment issues in every application. *Cf. Skrmetti*, 2025 WL 512049, at *2. For example, there is a strong

chance that a child's use of social-media platforms for commercial speech—say, an online marketplace—might lead to a different constitutional analysis than other applications.  AG Br.26–27.  NetChoice implies that a child's use of social media for commercial speech would be outside of the challenged statute's coverage. NetChoice Br.66.  But it never explains why.

**D.**  The lack of a facial record affects NetChoice's arguments in other ways, too. For instance, NetChoice makes a thinly veiled policy argument that children will be "worse off" if social-media companies allow children to use their platforms without enforceable contracts.  NetChoice Br.37.  But the record here does not show the degree to which terms of service are necessary for different platforms.  Thus, the parade of horribles hits a dead end.  And to the extent NetChoice's arguments rely on "covered websites' choices" about disseminating information, *id.* at 49 (quotation omitted), the record does not show—at a facial level—what those choices are.

**III.    Ohio's parental-consent provision passes constitutional muster.**

If the Court agrees that NetChoice (1) cannot litigate children's rights and (2) did not justify facial relief based on its members' rights, then NetChoice loses without further analysis.  But, if further analysis proves necessary, Ohio should still prevail.

Any further analysis will, of course, address NetChoice's First Amendment and vagueness challenges.  NetChoice specifically challenges the parental-consent

provision within Ohio's statute. That provision requires social-media operators to obtain parental consent for any contract with a child. Ohio Rev. Code §1349.09(B)(1). If a child's parent does not consent to the contract, the operator must deny the child access to the platform. *Id.* at (E). For several reasons, the provision survives constitutional review.

### A.     Ohio's parental-consent provision regulates conduct, not speech.

By its text, the First Amendment bars the States from abridging speech, "it does not bar the state[s] from restricting conduct." *Lichtenstein v. Hargett*, 83 F.4th 575, 582 (6th Cir. 2023). It follows that laws regulating conduct—not speech—must normally satisfy only rational basis review. *McLemore v. Gumucio*, 149 F.4th 859, 864, 866–67 (6th Cir. 2025).

The parental-consent provision regulates conduct: child contracting. Ohio's opening brief explained why as a matter of text, history, precedent, and federalism. NetChoice's response misses the mark on all fronts.

### 1.     NetChoice misreads the text of Ohio's statute.

First and foremost, the plain text of the parental-consent provision confirms that social-media operators need to obtain parental consent only if they seek to contract with children. The parental-consent provision says this in relevant part:

> (B) The operator of an online web site, service, or product that targets children, or is reasonably anticipated to be accessed by children, shall do all of the following:
>
> (1) Obtain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product, from the child's parent or legal guardian …

Ohio Rev. Code §1349.09(B)(1). Thus, the need to "[o]btain verifiable consent" arises only if an operator seeks to "contract with a child." *Id.* The statute's corresponding access provision is much the same. It says:

> If a child's parent or legal guardian does not affirmatively consent to the terms of service or other contract, the operator shall deny the child access to or use of the online web site, service, or product.

*Id.* at (E). This provision is a conditional statement. And the "If" of the statement is satisfied only when an operator is trying to impose "terms of service" or another "contract" on children. The "child access" barrier thus applies only in situations where an operator contracts with children.

Throughout its brief, NetChoice suggests that the parental-consent provision is not limited to child contracting. But NetChoice's argument misreads the statute. Specifically, NetChoice argues that Ohio's statute "designates a broad range of actions" as contracts: namely, any act of creating an account. *See* NetChoice Br.10, 36. That is incorrect. For starters, the statute's definition section offers no special definition of contract. Ohio Rev. Code §1349.09(A). Thus, ordinary meaning

applies under Ohio law. *State v. Bethel*, 167 Ohio St. 3d 362, 373 (2022). Additionally, NetChoice's textual analysis clips the phrase "including terms of service" out of the parental-consent provision. *Compare* NetChoice Br.10, 36; *with* Ohio Rev. Code §1349.09(B)(1). That omission changes the meaning. The parental-consent provision does *not* say that contracts include all acts of registering, signing up, or otherwise creating an account. Rather, the parental-consent provision says that contracts "includ[e] terms of services" that are imposed as a condition (during the account set-up process) to "access or utilize" a platform. Ohio Rev. Code §1349.09(B)(1). Terms of service are a normal type of contract. *E.g.*, *Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 31 (2d Cir. 2002). So, the statutory text—when read in full—does not expand the normal meaning of contract.

Given its weakness on the text, NetChoice resorts to consequentialism. It argues that things would go poorly if social-media companies allowed children to use platforms without agreeing to terms of service. *See* NetChoice Br.36–37. This atextual argument is woefully underdeveloped. NetChoice never unpacks—much less facially proves, *see above* 5–8—why terms of service are a must for children using social-media platforms. For instance, NetChoice never explains why social-media companies need contracts enforceable against children to police behavior *on their own* platforms. No doubt, terms of service are important for social-media companies. *See*

AG Br.7–9. But it is far from clear that they impose any true guardrails for children that could not otherwise exist. *Contra* NetChoice Br.37.

Regardless, none of this changes the text. NetChoice is free to think that Ohio's parental-consent provision is bad policy. But, as a matter of text, the provision does not apply unless social-media operators contract with children. The provision thus regulates conduct.

One final textual point. Ohio's reading—limiting the parental-consent provision to child-contracting situations—is the correct reading of the statute. But, even if the Court thinks the statute can be read another way, Ohio's reading is at least a reasonable construction. Thus, the Court should adopt Ohio's reading to avoid any First Amendment problem. *See First Choice Chiropractic, LLC v. Dewine*, 969 F.3d 675, 681 (6th Cir. 2020).

### 2. NetChoice does not dispute the States' long history of regulating child contracting.

The States have strictly regulated child contracting since the founding. *See* AG Br.29–31. The common law's infancy doctrine taught that children were incapable of forming binding contracts. *See McCoy v. BATFE*, 140 F.4th 568, 575–76 (4th Cir. 2025). In effect, the doctrine greatly restricted children's ability to "exercise rights and deal with others in society." *NRA v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025) (*en banc*). Even so, it posed no constitutional problem.

NetChoice does not challenge Ohio's historical account. Nor does it identify any authority suggesting that the infancy doctrine's practical effects on speech make it unconstitutional. NetChoice instead argues that this history is "immaterial." NetChoice Br.40. That is plainly incorrect. The Supreme Court has encouraged government actors to "point to historical evidence about the reach of the First Amendment's protections" when defending their laws. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24–25 (2022). And the Court has recognized that there will be far less "cause for constitutional concern" when a government practice has "always coexisted with the First Amendment." *Vidal v. Elster*, 602 U.S. 286, 295–96 (2024). That holds true even if a law "necessarily requires content-based distinctions." *Id.*

The mention of historical tradition in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), is particularly bad for NetChoice's case. *Brown* serves as the foundation of NetChoice's argument. But NetChoice disregards an important qualifier within *Brown*. The Supreme Court openly acknowledged that California's argument for its law—a law about video games with violent depictions—would have "fare[d] better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence." *Brown*, 564 U.S. at 795. Here, there *is* a longstanding tradition of States specially restricting child contracting. It

follows that Ohio's law should automatically "fare better" than the law in *Brown*. *See id.* Thus, far from being "immaterial," NetChoice Br.40, history illustrates why NetChoice's principal authority is easily distinguished.

The States' long history of regulation also counters NetChoice's other arguments. For example, NetChoice argues that accepting Ohio's position would stifle the "market economy." NetChoice Br.37. But the infancy doctrine has existed for centuries without economic ruin. Historical comparison also shows why a special version of the infancy doctrine is needed in the social-media context. *Contra id.* at 39. For much of this country's history, the infancy doctrine has proven effective in limiting child contracting. *See, e.g.*, *NRA*, 133 F.4th at 1118. But, thus far, the doctrine has not stopped online platforms from contracting with children via terms of service. AG Br.9 (collecting cases). It thus makes sense that state lawmakers are now adapting the doctrine to this new context. *Cf. Bruen*, 597 U.S. at 30 (recognizing that "a modern-day regulation" with a "historical analogue" may "pass constitutional muster" even if it "is not a dead ringer for historical precursors") (emphasis omitted). And, historically speaking, NetChoice is wrong to suggest that Ohio's power is limited to regulating "objectionable terms" within child contracts. NetChoice Br.40. The infancy doctrine governs children's very capacity to enter

14

into contractual agreements; the doctrine does not operate term by term. *See McCoy*, 140 F.4th at 575–76.

### 3. NetChoice ignores this Court's recent, binding cases about distinguishing conduct and speech.

NetChoice stresses non-binding, district-court authority involving different state laws. *See* NetChoice Br.1. But it fails to grapple with this Court's binding precedent. The Court's recent decisions in *McLemore* and *Lichtenstein* offer crucial guidance about how the First Amendment interacts with laws involving conduct. For example, *McLemore* reinforces that a law may regulate conduct—and receive only rational basis review—even if the law involves "the use of language." 149 F.4th at 865. And *Lichtenstein* synthesized decades of Supreme Court precedent into a helpful litmus test. Specifically, *Lichtenstein* emphasized that the Supreme Court "has never applied exacting free-speech scrutiny to laws that bar conduct based on the harm that the conduct causes apart from the message it conveys." 83 F.4th at 583. Thus, the key question—in sorting out conduct regulation from speech regulation—is whether a law can be justified by preventing harms "over and above a disapproval of the message" that the regulated conduct sends. *Id.* at 584 (quotation omitted).

Here, the parental-consent provision satisfies *Lichtenstein*'s approach. The provision prevents children (who lack the capacity to contract) from entering into binding contracts without their parents' involvement. That stops a harm "over and

above a disapproval" of any message on social media.  Surprisingly, NetChoice addresses neither *McLemore* nor *Lichtenstein*.  And it never confronts Ohio's argument that the parental-consent provision satisfies *Lichtenstein'*s approach.  That is a huge misstep, since *Lichtenstein* is binding on this panel.  *See* 6th Cir. R. 32.1(b).

The cases NetChoice does discuss do not save its argument.  For example, relying on a preliminary analysis from the Northern District of Georgia, NetChoice suggests that the Supreme Court's decision in *Brown* forecloses treating regulation of child contracting as a regulation of conduct.  NetChoice Br. 34–35.  *Brown*, however, never analyzed whether California's video-game law was about conduct rather than speech.  That makes sense because California's law could not have been justified by something "over and above a disapproval" of violent depictions.  *See Lichtenstein*, 83 F.4th at 584 (quotation omitted).

NetChoice's reliance on *Blick v. Ann Arbor Public School District*, 105 F.4th 868 (6th Cir. 2024) is also misplaced.  NetChoice cites the case for the idea that sometimes laws regulate speech by targeting activities useful for speaking.  *Id.* at 882. *Lichtenstein* recognized that point as well.  83 F.4th at 585.  That possibility (of indirect targeting) is why it is important to look for a state justification that is "over and above" disapproval of a particular message.  *Id.* at 584 (quotation omitted).  And in this case, such a justification exists.

The Supreme Court's decision in *NRA of America v. Vullo*, 602 U.S. 175 (2024) is also inapposite. There, the Court emphasized that the government may not coerce a private party to punish speech the government disfavors. *Id.* at 190. But that just leads back to the inquiry *Lichtenstein* emphasized: Is the government regulating conduct because it disfavors a message? Or is the government regulating conduct "based on the harm that the conduct causes apart" from its message? *See Lichtenstein*, 83 F.4th at 583. Here, the latter.

### 4.    NetChoice downplays federalism.

NetChoice's reading of the First Amendment would do harm to this country's federalist structure. That is no doubt why a diverse collection of more than 30 States opposes NetChoice's efforts "to distort the First Amendment" into a doctrine of "absolute regulatory immunity for internet platforms." State Amicus Br.2. This Court should likewise be wary of reading the First Amendment to so "greatly reduce the traditional powers of states over their domestic economy." *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 497 (1949). As Justice O'Connor once put it, the First Amendment does not guarantee businesses "a right to choose" their "customers ... without restraint from the State." *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring). Presumably, the same goes for social media.

NetChoice fails to seriously engage. It says that Ohio "cannot rely on federalism to violate constitutional rights." NetChoice Br.40. That statement is true, but it is also circular; it assumes a violation. NetChoice thus talks past the interpretative point Ohio is making. When courts read legal texts, they should be reluctant to employ readings that topple "the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (quotation omitted). Here, therefore, the Court should be reluctant to read the First Amendment as stripping the States of their traditional power to regulate child contracting.

## B. If the parental-consent provision regulates speech, then intermediate scrutiny applies.

Because the parental-consent provision regulates conduct and not speech, it should receive rational basis review *regardless* of whether it is content based or content neutral. *See Lichtenstein*, 83 F.4th at 588; *McLemore*, 149 F.4th at 864, 866–67. But even assuming the provision regulates speech rather than conduct, the provision is content and speaker neutral. And, if the limited coverage exceptions within Ohio's statute cause a constitutional problem, *see* Ohio Rev. Code §1349.09(O), the Court should sever them from the statute.

### 1. The parental-consent provision is content neutral.

Scrutiny under the First Amendment depends on how speech is regulated. A law is content based—and receives strict scrutiny—when it targets speech "because of

the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quotation omitted). A law is content neutral—and receives lesser scrutiny—when the "substantive message" of regulated speech is "is irrelevant" to the law's application. *Id.* at 71. Along related lines, the government may regulate "one medium (or a subset thereof) but not others" without triggering strict scrutiny so long as the regulation can be "justified by" the medium's "special characteristics." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 660–61 (1994).

The parental-consent provision is content neutral. The provision applies regardless of any platform's message, topic, idea, or subject matter. The provision's coverage instead depends on (1) a platform's interactive features, (2) whether a platform involves child contracting, and (3) whether a platform is "reasonably anticipated to be accessed by children." Ohio Rev. Code §1349.09(A)(1), (B)(1); *see also* AG Br.10–12 (detailing the statute's coverage). True, deciding whether children are likely to access a platform requires some consideration of a platform's content. But such consideration "matters only to the extent that it informs" an objective inquiry about children's likely use. *See Austin*, 596 U.S. at 71. Think of it this way. The parental-consent provision regulates a "subset" of a "medium" (social-media platforms directed at children) because of special characteristics (including the

19

propensity of child contracting) and not because of any platform's message. *See Turner*, 512 U.S. at 660–61.

NetChoice takes an overbroad view of what counts as content based. It does not identify any specific message, idea, subject matter, or topic that the parental-consent provision targets. Instead, NetChoice stays at a high level of abstraction: it says Ohio statute must be content based because it "*favors* expression and websites that that do *not* appeal to minors." NetChoice Br. 48. This generic "favoritism" approach conflicts with *Austin*. The regulation at issue there undoubtedly favored billboards containing on-premise advertising over billboards containing off-premise advertising. *See Austin*, 596 U.S. at 64–66. Such favoritism did not justify strict scrutiny. Instead, the Supreme Court analysis focused more granularly on *messages*: it held that strict scrutiny was unjustified because the regulation did not target the "substantive message" on any billboard. *Id.* at 71. Similarly here, while gauging the likelihood of child access requires considering content in some sense, Ohio's statute does not target the "substantive message" of any social-media platform.

NetChoice's discussion of *Turner* also leaves much to be desired. That decision did not say that strict scrutiny applies anytime a law references content to draw coverage distinctions. *Contra* NetChoice Br. 50. Like *Austin*, *Turner* was more specific: it said that laws will "in most instances" be content neutral if they operate "without

reference" to the "ideas or views expressed" in the regulated speech.  512 U.S. at 643.  And here, Ohio's statute applies without regard to the "ideas or views expressed" on social-media platforms.  *Turner* further emphasized the government's ability to regulate a "subset" of a particular "medium" based on the medium's special characteristics.  *Id.* at 660.  The Court cautioned that "broad-based" regulation of a medium was likely to fare better than regulation of a "select few" within a medium, given that a selective approach might signal "suppression and manipulation."  *Id.* at 661.  That is no red flag here:  Ohio's statute applies to a broad segment of the social-media medium, not just a "select few."

Recent cases also counsel against reflexively applying strict scrutiny here.  Last term, the Supreme Court applied intermediate scrutiny to laws that were arguably content or speaker based.  *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 492 (2025); *TikTok Inc. v. Garland*, 604 U.S. 56, 72–73 (2025).  NetChoice limits these decisions to their four corners, *see* NetChoice Br. 50–52, but it ignores the lessons they teach.  *Paxton*, at minimum, confirms that history and tradition remain quite relevant to discerning the First Amendment's boundaries.  *E.g.*, 606 U.S. at 472–74.  NetChoice cannot make those considerations "immaterial."  NetChoice Br.40.  And *TikTok* held that even a law making "TikTok-specific distinctions" could avoid strict scrutiny.  604 U.S. at 72–73.  The challenged law here does not single out a

particular social-media platform. So it should presumably start on the same, or better, constitutional footing.

### 2. The limited exceptions in Ohio's statute are severable.

NetChoice spends much time on a minor aspect of Ohio's statute. Recall that the statute's coverage provisions exempt certain platforms *if* such platforms limit user interaction to certain discrete activities involving product sales or news reports. Ohio Rev. Code §1349.09(O). NetChoice argues that these exceptions make the entire parental-consent provision unconstitutional. NetChoice Br.42–47. This argument fails for two reasons. *First*, the exceptions do no real work in themselves: they are a null set or virtually so. *Second*, these exceptions are severable if they cause any problem.

*Scope of exceptions.* Begin with the limited nature of these exceptions. The relevant exceptions apply only to websites "in which interaction between users is limited to" reviewing sales products or commenting on news reports. Ohio Rev. Code §1349.09(O). But if interactions on a platform are that limited, the platform will not qualify for coverage in the first place. For instance, such a platform would not have a feature for populating "a list of other users with whom an individual shares or has the ability to share a social connection." Ohio Rev. Code §1349.09(A)(1)(c). Thus, these exceptions merely confirm what the statute's initial coverage provision already

accomplishes. *Cf. Snyder v. United States*, 603 U.S. 1, 19 (2024) (noting that lawmakers commonly write in a "belt and suspenders manner"). The exceptions, in other words, reinforce that the statute covers social-media platforms and not other types of platforms that inherently involve less user interaction. The Court should thus recognize the limited nature of these exceptions to avoid any constitutional problem. *See First Choice Chiropractic*, 969 F.3d at 681; *cf. also Bonta*, 152 F.4th at 1015–16 (holding that exceptions for "commercial transactions" and "consumer reviews" did not render a California social-media law content based).

In arguing otherwise, NetChoice cites a few declarations to suggest that these exceptions might sometimes matter to coverage. NetChoice Br.46. But the cited declarations do not address the interaction between the statute's exceptions and its initial coverage provision. *See* Roin Decl., R.2-3, PageID#91–92; Masnick Decl., R.2-4, PageID#101–02. So they are of little value.

***Severability.*** If the Court believes the exceptions cause a problem, it should sever them. *See Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 623–28 (2020) (Kavanaugh, J., op.). Ohio laws are presumptively severable. *State ex rel. Sunset Estate Props., LLC v. Vill. of Lodi*, 142 Ohio St. 3d 351, 356 (2015); Ohio Rev. Code §1.50. To be severed, a provision must simply be "capable of separation" in a way that—considering a statute's "general scope"—still "give[s] effect to the apparent

[legislative] intention" without adding words. *Sunset Estate*, 142 Ohio St. 3d at 356 (quotation omitted). Here, as just discussed, the exceptions have little if any independent effect. So they are easy to separate from the statute without adding words or harming legislative intent.

NetChoice makes a mess of Ohio severability law. *See* NetChoice Br. 45. It overlooks that Ohio statutes are presumptively severable. Ohio Rev. Code §1.50. And it omits the Supreme Court of Ohio's longstanding test for severability. *See Sunset Estate*, 142 Ohio St. 3d at 356; *Geiger v. Geiger*, 117 Ohio St. 451, 466 (1927).

Relatedly, NetChoice stresses that a content-based exception can render an entire statute content based. *See* NetChoice Br.43. That is technically true, but it does not end the discussion. If an exception makes a law content based (and unconstitutional), a court must *still decide* whether the exception is severable. In *Barr*, an exception rendered a federal statute content based. 591 U.S. at 621. But the solution was simple: sever the exception. *Id.* at 636. The same here if the exceptions cause a problem.

### C.   The parental-consent provision is properly tailored.

The parental-consent provision regulates conduct, so it need survive only rational-basis review. *McLemore*, 149 F.4th at 866–67. But, at most, the provision should receive intermediate scrutiny. The provision survives both tests. Ohio has

compelling interests in promoting children's welfare, empowering parents, and protecting children from abusive contracts.  AG Br.48–49.  The parental-consent provision takes a modest, but important step to further these interrelated interests:  it ensures that parents have at least some awareness of children's social-media use when social-media companies are trying to contract with children.

NetChoice's tailoring arguments have many flaws.  NetChoice says that the parental-consent provision fails intermediate scrutiny, but its principal authority is *Brown*—a case applying strict scrutiny.  *See* NetChoice Br.52–56; *Brown*, 564 U.S. at 799–804.  Indeed, *Brown* expressly commented that strict scrutiny made California's burden "much higher" than it would have been under intermediate scrutiny.  564 U.S. at 799–800.  NetChoice, it follows, cannot smuggle strict-scrutiny principles into a case demanding lesser review.

Regardless, the evidentiary comparison between *Brown* and this case is a sloppy one.  In *Brown*, California submitted only limited, flawed research about the connection between violent video games and children.  *See* 564 U.S. at 800.  This case, by contrast, involves a much deeper (and ever-growing) body of research highlighting the many dangers stemming from children's constant social-media use.  *See e.g.*, AG Br.5–7 (discussing record).  Founders of social media have admitted that they designed their platforms to exploit human psychology.  *Id.* at 6.  And the nation's

Surgeon General has declared children's social-media use "an urgent public health issue."  Surgeon General Advisory, R.42-2, PageID#492.  Nothing like that had occurred in *Brown*.  Even for strict scrutiny, the level of evidence needed varies by situation.  In *Williams-Yulee v. Florida Bar*, for example, the plurality did not call for perfect causal evidence regarding judicial fundraising and judicial integrity.  *See* 575 U.S. 433, 442–44 (2015) (Roberts, C.J., op.).  In the current situation, the States surely need not await perfect evidence, as to the effects of every different internet platform, before regulating a dangerous "experiment" in which children are "unknowing participants."  Surgeon General Advisory, R.42-2, PageID#500.

Perhaps the best sign that Ohio's approach is well tailored is the lack of a better option.  Like the District Court, NetChoice has not identified any alternative path that would work as well in serving Ohio's interests but would also be less intrusive for children, parents, and social-media companies.  For example, NetChoice posits that Ohio could simply inform parents about the "private tools" that some social-media platforms afford.  NetChoice Br.57.  But an information campaign would not ensure that parents engage as fully as they would for a consent requirement; nor would it protect children from social-media contracts.  NetChoice also suggests that social media's contracts with children could simply be voidable.  *See* NetChoice Br.63.  But that approach has not proven successful in the online context.  *See* AG

Br.9 (collecting authority).  At one point, NetChoice even mentions the quiet part out loud.  It hints that social-media platforms should really be left to "*self-regulation.*"  NetChoice Br.58.  But, of course, leaving social-media companies to their own whims does nothing to further Ohio's interests in protecting its children.

### D.    The child-protection statute is not unconstitutionally vague.

Ohio's statute is not unconstitutionally vague, particularly when evaluated in the present facial, pre-enforcement context.  *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 503 (1982).  The statute's combination of definitions and plain terms give fair notice of its coverage; the statute is thus not "so standardless" that it seriously encourages "discriminatory enforcement."  *See United States v. Williams*, 553 U.S. 285, 304 (2008); *accord Bonta*, 152 F.4th at 1022–23 (rejecting vagueness challenges to California social-media law).  As NetChoice concedes, NetChoice Br.72 n.9, the statute's coverage provisions are similar to federal law governing websites "directed to children."  *See* 16 C.F.R. §312.2; *cf. also* 15 U.S.C. §6502(b)(1)(A)(ii) (requiring parental consent for collection of children's personal information).

NetChoice spends little time on vagueness, a challenge that has remained underdeveloped throughout this case.  *See* NetChoice Br.71–73.  Most important, NetChoice makes no attempt to meet its facial burden of showing that the statute's

application will be unclear in a significant number of cases. *See Williams*, 553 U.S. at 304. NetChoice instead quibbles at the margins. It suggests, for instance, that there might be tough cases for sorting out when coverage exceptions apply. *See* NetChoice Br.71. But as explained above (at 22–24), the statute's coverage exceptions have little if any effect on the statute's scope and are easily severed if problematic.

NetChoice also critiques the statute's list of eleven discretionary factors, which guide evaluation of whether a platform is directed at children. *See* Ohio Revised Code §1349.09(C). NetChoice questions how "covered websites are supposed to weigh" these factors. *See* NetChoice Br.72. But the statutory factors—which include things like whether a platform uses animation or child celebrities—simply provide a common-sense, non-exhaustive list of relevant considerations when deciding whether a platform "is reasonably anticipated to be accessed by children." Ohio Rev. Code §1349.09(C). It is no more complicated than that.

At bottom, NetChoice can only feign confusion because it brought a facial challenge before any history of enforcement (or non-enforcement). Such "speculation" about "future enforcement" is precisely why such challenges are disfavored. *See Moody*, 603 U.S. at 723.

## IV.    NetChoice provides no persuasive rejoinder justifying the scope of the District Court's relief.

The District Court granted overbroad relief.  It enjoined the *entire* child-protection statute in all potential applications.  *See* Op. & Or., R.56, PageID#1348.  That was wrong (1) because the District Court did not limit injunctive relief to NetChoice's members as required under *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and (2) because it awarded relief as to unchallenged provisions within Ohio's statute.  As to the first problem, even NetChoice appears to accept that relief should be limited to "covered members."  *See* NetChoice Br.73.

Turn then to the second problem.  In moving for summary judgment, NetChoice did not develop arguments specifically directed at the statute's separate parental-notification provisions, contained in Ohio Rev. Code §1349.09(B)(2)–(3).  *See* NetChoice Mot. Summ. J., R.43, PageID#638–66.  Apparently, NetChoice simply assumed those provisions would stand or fall with the parental-consent provision.  *See* NetChoice Br.10–11.  But that is not how relief for constitutional violations works.  Rather, federal courts are supposed to "limit the solution to the problem."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (quotation omitted).

Oddly, NetChoice now suggests that Ohio forfeited this argument because it did not address these unchallenged provisions within its summary-judgment briefing.

*See* NetChoice Br.10–11, 67–68.  That gets party-presentation rules backwards.  Ohio had no obligation to respond to a claim that NetChoice never made.  Thus, whatever this Court holds for the parental-consent provision, the District Court was wrong to enjoin the parental-notification provisions.  *See* Ohio Rev. Code §1349.09(B)(2)–(3).

## CONCLUSION

For these reasons, this Court should reverse and remand with instructions for judgment in the Attorney General's favor.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN
Ohio Solicitor General
 *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.sridharan@ohioago.gov

*Counsel for Appellant*
 *Dave Yost*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 6,492 words. *See* Fed. R. App. P. 32(a)(7)(B)(ii).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2025, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN