No. 25-3371

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NETCHOICE, LLC,

*Plaintiff-Appellee*,

v.

DAVID ANTHONY YOST, in his official capacity as Ohio Attorney General,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Southern District of Ohio,
No. 2:24-cv-00047 (Judge Algenon L. Marbley)

# PETITION FOR REHEARING AND REHEARING EN BANC

STEVEN P. LEHOTSKY
JEREMY EVAN MALTZ
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com

JARED B. MAGNUSON
LEHOTSKY COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

ERIN E. MURPHY
*Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellee*

July 16, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Sixth Circuit Rule 26.1, NetChoice certifies that it does not have a parent corporation, that it is not a subsidiary or affiliate of a publicly held corporation, and that no publicly owned corporation, not a party to the appeal or an amicus, has a financial interest in the outcome of this appeal.

## TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES........................................................................... iii

INTRODUCTION AND RULE 40(B)(2) STATEMENT ...................................... 1

BACKGROUND ............................................................................................. 3

REASONS FOR GRANTING REHEARING ...................................................... 6

I. The Panel Decision Is Egregiously Wrong And Conflicts With Decisions From This And Other Courts ....................................................... 6

II. The Case Presents An Exceptionally Important Question............................ 16

CONCLUSION.............................................................................................. 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*Ashcroft v. FSC*,
535 U.S. 234 (2002) .......... 9

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 7, 9, 13, 14

*CCIA v. Uthmeier*,
2025 WL 3458571 (11th Cir. 2025) .......... 1, 16

*Craig v. Boren*,
429 U.S. 190, 216 (1976) .......... 10, 11

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975) .......... 7, 12, 16

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 8

*FSC v. Paxton*,
606 U.S. 461 (2025) .......... 2, 8, 14

*Hodge v. Talkin*,
799 F.3d 1145 (D.C. Cir. 2015) .......... 9

*June Med. Servs. v. Russo*,
591 U.S. 299 (2020) .......... 10, 11

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) .......... 8, 10

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......... 3, 9

*Moody v. NetChoice*,
603 U.S. 707 (2024) .......... 6, 12

*NetChoice v. Fitch*,
134 F.4th 799 (5th Cir. 2025) .......... 3, 8

*NetChoice v. Fitch*,
2025 WL 2078435 (5th Cir. 2025) .......... 1

*NetChoice v. Fitch*,
145 S.Ct. 2658 (2025) .......... 16, 17

*NetChoice v. Hilgers*,
2026 WL 1850018 (D. Neb. 2026) .......... 1

*NetChoice v. Jones*,
822 F.Supp.3d 656 (E.D. Va. 2026) .......... 1

*NetChoice v. Murrill*,
812 F.Supp.3d 594 (M.D. La. 2025) .......... 1

*Packingham v. N.C.*,
582 U.S. 98 (2017) .......... *passim*

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 14

*Sec'y of State v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) .......... 8, 10

*Sisters for Life v. Louisville-Jefferson Cnty.*,
56 F.4th 400 (6th Cir. 2022) .......... 3, 9, 13, 15

*United States v. Playboy*,
529 U.S. 803 (2000) .......... 9

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976) .......... 9

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) .......... 10

**Statutes**

Ohio Rev. Code §1349.09 .......... 1

Ohio Rev. Code §1349.09(A)(1) .......... 4, 12

Ohio Rev. Code §1349.09(B) .......... 1, 4

Ohio Rev. Code §1349.09(C) .......... 2, 4, 16

Ohio Rev. Code §1349.09(I) .......... 17

Ohio Rev. Code §1349.09(*O*) .......... 5

Ohio Rev. Code §1349.09(*O*)(2) .......... 2

**Other Authorities**

H.B.227 (Ky. 2026) .......... 16

H.B.4388 (Mich. 2025) .......... 16

## INTRODUCTION AND RULE 40(B)(2) STATEMENT

Over the past few years, courts throughout the country have grappled with challenges to recent state efforts to restrict minors' access to "social media." Most have held that such laws violate the First Amendment. NetChoice.Br.1 (collecting cases); *NetChoice v. Jones*, 822 F.Supp.3d 656 (E.D. Va. 2026), *appeal filed*, No.26-1252 (4th Cir.); *NetChoice v. Murrill*, 812 F.Supp.3d 594 (M.D. La. 2025), *appeal filed*, No.26-30016 (5th Cir.); *NetChoice v. Hilgers*, 2026 WL 1850018 (D. Neb. 2026); *but see CCIA v. Uthmeier*, 2025 WL 3458571 (11th Cir. 2025) (staying preliminary injunction); *NetChoice v. Fitch*, 2025 WL 2078435 (5th Cir. 2025) (same). Yet in this case, a majority of a panel of this Court became the first to reject a First Amendment challenge to such a law after final judgment—albeit without agreeing on why. In doing so, the fractured panel put this Court on the wrong side of a split without providing clear guidance on the law and embraced deeply flawed reasoning that cannot be reconciled with decades of settled First Amendment law.

Like several recent state laws, Ohio's Parental Notification by Social Media Operators Act ("HB33"), Ohio Rev. Code §1349.09, bans minors from creating accounts on a slew of popular websites unless they obtain parental consent. HB33 does not just sweep in "social media" websites as commonly understood; it covers *any* website that allows users to "[i]nteract socially" and is "reasonably anticipated to be accessed by children." §1349.09(B). In determining which websites are

covered, HB33 openly requires consideration of the website's *content*, including its "[s]ubject matter," "[v]isual content," "[u]se of animated characters," and more. §1349.09(C). And it exempts websites whose "primary purpose" is "to report news and current events." §1349.09(*O*)(2). HB33 thus triggers strict scrutiny, which is "fatal in fact absent truly extraordinary circumstances." *FSC v. Paxton*, 606 U.S. 461, 484-85 (2025). There is no world in which HB33 is the least restrictive means of achieving Ohio's asserted interests: It restricts access to an exceedingly broad universe of protected speech, including on all manner of websites with no conceivable connection to Ohio's purported concerns.

While two judges concluded that HB33 triggers strict scrutiny, only one (Judge Clay) thought HB33 satisfies it. But as Judge Ritz recognized in dissent, the notion that restricting minors' access to everything from YouTube to Goodreads to Dreamwidth is the "least restrictive means" of achieving anything beggars belief. Judge Batchelder, for her part, refused to subject HB33 to First Amendment scrutiny, concluding that NetChoice failed to satisfy the standard for a facial challenge. But she reached that conclusion only by adopting the puzzling theory (shared by Judge Clay) that she had to ignore the burdens that HB33 imposes on the millions of users that wish to access covered websites because NetChoice purportedly lacks "prudential standing" to assert their First Amendment rights. That squarely conflicts with the Fifth Circuit's decision in *NetChoice v. Fitch*, 134 F.4th 799, 802-03 (5th

Cir. 2025). And it is irreconcilable with countless Supreme Court and Sixth Circuit cases teaching that courts not only may, but *must*, consider the full universe of speech a law burdens to determine whether it burdens "substantially more speech than necessary" to further the government's interests. *McCullen v. Coakley*, 573 U.S. 464, 490 (2014); *accord Sisters for Life v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 407 (6th Cir. 2022). By Judge Batchelder's logic, it is hard to see how any party could ever succeed on a facial First Amendment claim; few will have "third-party standing" to represent everyone whose speech is burdened.

The panel's resolution makes this Court the first in the country to permit a state to require minors to obtain parental consent before accessing social media after final judgment. Worse, the majority could not even agree on a rationale, even though states and litigants alike need guidance about the constitutionality of laws like HB33. And the rationales it offered conflict with decisions from the Supreme Court, this Court, and courts across the country. This Court should not let this highly fractured collection of opinions be its last word on this profoundly important constitutional question.

## BACKGROUND

NetChoice is an Internet trade association whose members operate online services that "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. N.C.*, 582

U.S. 98, 107 (2017). Adults and minors alike use those services to engage in all manner of protected First Amendment activity.

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree "social media" websites are appropriate for minors. In a Nation that values the First Amendment, the preferred approach is to let parents decide what constitutionally protected speech their children may access—including by utilizing the many available tools to monitor their activities on the Internet. Yet notwithstanding the wealth of tools available to help parents tailor and restrict their minors' Internet access, Ohio has taken it upon itself to decide what is appropriate for minors. Ohio enacted HB33, which dramatically restricts minors' access to "social media" websites, curtailing their ability to engage in core First Amendment activities on those services.

HB33 requires minors under 16 to obtain parental consent before creating an account to access websites that allow users to "[i]nteract socially" and that "target[]" or are "reasonably anticipated to be accessed by children." §1349.09(A)(1), (B). To determine whether a website is covered, "the attorney general or a court may consider" (among other things) the website's "[s]ubject matter," "[v]isual content," "[u]se of animated characters or child-oriented activities," and "[m]usic or other audio content." §1349.09(C). HB33 exempts websites where user interaction is

limited to "[r]eviewing products" or "commenting on [others'] reviews," or "[c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." §1349.09(*O*).

NetChoice sued on behalf of its members, who operate some of the websites regulated by HB33, and the district court granted summary judgment on its First Amendment claims. The court concluded that HB33 triggers First Amendment scrutiny because it restricts access to protected expression, and that HB33 must survive strict scrutiny because it explicitly makes content-based distinctions among which websites are covered. MSJ.Op., R.56, PageID#1329-39. The court also held that HB33 flunks strict scrutiny because it is not remotely tailored: By its terms, it sweeps in "thousands" of websites, like Dreamwidth and Goodreads, that no one has ever argued are harmful to minors. MSJ.Op., R.56, PageID#1342-43.

In a fractured set of opinions that commanded no majority, a panel of this Court reversed. Judge Clay and Judge Batchelder each separately concluded that NetChoice lacks "prudential standing" to assert the First Amendment rights of minors. Op.15-16 (Clay, J.); Op.46-47 (Batchelder, J.). But they nevertheless agreed that HB33 implicates the First Amendment and triggers heightened scrutiny. Op.17-18; Op.54; *accord* Op.66 (Ritz, J.). Judge Clay and Judge Ritz both recognized that HB33 triggers strict scrutiny because it is facially content based.

Op.20-21; Op.66. Yet Judge Clay concluded that, despite its breadth, HB33 is the least restrictive means of furthering Ohio's interest in protecting minors online. Op.21-27. Judge Batchelder, without reaching the merits, rejected NetChoice's challenge on the grounds that it failed to prove its facial challenge because she needed more facts about each covered member, Op.53-55—a position both Judge Clay and Judge Ritz rejected, Op.26-27; Op.64-65. So though there was no controlling opinion, the panel reversed because both Judge Clay and Judge Batchelder rejected NetChoice's challenge, albeit on different grounds.

## REASONS FOR GRANTING REHEARING

### I. The Panel Decision Is Egregiously Wrong And Conflicts With Decisions From This And Other Courts.

1. "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody v. NetChoice*, 603 U.S. 707, 733 (2024). That includes the principle "that all persons have access to places where they can speak and listen," *Packingham*, 582 U.S. at 104. Today, those places encompass the "vast democratic forums of the Internet," including "social media" websites. *Id.* The First Amendment therefore limits government efforts to restrict access to "social media" websites, even when its ostensible aim is to protect minors. *Id.* at 106-08.

"[T]he values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v.*

*Jacksonville*, 422 U.S. 205, 214 (1975). The First Amendment thus "limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech" and when it suppresses protected speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 209, 213-14. So just as states cannot ban minors from accessing libraries, movies, or video games, they cannot ban minors from accessing websites that are valuable sources for "exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107.

Nor may they require minors to obtain parental consent before accessing or engaging in protected speech. While the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend," it "does not follow that the state has the power to prevent children from hearing or saying anything without their parents' prior consent." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* And they do not withstand First Amendment scrutiny, as they "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

2. The panel started off on the right foot by recognizing that HB33's speech restrictions trigger First Amendment scrutiny. Op.17-18; Op.54; Op.66. *Contra* Ohio.Op.Br.32-39. Judge Clay and Judge Ritz likewise correctly recognized that HB33 triggers strict scrutiny because it is content based. Op.20-21; Op.66. (Judge Batchelder did not reach the question. Op.52-53.) From there, however, things went awry. Although content-based laws like HB33 must be the least restrictive means of achieving a compelling governmental interest—a test that is "fatal in fact absent truly extraordinary circumstances," *FSC*, 606 U.S. at 484-85—Judge Clay and Judge Batchelder inexplicably concluded that HB33 may nevertheless stand.

The problems began with their conclusion that NetChoice lacks "prudential standing" to assert the First Amendment rights of its members' users. Op.15-16; Op.46-47. That reflects a fundamental misunderstanding of why NetChoice invoked user rights—and creates a square circuit split with the Fifth Circuit's decision in *Fitch*, 134 F.4th at 802-03. This is not a case where plaintiffs with no Article III standing try to "establish an Article III case or controversy by asserting another person's rights." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (Thomas, J., concurring). Nor is it a case where plaintiffs with no First Amendment rights seek to bring a First Amendment claim on behalf of third parties. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 955-56 (1984); *cf. Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

Instead, NetChoice invokes users' rights because they are essential to the First Amendment inquiry into whether HB33 "burden[s] substantially more speech than necessary to achieve the [government's] asserted interests." *McCullen*, 573 U.S. at 490. As this Court has expressly recognized, to conduct that analysis, a court *must* "consider a statute's full range of applications even when some of them do not implicate a particular plaintiff." *Sisters for Life*, 56 F.4th at 407; *Hodge v. Talkin*, 799 F.3d 1145, 1156-57 (D.C. Cir. 2015). That is especially so when, as here, a law burdens the dissemination of speech, as the First Amendment affords "protection" to "the communication, to its source and to its recipients both." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 756-57 (1976).

That explains why the Supreme Court has routinely considered third parties' First Amendment rights without analyzing "third-party standing." Take *Brown*. The only parties there were associations of vendors who wanted to sell violent video games to minors. The Court acknowledged that the law implicated their First Amendment rights to do so. 564 U.S. at 790-92 & n.1. But the bulk of its analysis focused on minors' rights—because they were essential to the ultimate constitutional question. *See Ashcroft v. FSC*, 535 U.S. 234, 252 (2002) (analyzing "rights of adults," in suit brought by publishers, not consumers, of adult-oriented materials); *United States v. Playboy*, 529 U.S. 803, 811-13 (2000) (similar).

Even if "third-party standing" principles had some role to play here, they are easily satisfied. While "plaintiff[s] generally must assert [their] own legal rights," the Supreme Court has "relaxed th[at] prudential-standing limitation" in the First Amendment context. *Munson*, 467 U.S. at 955-56. Even parties who (unlike NetChoice's members) lack First Amendment rights of their own to assert may "challenge a statute not because their own rights … are violated, but because … the statute's very existence may cause others not before the court to refrain from constitutionally protected speech." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).

Even outside the First Amendment context, plaintiffs have "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130. "In such cases," "'the obvious claimant' … is the party upon whom the challenged statute imposes 'legal duties and disabilities.'" *June Med. Servs. v. Russo*, 591 U.S. 299, 319 (2020) (plurality op.). Take *Craig v. Boren*, which permitted a beer vendor to assert the equal-protection rights of her underage male customers. Although there was "no barrier whatever to Oklahoma males" raising the same challenge, 429 U.S. 190, 216 (1976) (Burger, C.J., dissenting), the Court reaffirmed that the vendor could "assert those concomitant rights of third

parties that would be 'diluted or adversely affected' should her constitutional challenge fail," *id.* at 195 (majority op.).

Here, too, HB33 directly regulates NetChoice members, so their standing (and NetChoice's) is indisputable. And the "threatened imposition of governmental sanctions" will force members to restrict users' access to their services, thereby "result[ing] indirectly in the violation of third parties' rights." *Id.* So even if NetChoice's members needed "third-party standing" to assert users' rights, they would have it. That is true regardless of claims that members and users may have "conflicting" interests. *Contra* Op.15; Op.48-50. The same could be said whenever vendors invoke their customer's rights. Oklahoma undoubtedly thought vendors were not acting in the best interest of underage males in *Craig*. The Supreme Court nevertheless has consistently reaffirmed that those directly regulated by a law may vindicate the rights of third parties they are conscripted into restricting. *Russo*, 591 U.S. at 319.

3. Judge Batchelder's conclusion that NetChoice failed to prove its facial challenge rested almost entirely on her "prudential standing" analysis: Because she concluded that NetChoice lacked "standing" to assert users' rights, she refused to consider HB33's impact on users *at all*, or even to subject it to First Amendment scrutiny. Op.53-55. But *Brown*—and a host of cases before and after—confirm that courts must consider *all* First Amendment rights a law restricts when assessing its

constitutionality. *See supra* pp.8-9. By Judge Batchelder's logic, it is hard to see how anyone could ever succeed on a facial challenge unless she had "prudential standing" to represent all impacted third parties.

Once it is clear that the court must consider users' rights, it follows that HB33 "raises the same First Amendment issues" in "every application," regardless of how broadly it restricts the First Amendment rights of NetChoice's members. Op.65 (Ritz, J.). Judge Batchelder acknowledged that may be the case. Op.53 ("Minors' rights … might present a more unitary First Amendment analysis."). By its terms, HB33 burdens users' access to *only* those websites where they "[i]nteract socially" and "[c]reate or post content viewable by others," §1349.09(A)(1)(a), (d)—*i.e.*, engage in and access protected speech. It accordingly burdens users' First Amendment rights in all applications.

At a minimum, HB33 burdens access to enough protected speech to confirm that its "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723-24. That is plain under decades of settled First Amendment law. In *Erznoznik*, the Court did not need to catalog all potential applications of the ordinance prohibiting drive-in theaters from showing films containing nudity. It sufficed that the ordinance was "not directed against sexually explicit nudity" or other unprotected speech, but swept in protected films too, rendering it "demonstrably overbroad." 422 U.S. at 213, 216. Likewise in *Brown*, the Court did

not need to catalog the entire universe of violent video games to hold the law facially unconstitutional, even though some unquestionably contained some speech unprotected vis-à-vis minors. *See* 564 U.S. at 818-19 (Alito, J., concurring); *id.* at 857 (Breyer, J., dissenting). It was enough that the statute facially restricted access to all manner of protected speech.

In *Packingham*, too, the Court did not even need to "decide the precise scope" of the statute. 582 U.S. at 106. Even assuming it applied only to "social networking sites as commonly understood," the statute was facially unconstitutional because it was "unprecedented in the scope of First Amendment speech it burden[ed]." *Id.* at 107. Hence, it even made no difference whether the law could constitutionally be applied to, *e.g.*, "an adult previously convicted of molesting children from visiting a dating site for teenagers." *Id.* at 118 (Alito, J., concurring). It was not limited to such applications; it swept broadly to include all "social networking sites"—possibly more. *Id.* at 106-07 (majority op.); *id.* at 114-17 (Alito, J., concurring); *Sisters for Life*, 56 F.4th at 407 (characterizing *Packingham* as a facial challenge).

Here, too, HB33 undoubtedly burdens a substantial amount of protected speech. There is no need to determine precisely *how* overbroad it is to conclude that it burdens protected speech so excessively that it cannot be the least speech-restrictive means of accomplishing anything. As *Erznoznik*, *Brown*, *Packingham, Sisters for Life*, and scores of other cases teach, if the government has concerns about

unprotected speech, predatory conduct, or speech that poses safety risks, it should enact a law confined to that activity, not restrict access to broad swathes of fully protected speech. The government cannot "burn[] the house to roast the pig." *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

4. Judge Clay, for his part, concluded that HB33 satisfies strict scrutiny. That is mystifying. The Supreme Court just reiterated that strict scrutiny is "fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 484-85. There is no universe in which HB33 can satisfy that test—which is likely why Ohio barely argued otherwise and never built the kind of extensive record strict scrutiny requires, Ohio.Op.Br.51-52. As Judge Clay acknowledged, Op.30-31, HB33 not only restricts access to all manner of protected activity on traditional "social media" websites like Instagram and TikTok—it sweeps in *every* interactive website minors are likely to access, including Dreamwidth (a blogging website) and Goodreads (a website where users share book recommendations), which no one claims causes any harm to children. The notion that such a radical incursion on First Amendment rights could possibly be the "least restrictive means" of achieving Ohio's professed interests beggars belief.[1]

---

[1] That HB33's parental-consent requirement applies regardless of whether minors "have parents who *care* whether they" access covered websites confirms the lack of tailoring. *Brown*, 564 U.S. at 804.

*Packingham* confirms as much. There, the Supreme Court concluded that a North Carolina law barring convicted sex offenders from accessing "social media" websites could not satisfy even *intermediate* scrutiny. 582 U.S. at 105-06. As the concurring Justices observed, the law's "wide sweep preclude[d] access to a large number of websites," though many were "unlikely" to implicate the state's interest in protecting children against sex crimes. *Id.* at 114 (Alito, J., concurring in judgment). If restricting convicted sex offenders' use of the Internet more broadly than needed to protect minors flunks intermediate scrutiny, there is no world in which HB33's restricting minors from accessing and engaging in all manner of protected speech online survives strict scrutiny. Indeed, Ohio has never even tried to "ma[k]e any showing" why HB33 must apply to "*all* [covered entities]." *Sisters for Life*, 56 F.4th at 405.

5. The fundamental errors in the majority's fractured opinions are reason enough to grant rehearing. But that need is heightened by the substantial division of authority they create.

More than a dozen states have recently enacted laws restricting minors from accessing "social media." District courts throughout the country have held that those laws violate the First Amendment—which Justice Kavanaugh observed is "no surprise" since they are "likely unconstitutional." *NetChoice v. Fitch*, 145 S.Ct. 2658

(2025) (Kavanaugh, J., concurring).[2] After all, a mountain of Supreme Court precedent underscores that the First Amendment prohibits states from decreeing what constitutionally protected speech minors may access. *E.g.*, *Erznoznik*, 422 U.S. at 212-14. This case renders this Court the first (after a final judgment) to break rank—though without agreeing on why. That departure places it on the wrong side of a lopsided split, Op.66 (collecting cases), underscoring the need for rehearing.

## II. The Case Presents An Exceptionally Important Question.

No one can seriously dispute that whether and to what extent states may restrict minors from accessing "social media" websites is a profoundly important question. Ohio is one of more than a dozen states that have enacted laws attempting to do so, and several others—including Michigan and Kentucky—have considered similar laws in recent sessions. *See* H.B.4388 (Mich. 2025); H.B.227 (Ky. 2026). These ongoing debates confirm that this case implicates exceptionally important questions. Yet with no controlling analysis, the decision leaves the constitutionality of such laws—including HB33—uncertain. Without precedential guidance on the core First Amendment issue such laws implicate, states will be forced to legislate with serious doubts about whether any particular measure can survive.

[2] Though an Eleventh Circuit stay panel suggested that Florida's "social media" law likely triggers and survives intermediate scrutiny, that interim decision expressly distinguished laws like HB33 with obvious content-based distinctions. *CCIA*, 2025 WL 3458571, at *4-5, *9 n.12; *cf.* §1349.09(C).

The need for clarity is heightened by the irreparable First Amendment injuries these laws inflict. The websites targeted by laws like HB33 are for many the "principal sources for" "speaking" and "exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Left standing, the panel decision threatens to strip countless minors of access to those and many other websites—from Dreamwidth to Goodreads to LinkedIn. MSJ.Op., R.56, PageID#1327-28. That is no hypothetical risk: HB33's escalating, daily penalties, §1349.09(I), will lead some to "err on the side of caution" and "restrict access" more than is necessary. Dreamwidth.Decl., R.2-2, PageID#86. Indeed, multiple NetChoice members and others (*e.g.*, Bluesky) have been forced to bar some or all users from accessing their services in states where similar laws have taken effect. NetChoice.Br.75. This Court should grant rehearing and consider these critical questions en banc before Ohioans are forced to live with a law that one Supreme Court Justice recognized is "likely unconstitutional." *Fitch*, 145 S.Ct. 2658.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted,

s/Erin E. Murphy

ERIN E. MURPHY
*Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

STEVEN P. LEHOTSKY
JEREMY EVAN MALTZ
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com

JARED B. MAGNUSON
LEHOTSKY COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

*Counsel for Plaintiff-Appellee*

July 16, 2026

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 40(d)(3) because this brief contains 3,898 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 with 14-point Times New Roman font.

Date: July 16, 2026

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy