**No. 25-3371**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

—————————

NETCHOICE, LLC,

*Plaintiff-Appellee*,

v.

DAVID ANTHONY YOST, in his official capacity as Ohio Attorney General,

*Defendant-Appellant*.

—————————

On Appeal from the United States District Court for the Southern District of Ohio,
No. 2:24-cv-00047 (Judge Algenon L. Marbley)

—————————

## MOTION TO STAY ISSUANCE OF MANDATE

—————————

STEVEN P. LEHOTSKY
JEREMY EVAN MALTZ
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com

JARED B. MAGNUSON
LEHOTSKY COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellee*

August 11, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Sixth Circuit Rule 26.1, NetChoice certifies that it does not have a parent corporation, that it is not a subsidiary or affiliate of a publicly held corporation, and that no publicly owned corporation, not a party to the appeal or an amicus, has a financial interest in the outcome of this appeal.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.......................................................................... iii

INTRODUCTION ..................................................................................... 1

BACKGROUND ...................................................................................... 4

ARGUMENT ......................................................................................... 7

I.    There Is A Reasonable Probability That The Supreme Court Will
      Grant Certiorari And Reverse ......................................................... 7

II.   Good Cause Supports Staying The Mandate................................... 20

CONCLUSION ....................................................................................... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021)...................................................................21

*Ashcroft v. FSC,*
535 U.S. 234 (2002)...................................................................18

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011).......................................................... *passim*

*CCIA v. Paxton,*
747 F.Supp.3d 1011 (W.D. Tex. 2024) ...................................8

*CCIA v. Uthmeier,*
2025 WL 3458571 (11th Cir. Nov. 25, 2025) .........................8

*Craig v. Boren,*
429 U.S. 190 (1976)............................................................ 19, 20

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975)....................................................... 10, 15, 16

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024)...................................................................17

*FSC v. Paxton,*
606 U.S. 461 (2025)................................................................ 2, 12

*Hodge v. Talkin,*
799 F.3d 1145 (D.C. Cir. 2015).................................................18

*June Med. Servs. v. Russo,*
591 U.S. 299 (2020)...................................................................19

*Kowalski v. Tesmer,*
543 U.S. 125 (2004)............................................................ 18, 19

*Maryland v. King,*
567 U.S. 1301 (2012)................................................................17

iii

*McCullen v. Coakley*,
573 U.S. 464 (2014)..............................................................3, 12, 18

*Moody v. NetChoice*,
603 U.S. 707 (2024)................................................................ 3, 9, 13

*NetChoice v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025).......................................8

*NetChoice v. Carr*,
789 F.Supp.3d 1200 (N.D. Ga. 2025) ...............................................8

*NetChoice v. Fitch*,
134 F.4th 799 (5th Cir. 2025)...........................................................17

*NetChoice v. Fitch*,
2025 WL 2078435 (5th Cir. July 17, 2025) ...................................... 8

*NetChoice v. Fitch*,
145 S.Ct. 2658 (2025)...................................................... 2, 8, 9, 22

*NetChoice v. Griffin*,
812 F.Supp.3d 905 (W.D. Ark. 2025) ..............................................13

*NetChoice v. Hilgers*,
2026 WL 1850018 (D. Neb. June 27, 2026).......................................8

*NetChoice v. Jones*,
822 F.Supp.3d 656 (E.D. Va. 2026) .................................................8

*NetChoice v. Murrill*,
812 F.Supp.3d 594 (M.D. La. 2025)..................................................8

*NetChoice v. Reyes*,
748 F.Supp.3d 1105 (D. Utah 2024) .................................................8

*Packingham v. N.C.*,
582 U.S. 98 (2017)............................................................... *passim*

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)................................................................. 4, 20

*Sec'y of State v. Joseph H. Munson Co.*,
 467 U.S. 947 (1984).................................................................... 18, 19

*Sisters for Life v. Louisville-Jefferson Cnty.*,
 56 F.4th 400 (6th Cir. 2022) ....................................................... 15, 18

*United States v. Playboy*,
 529 U.S. 803 (2000)..........................................................................18

*United States v. Stevens*,
 559 U.S. 460 (2010)...........................................................................11

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*,
 425 U.S. 748 (1976)...........................................................................18

*Virginia v. Am. Booksellers Ass'n*,
 484 U.S. 383 (1988)...........................................................................19

*White v. Plappert*,
 137 F.4th 579 (6th Cir. 2025)....................................................... 7, 20

**Statutes and Rules**

Ohio Rev. Code §1349.09(A)(1).............................................2, 5, 11, 16

Ohio Rev. Code §1349.09(B) ............................................................5, 11

Ohio Rev. Code §1349.09(C) ...............................................................5

Ohio Rev. Code §1349.09(*I*) ............................................................ 21

Ohio Rev. Code §1349.09(*O*) ............................................................ 5

6th Cir. R. 41(a)................................................................................ 1

Fed. R. App. P. 41(b)......................................................................... 1

Fed. R. App. P. 41(d)(1) ............................................................. 1, 4, 7

**Other Authorities**

*CCIA v. Uthmeier*,
 No. 25-11881 (11th Cir. argued Mar. 10, 2026) ...............................9

*NetChoice v. Carr*,
No. 25-12436 (11th Cir. argued Mar. 10, 2026) ...................................................... 9

*NetChoice v. Jones*,
No. 26-1252 (4th Cir. fully briefed June 12, 2026) ...............................................9

*NetChoice v. Murrill*,
No. 26-30016 (5th Cir. fully briefed June 16, 2026) ............................................9

*NetChoice v. Fitch*,
No. 25-60348 (5th Cir. argued Feb. 3, 2026)........................................................9

*NetChoice v. Reyes*,
No. 24-4100 (10th Cir. argued Nov. 20, 2025)......................................................9

**INTRODUCTION**

Pursuant to Federal Rule of Appellate Procedure 41(d) and Circuit Rule 41(a), NetChoice respectfully moves to stay the issuance of the mandate pending the filing and disposition of a petition for a writ of certiorari.[1]  There is a reasonable probability that four Justices will vote to grant certiorari in this case.  Over the past few years, courts throughout the country have grappled with challenges to a slew of state efforts to restrict minors' access to what they have loosely deemed "social media" websites. Whether such laws are consistent with the First Amendment is a question of overwhelming national importance.  If states are allowed to enforce laws like HB33, millions of minors across the country could lose access to a critical medium for engaging in protected speech.  Given the slew of state laws restricting minors from accessing such websites, and the disagreement among jurists around the country about whether and in what circumstances such efforts are consistent with the First Amendment, it is inevitable that the Supreme Court will need to step in to provide a uniform answer—particularly now that this case has created a circuit split on a prudential-standing issue that, for one panel member, largely drove the First Amendment analysis.  And this case is a strong vehicle for the Court to do so.

---

[1] Under Federal Rule of Appellate Procedure 41(b) and Circuit Rule 41(a), the filing of this motion automatically stays the mandate for "the time necessary for disposition of [this] motion seeking a stay."

There is also a reasonable probability that the Supreme Court will reverse. Indeed, one Supreme Court Justice has already gone out of his way to note that laws like HB33 are "likely unconstitutional." *NetChoice v. Fitch*, 145 S.Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in the denial of the application to vacate stay). Every member of the panel agreed that HB33 triggers First Amendment scrutiny, and a majority correctly recognized that HB33 requires strict scrutiny, "the most demanding test known to constitutional law." *FSC v. Paxton*, 606 U.S. 461, 484 (2025). While Judge Clay (alone) concluded that HB33 survives strict scrutiny, there is a very reasonable probability that the Supreme Court will disagree. The Court just reiterated that strict scrutiny "is fatal in fact absent truly extraordinary circumstances." *Id.* at 485. It is hard to see how restricting minors' access to everything from YouTube to Goodreads to Dreamwidth could possibly be the "least restrictive means" of achieving Ohio's interest in protecting minors, *id.* at 471— which is likely why Ohio barely tried to argue otherwise.

There is also a reasonable probability that the Supreme Court will disagree with Judge Batchelder's conclusion that NetChoice failed to prove its facial challenge. By its terms, HB33 targets *only* those websites where users "[i]nteract socially with other users" and "[c]reate or post content viewable by others," Ohio Rev. Code §1349.09(A)(1)(a), (d)—*viz.*, websites where users engage in protected speech. HB33 thus restricts minors from accessing protected speech in *all*

2

applications. And because the statute on its face sweeps in websites "reasonably anticipated to be accessed by children" without regard to whether such websites raise any of the state's concerns, its narrow tailoring problems are present in every application. Moreover, even assuming there were some constitutional applications, the "unconstitutional applications substantially outweigh" by a longshot any "constitutional ones" that may exist. *Moody v. NetChoice*, 603 U.S. 707, 724 (2024).

Judge Batchelder concluded otherwise based on her belief that she had to ignore the burdens HB33 imposes on the millions of users that wish to access covered websites because NetChoice purportedly lacks "prudential standing" to invoke their First Amendment rights. There is a reasonable probability that the Supreme Court will disagree. When it comes to facial First Amendment challenges, courts not only may, but *must*, consider the full universe of speech a law burdens to determine whether it burdens "substantially more speech than necessary." *McCullen v. Coakley*, 573 U.S. 464, 490 (2014). That is why the Supreme Court repeatedly invoked the First Amendment rights of minors who wished to purchase violent video games in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), even though the only plaintiffs in that case were trade associations that represented vendors who wished to sell those games to minors. Judge Batchelder's view departs from Supreme Court cases examining the same First Amendment issues.

3

In short, NetChoice's forthcoming petition raises a "substantial question." Fed. R. App. P. 41(d)(1). And there is plainly "good cause" for a stay. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). If HB33 goes into effect, hundreds of thousands of minors in Ohio will lose access overnight to some of the most important mediums for engaging in protected First Amendment activity. That is not speculation; laws like HB33 have already forced some online services to cut off access to all minors—or even adults— in the rare states where they have taken effect. The Court should not allow such a massive imposition on First Amendment rights to come to pass in Ohio before the Supreme Court has an opportunity to consider whether to weigh in.

## BACKGROUND

1. NetChoice is an Internet trade association whose members operate online services, which "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. N.C.*, 582 U.S. 98, 107 (2017). Adults and minors alike use those services to engage in all manner of protected First Amendment activity. NetChoice.Decl., R.2-1, PageID#65-66; MSJ.Op., R.56, PageID#1303. Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree "social

4

media" websites are appropriate for minors. In a Nation that values the First Amendment, the preferred approach is to let parents decide what constitutionally protected speech their children may access—including by utilizing the many available tools to monitor their activities on the Internet.

Notwithstanding the wealth of tools available to help parents oversee their minors' Internet access, *see* MSJ.Op., R.56, Page ID #1343, Ohio enacted HB33, which dramatically restricts minors' access to "social media" websites and thereby curtails their ability to engage in core First Amendment activities on those services. HB33 requires minors under 16 to obtain parental consent before creating an account to access websites that allow users to "[i]nteract socially" and that "target[]" or are "reasonably anticipated to be accessed by children." §1349.09(A)(1), (B). To determine whether a website is covered, "the attorney general or a court may consider" (among other things) the website's "[s]ubject matter," "[v]isual content," "[u]se of animated characters or child-oriented activities," and "[m]usic or other audio content." §1349.09(C). HB33 exempts websites where user interaction is limited to "[r]eviewing products" or "commenting on [others'] reviews," or "[c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." §1349.09(*O*).

5

2. NetChoice sued on behalf of its members, who operate some of the websites regulated by HB33, and the district court granted summary judgment on its First Amendment claims. The court concluded that HB33 triggers First Amendment scrutiny because it restricts access to protected expression, and that HB33 must survive strict scrutiny because it is content based. MSJ.Op., R.56, PageID#1329-39. The court also held that HB33 flunks that test because it is not remotely tailored: It sweeps in "thousands" of websites, like Dreamwidth and Goodreads, that no one has ever argued—and that the record cannot show—are harmful to minors. MSJ.Op., R.56, PageID#1342-43.

In a fractured set of opinions, this Court reversed. Judge Clay and Judge Batchelder separately concluded that NetChoice lacks "prudential standing" to assert the First Amendment rights of minors. Op.15-16 (Clay, J.); Op.46-47 (Batchelder, J.). But they nevertheless agreed that HB33 implicates the First Amendment and triggers heightened scrutiny. Op.17-18; Op.54; *accord* Op.66 (Ritz, J.). Judge Clay and Judge Ritz both recognized that HB33 triggers strict scrutiny because it is facially content based. Op.20-21; Op.66. Yet Judge Clay concluded that, despite its breadth, HB33 survives that exceedingly demanding test. Op.21-27. Judge Batchelder, without reaching the merits, ruled against NetChoice on the ground that it failed to prove its facial challenge because she needed more facts about each covered member, Op.53-55—a position both Judge Clay and Judge Ritz rejected,

6

Op.26-27; Op.64-65. So though there was no controlling opinion, the panel reversed because both Judge Clay and Judge Batchelder rejected NetChoice's challenge.

## ARGUMENT

The Court may stay its mandate pending the filing of a petition for a writ of certiorari if "the petition would present a substantial question" and "there is good cause for a stay." Fed. R. App. P. 41(d)(1). A petition presents a substantial question if there is (1) "a reasonable probability that four Justices will vote to grant certiorari"; (2) a reasonable probability "that five Justices will vote to reverse the judgment of this court"; and (3) "irreparable injury absent a stay." *White v. Plappert*, 137 F.4th 579, 581 (6th Cir. 2025). This case easily meets that standard.

## I.    There Is A Reasonable Probability That The Supreme Court Will Grant Certiorari And Reverse.

1. If Ohio's law takes effect, hundreds of thousands of minors in Ohio risk losing access to websites that for many are valuable sources for speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Given the overwhelming national importance of the question presented and the slew of similar laws across the country, there is a reasonable probability that the Supreme Court will grant certiorari to resolve whether state efforts to restrict minors' access to "social media" services are consistent with the First Amendment.

7

One Supreme Court Justice has already concluded that laws like HB33 are "likely unconstitutional." *Fitch*, 145 S.Ct. at 2658 (Kavanaugh, J.).  So have a slew of jurists across the country in enjoining laws similar to HB33.[2]  As those courts have recognized, "the core principles of the First Amendment constitute a vital shield protective of the constitutional rights of both adults and youth." *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1210 (N.D. Ga. 2025).  States thus generally "do[] not have the legal authority to block minors' access to constitutionally protected speech," including by requiring them to obtain parental consent to do so.  *NetChoice v. Jones*, 822 F.Supp.3d 656, 675 (E.D. Va. 2026).  And courts have repeatedly concluded that restricting minors' access to "social media" services is not a narrowly tailored means of achieving any valid state interest, as such restrictions unconstitutionally "erect[] barriers to accessing" an entire universe of protected speech, "rather than placing those barriers around the content or functions that raise concern." *E.g.*, *NetChoice v. Griffin*, 2025 WL 978607, at *13 (W.D. Ark. Mar. 31, 2025).  While several of

---

[2] *See NetChoice v. Reyes*, 748 F.Supp.3d 1105 (D. Utah 2024), *appeal filed*, No.24-4100 (10th Cir.); *NetChoice v. Murrill*, 812 F.Supp.3d 594 (M.D. La. 2025), *appeal filed*, No.26-30016 (5th Cir.); *Griffin*, 2025 WL 978607, *appeal filed*, No.25-1889 (8th Cir.); *Carr*, 789 F.Supp.3d 1200, *appeal filed*, No.25-12436 (11th Cir.); *Jones*, 822 F.Supp.3d 656, *appeal filed*, No.26-1252 (4th Cir.); *NetChoice v. Hilgers*, 2026 WL 1850018 (D. Neb. June 27, 2026), *appeal filed*, No.26-2478 (8th Cir.); *cf. CCIA v. Paxton*, 747 F.Supp.3d 1011 (W.D. Tex. 2024), *aff'd on other grounds*, 2026 WL 2130729 (5th Cir. July 24, 2026); *but see NetChoice v. Fitch*, 2025 WL 2078435 (5th Cir. July 17, 2025) (staying preliminary injunction); *CCIA v. Uthmeier*, 2025 WL 3458571 (11th Cir. Nov. 25, 2025) (same).

those cases involve pending appeals, multiple have been fully briefed and argued for months,[3] heightening the prospect of further division before the Supreme Court will act on NetChoice's impending petition for certiorari here.

The widespread disagreement with the approaches taken by the panel members in the majority here is unsurprising. As Justice Kavanaugh explained, laws like HB33 are exceedingly difficult to reconcile with the Supreme "Court's precedents." *Fitch*, 145 S.Ct. at 2658. "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733. That includes the principle "that all persons have access to places where they can speak and listen." *Packingham*, 582 U.S. at 104. The Supreme Court has been emphatic that those places include the "vast democratic forums of the Internet." *Id.* The First Amendment thus limits the government's power to restrict access to "social media" websites, even when its ostensible aim is to protect minors. *Id.* at 106-08.

Those same principles apply in full measure to minors who seek access to those websites. The "values protected by the First Amendment are no less applicable

---

[3] *See NetChoice v. Fitch*, No.25-60348 (5th Cir. argued Feb. 3, 2026); *Reyes*, No.24-4100 (10th Cir. argued Nov. 20, 2025); *CCIA v. Uthmeier*, No.25-11881 & *NetChoice v. Carr*, No.25-12436 (11th Cir. argued Mar. 10, 2026); *see also Jones*, No.26-1252 (4th Cir. fully briefed June 12, 2026); *Murrill*, No.26-30016 (5th Cir. fully briefed June 16, 2026).

when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).  Just as the First Amendment "limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it also prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 209, 213-14.  So laws that restrict minors' access to websites that for many are valuable sources for "exploring the vast realms of human thought and knowledge," *Packingham*, 582 U.S. at 107, warrant the same First Amendment scrutiny as laws that restrict minors' access to libraries, movies, or video games.

Applying those principles, the Supreme Court has routinely struck down government efforts to protect minors for purportedly harmful speech on new forms of media—including by requiring minors to obtain parental consent before accessing such speech.  In *Brown*, for example, the Court held a California law prohibiting the sale of violent video games to minors facially unconstitutional under the First Amendment.  564 U.S. at 804-05.  While California (and the dissent) resisted the notion that "persons under 18 have any constitutional right to speak or be spoken to without their parents' consent," the Court disagreed.  *Id*. at 795 n.3.  Of course, "parents have traditionally had the power to control what their children hear and say." *Id.*  And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors

10

whose parents have advised the promoters that their children are forbidden to attend." *Id*. "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id*. Otherwise, states could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to" engage with them. *Id.* They "do not enforce *parental* authority over children's speech"; they instead "impose *governmental* authority, subject only to a parental veto." *Id.*

There is a reasonable probability that the Supreme Court will conclude that HB33 should meet the same fate. The first step in a facial analysis is to determine what the statute covers. HB33 is a statute of "alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). It bans minors under 16 from creating accounts on a slew of websites unless a parent provides the website with consent. The Act defines the list of covered websites extremely broadly to include virtually all websites that allow users to "[i]nteract socially" and that "target[]" or are "reasonably anticipated to be accessed by children." §1349.09(A)(1), (B). HB33 thus requires minors to obtain parental consent before creating an account on all manner of websites, be it "social media" websites like Instagram, video-sharing

11

websites like YouTube, blogging websites like Dreamwidth, or communities for booklovers like Goodreads.

As all members of the panel recognized, those restrictions demand First Amendment scrutiny. Op.17-18 (Clay, J.); Op.54 (Batchelder, J.); Op.66 (Ritz, J.). And as Judge Clay and Judge Ritz correctly recognized, HB33 triggers strict scrutiny because it is facially content based. Op.20-21; Op.66. As the Supreme Court made clear just last year, that test is "fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 484-85. It is hard to fathom how HB33 could surmount that high hurdle—which is likely why Ohio did not make much of an effort to do so. *See* Ohio.Op.Br.51-52; Ohio.Reply.Br.26. As even Judge Clay acknowledged, *see* Op.30-31, HB33 applies not just to the traditional "social media" websites like Instagram and TikTok with which the state has principally expressed concerns, but to virtually all websites minors are likely to access, including services like Dreamwidth and Goodreads, that *no one claims cause any harm to minors.* There is therefore (at the very least) a fair prospect that the Supreme Court will reject Judge Clay's analysis and conclude that HB33 is not the "least restrictive means" of achieving Ohio's interests. *McCullen*, 573 U.S. at 478.

2. There is also a reasonable probability that the Supreme Court will reject Judge Batchelder's conclusion that NetChoice failed to satisfy its burden to prove that HB33 is facially unconstitutional. According to Judge Batchelder, NetChoice

12

failed to "provide an adequate record to decide which of The Act's applications violate the First Amendment." Op.53. But NetChoice provided everything that Supreme Court precedent requires. *Moody* requires courts to "assess the state laws' scope," decide "which of the laws' applications violate the First Amendment," and "measure them against the rest." 603 U.S. at 724-25. That analysis may be more application-specific in some cases, as not all laws implicate the First Amendment in all their applications. In *Moody* itself, for instance, there was uncertainty about whether the laws at issue regulated protected expression in all their applications since (unlike HB33) they did not restrict *access* to protected speech, but restricted the ability of covered services to remove certain user speech or users. *See id.* at 728-31; *NetChoice v. Griffin*, 812 F.Supp.3d 905, 919 (W.D. Ark. 2025) (explaining the "important difference" between the two). The laws in *Moody* thus may not have implicated the First Amendment in all (or even most of) its applications since not all services covered by the law necessarily engaged in protected speech when curating and disseminating third-party speech. *See* 603 U.S. at 725 (explaining that the laws arguably covered Uber and Venmo).

The same concern does not arise when (as here) a statute on its face regulates speech in "every application" by restricting access to it. Op.65 (Ritz, J.). If Ohio passed a law requiring minors to obtain parental consent before obtaining library cards to access the library, a challenger would not have to produce a massive record

13

about every minor, every book, and every page in every book that the law covers to show that the statute is facially unconstitutional. That would be true even though some books inevitably contain material that is unprotected as to minors, as the law would still implicate speech in all its applications, and the lack of tailoring would be glaring no matter what level of scrutiny applied. Cases like *Brown*, *Packingham*, and *Erznoznik* illustrate how the Supreme Court has traditionally applied the facial analysis in cases that involve laws that burden access to speech. In *Brown*, for instance, the Court did not demand a catalog of the entire universe of covered games, even though some video games covered by the law likely included speech that is unprotected as to minors. *See Brown*, 564 U.S. at 857 (Breyer, J., dissenting) (describing video game with obscenity); *id*. at 818-19 (Alito, J., concurring). It sufficed that the statute on its face restricted access to an entire category of speech that was not itself unprotected, and that the state could not justify such a sweeping restriction.

In *Packingham*, too, the Court did not find it necessary to catalog every potential application of the statute; indeed, it did not even need to "decide the precise scope." 582 U.S. at 106. Even assuming the law applied only to "social networking sites as commonly understood," it "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. The Court did not

14

need to consider whether the law could be constitutionally applied to, *e.g.*, "an adult previously convicted of molesting children from visiting a dating site for teenagers," or a "site where minors communicate with each other about personal problems." *Id.* at 118 (Alito, J., concurring). The statute was unconstitutional on its face because it was not *limited* to those applications; it instead swept broadly to include all "social networking sites" and potentially more. *Id.* at 106-07; *id.* at 114-17 (Alito, J., concurring); *see Sisters for Life v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 407 (6th Cir. 2022) (characterizing *Packingham* as a facial challenge case).

And in *Erznoznik*, the Court did not catalog all potential applications of the city ordinance prohibiting drive-in theaters from showing films containing nudity. While the Court did not dispute that the city could have constitutionally applied the statute to films "deemed obscene … as to minors," 422 U.S. at 213, it held the ordinance unconstitutional on its face because it was "demonstrably overbroad," *id.* at 216. "The ordinance," the Court explained, is "not directed against sexually explicit nudity, nor is it otherwise limited." *Id.* at 213. Rather, the statute by its terms "sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness," including "a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous." *Id.* The Court did not ask for proof that drive-in theaters wanted to show films displaying those things. Nor did it make the

15

challenger catalog all the potential films that the ordinance barred drive-in theaters from showing. It sufficed to show that the ordinance was directed not at unprotected speech but by design swept in films that were protected by the First Amendment. *Id.* at 213.

There is a reasonable prospect that a majority of the Supreme Court will conclude that, like the laws in *Brown*, *Packingham*, and *Erznoznik*, HB33 implicates the First Amendment in all its applications because it always and everywhere restricts access to speech. There is also a reasonable prospect that a majority will conclude that its content-based restrictions are unconstitutional in all (or at least most of) their applications. Indeed, Ohio barely tried to identify any application that might *not* raise the First Amendment problems NetChoice identified. Ohio identified no covered service, for instance, on which protected First Amendment activities do not proliferate. Nor could it; by its terms, HB33 applies *only* to websites where users "[i]nteract socially with other users" and "[c]reate or post content viewable by others," §1349.09(A)(1)(a), (d)—in other words, where users engage in speech. To be sure, there may be some unprotected speech on some of those services, just as there is bound to be some unprotected speech in parks, on sidewalks, at parades, or in virtually any other place where people gather to speak. But just as that would not save an effort to ban minors from visiting parks or parades without parental consent, it should not save Ohio's effort to restrict minors' access to a vast universe of online

16

services that sweeps far broader than any concerns the state has raised. There is at the very least a reasonable prospect that a majority of the Supreme Court will agree.

3. Judge Batchelder concluded otherwise because she believed that she had to ignore HB33's burdens on users altogether because (in her view) NetChoice lacks "prudential standing" to assert the First Amendment rights of its members' users. Op.46-47 (Batchelder, J.). Judge Clay thought the same. Op.15-16 (Clay, J.). There is a reasonable probability that the Supreme Court will grant certiorari to reconsider that conclusion because it squarely conflicts with the Fifth Circuit's decision in *NetChoice v. Fitch*, 134 F.4th 799, 802-03, 806-07 (5th Cir. 2025), which rejected a similar prudential standing argument in response to NetChoice's First Amendment challenge to an analogous Mississippi law. *See Maryland v. King*, 567 U.S. 1301, 1302 (2012) (Roberts, C.J., in chambers) (there is a "reasonable probability" that the Supreme Court "will grant certiorari" whenever a decision squarely "conflicts with decisions" of other circuit courts).

There is also a reasonable probability that a majority of the Supreme Court will disagree with Judge Clay's and Judge Batchelder's analysis. This is not a case in which plaintiffs with no Article III standing have tried to "establish an Article III case or controversy by asserting another person's rights." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (Thomas, J., concurring). Nor is it a case in which plaintiffs with no First Amendment rights seek to bring a First

17

Amendment claim on behalf of third parties. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 955-56 (1984); *cf. Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). NetChoice invokes users' rights because they are a necessary component of the requisite First Amendment inquiry into whether HB33 "burden[s] substantially more speech than necessary to achieve the [government's] asserted interests." *McCullen*, 573 U.S. at 490. To conduct that analysis, a court *must* "look[] beyond the plaintiff's particular conduct." *Hodge v. Talkin*, 799 F.3d 1145, 1156-57 (D.C. Cir. 2015); *accord Sisters for Life*, 56 F.4th at 407. That is especially so when, as here, a law burdens the dissemination of speech, as the First Amendment affords "protection" to "the communication, to its source and to its recipients both." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 756-57 (1976).

That explains why the Supreme Court has routinely considered third parties' First Amendment rights without analyzing "third-party standing." In *Brown*, the only parties were associations of vendors who wanted to sell violent video games to minors. The Court recognized that the law implicated their First Amendment rights to do so. 564 U.S. at 790-92 & n.1. But the bulk of its analysis focused on minors' rights—because they were essential to the ultimate constitutional question. *Accord Ashcroft v. FSC*, 535 U.S. 234, 252 (2002) (analyzing "rights of adults," in suit brought by publishers, not consumers, of adult-oriented materials); *United States v. Playboy*, 529 U.S. 803, 811-13 (2000) (same).

18

Even if the Supreme Court were to consider "third-party standing" doctrine relevant here, there is a reasonable probability that a majority would conclude that NetChoice satisfies it. While "plaintiff[s] generally must assert [their] own legal rights," the Court has "relaxed th[at] prudential-standing limitation" in the First Amendment context. *Munson*, 467 U.S. at 955-56. Even parties who (unlike NetChoice's members) lack First Amendment rights of their own may "challenge a statute not because their own rights … are violated, but because … the statute's very existence may cause others not before the court to refrain from constitutionally protected speech." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988). Moreover, even beyond the First Amendment context, plaintiffs have "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130. "In such cases," "'the obvious claimant' … is the party upon whom the challenged statute imposes 'legal duties and disabilities.'" *June Med. Servs. v. Russo*, 591 U.S. 299, 319 (2020) (plurality op.). Take *Craig v. Boren*, which permitted a beer vendor to invoke the equal-protection rights of her underage male customers. Although there was "no barrier whatever to Oklahoma males" raising the same challenge, 429 U.S. 190, 216 (1976) (Burger, C.J., dissenting), the Court concluded that the vendor could "assert those concomitant rights of third

19

parties that would be 'diluted or adversely affected' should her constitutional challenge fail," *id.* at 195 (majority op.).

Because HB33 directly regulates NetChoice members, they (and, by implication, NetChoice) plainly have standing to challenge the law. And the "threatened imposition of governmental sanctions" will force NetChoice members to restrict users' access to their services, thereby "result[ing] indirectly in the violation of third parties' rights." *Id.* So even if NetChoice's members needed "third-party standing" to assert users' rights, they would easily have it under longstanding Supreme Court precedent. That is true regardless of arguments that members and users may have "conflicting" interests. *Contra* Op.15; Op.48-50. The same could be said whenever vendors invoke their customers' rights. Oklahoma undoubtedly thought vendors were not acting in the best interest of underage males in *Craig*. The Supreme Court nevertheless reaffirmed that those directly regulated by a law may vindicate the rights of third parties they are conscripted into restricting—and there is a reasonable probability that it will do so again here.

## II.     Good Cause Supports Staying The Mandate.

Good cause also supports a stay. Absent a stay, the panel's decision will inflict irreparable harm on NetChoice's members and their users. *White*, 137 F.4th at 581. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Cuomo*, 592 U.S. at 19. And the

20

harm here is not just to member companies, but to the countless minors who will be cut off from vital channels of communication, education, and self-expression. NetChoice.Decl., R.2-1, PageID#65-66.  The websites targeted by HB33 are for many the "principal sources for knowing current events," "speaking and listening," "and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107.  The breadth of the Act's scope underscores that the impending loss of First Amendment rights is especially acute.  Absent a stay, Ohio's law threatens to substantially restrict access to those websites and the countless others—stretching from Dreamwidth to Goodreads to LinkedIn—that are swept in by its exceptionally broad coverage provision.  MSJ.Op., R.56, PageID#1327-28.

That is no hypothetical risk.  The law sets up a series of escalating financial penalties (thousands of dollars each day).  §1349.09(*I*).  As those penalties cannot be recouped once imposed, they threaten irreparable harm on their own.  *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021).  Moreover, those liabilities are bound to lead some covered services to "err on the side of caution" and "restrict access" more broadly than is necessary.  Dreamwidth.Decl., R.2-2, PageID#86.  One need not speculate on that score:  Multiple NetChoice members have had no practical choice but to bar some or all users from accessing their services in states where similar laws have taken effect.  NetChoice.Br.75.  A stay will ensure that the Supreme Court has time to address the critical questions at stake before Ohioans are

21

forced to live with a law that one Supreme Court Justice has already recognized is "likely unconstitutional." *Fitch*, 145 S.Ct. at 2658.

## CONCLUSION

This Court should stay the mandate pending the disposition of NetChoice's forthcoming petition for certiorari.

Respectfully submitted,

s/Erin E. Murphy

STEVEN P. LEHOTSKY
JEREMY EVAN MALTZ
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com

JARED B. MAGNUSON
LEHOTSKY COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellee*

August 11, 2026

22

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 40(d)(3) because this brief contains 5,193 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 with 14-point Times New Roman font.

Date:  August 11, 2026

s/Erin E. Murphy<br>
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy
