**No. 25-3371**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NETCHOICE, LLC, | : | |
| | : | On Appeal from the |
| Appellee, | : | United States District Court |
| | : | for the Southern District of Ohio |
| v. | : | Eastern Division |
| | : | |
| DAVE YOST, | : | District Court Case No. |
| | : | 2:24-cv-00047 |
| Appellant. | : | |

---

# RESPONSE IN OPPOSITION TO MOTION TO EXTEND STAY OF MANDATE

---

D. ANDREW WILSON
Attorney General of Ohio

MATHURA J. SRIDHARAN*
Ohio Solicitor General
**Counsel of Record*
GREGORY P. MATHEWS
Senior Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.sridharan@ohioago.gov

*Counsel for Appellant*
*Ohio Attorney General*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 6

I. The Supreme Court is unlikely to grant *certiorari* to review this multi-issue, flawed-record vehicle. ........ 8

II. The Supreme Court is unlikely to reverse this Court's judgment. ........ 12

III. An extension of the stay will cause irreparable harm and disserve the public interest. ........ 16

CONCLUSION ........ 17

CERTIFICATE OF COMPLIANCE ........ 18

CERTIFICATE OF SERVICE ........ 19

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amato v. Wilentz*,
952 F.2d 742 (3d Cir. 1991) .......... 12

*CCIA v. Paxton*,
184 F.4th 420 (5th Cir. 2026) .......... 11

*CCIA v. Uthmeier*,
___ F.4th ___, 2026 WL 3071065 (11th Cir. Oct. 14, 2026) .......... 7, 9, 14

*Daunt v. Benson*,
956 F.3d 396 (6th Cir. 2020) .......... 16

*Elk Grove Unified Sch. Dist. v. Newdow*,
542 U.S. 1 (2004) .......... 13

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .......... 15

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) .......... 12

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 16

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... *passim*

*NetChoice v. Att'y Gen., Ga.*,
___ F.4th ___, 2026 WL 3079563 (11th Cir. Oct. 15, 2026) .......... 7, 9, 14

*NetChoice v. Carr*,
789 F. Supp. 3d 1200 (N.D. Ga. 2025) .......... 11

*NetChoice v. Fitch*,
134 F.4th 799 (5th Cir. 2025) .......... 10

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) .......... 9, 11, 14

*NetChoice, LLC v. Paxton*,
121 F.4th 494 (5th Cir. 2024) ........ 14

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 7, 16

*Sec'y of Maryland v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ........ 13

*Thompson v. DeWine*,
976 F.3d 610 (6th Cir. 2020) ........ 16

*Vidal v. Elster*,
602 U.S. 286 (2024) ........ 15

*White v. Plappert*,
137 F.4th 579 (6th Cir. 2025) ........ 2, 6, 16

**Statutes and Rules**

Fed. R. App. P. 41 ........ 6, 8

Ohio Rev. Code §1349.09 ........ 4, 11

## INTRODUCTION

Ohio's child-protection statute, Ohio Revised Code §1349.09, was supposed to take effect in January 2024. But the district court enjoined the statute before that could happen. A panel of this Court determined that the district court's injunction was wrong. The panel's majority concluded—through varying rationales—that NetChoice failed to show that Ohio's statute is facially unconstitutional. After this Court denied *en banc* review, NetChoice moved for a stay of the issuance of the mandate, ostensibly to give it time to file a petition for a writ of *certiorari*. This Court granted that request but admonished NetChoice that the mandate "shall promptly issue if the petition is not filed within ninety days from the date of the final judgment by this court." Stay Order.

Despite that warning, NetChoice now asks this Court to facilitate more foot-dragging. NetChoice has twice prolonged the district court's unlawful injunction—first with a fourteen-day extension to petition for rehearing *en banc* and then with a ninety-day stay of the mandate. All told, despite this Court's decision upholding the law, Ohio's child-protection statute has been wrongly enjoined for nearly three years. NetChoice now requests even more room for delay, with no fixed end date, based on the Supreme Court's "new deadline and any future extension that the Supreme

Court may grant." NetChoice Extend Stay Mot.2. The Court should deny that request.

Undue delay is not the only problem. NetChoice cannot establish its entitlement to an additional stay, let alone an open-ended extension with slim justification. That is because obtaining any stay of the mandate is connected to NetChoice's likelihood of prevailing at the Supreme Court—by convincing both four Justices to grant *certiorari* and five Justices to reverse this Court. *White v. Plappert*, 137 F.4th 579, 581 (6th Cir. 2025). But NetChoice faces three high hurdles before the Supreme Court. *First*, NetChoice's case leans heavily on the First Amendment rights of children. But because of inherent conflicts of interest between social-media companies and children, NetChoice is not properly positioned to speak for children. *Second*, while NetChoice failed to bring any claims for as-applied relief, it also failed to build a proper facial record under *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). *Third*, to succeed here, NetChoice must of course prevail on its claim that Ohio's statute is unconstitutional. Ohio's statute, however, is the type of commonsense requirement—parental consent for child contracting—that can survive even the most demanding scrutiny. The requirement also finds strong historical support in the common-law infancy doctrine.

Adding things up, here is what lies ahead. To overcome this Court's decision, NetChoice must first convince the Supreme Court to accept all the above issues for

review. If NetChoice accomplishes that feat, it must then convince the Supreme Court to decide all those issues in its favor. Needless to say, the odds are extremely low. Everyone agrees, on a general level, that this case involves an important topic. But that is almost never enough for *certiorari*. Key here, the Supreme Court does not often review multi-issue cases with serious vehicle flaws (in this case, a lack of as-applied challenges paired with an underdeveloped facial record).

All said, the chances that NetChoice will receive review, and then run the table, are quite slim. Given those slim chances, this Court should *not* extend the stay of its mandate. An extension of the stay would cause further irreparable harm—rather than alleviating it—by further delaying the protections that the challenged statute provides to Ohio's children.

## STATEMENT

**I.** Within earlier briefing, Ohio provided background on (1) the harms children face from social-media use, (2) how the challenged child-protection statute counteracts those harms, and (3) what happened during trial-level proceedings. Ohio Merit Br.5–15. Ohio incorporates by reference that earlier discussion here. But three background points deserve quick review at this stage in the proceedings.

*First*, it is worth recapping some basics about children and social media. Recent figures reflect that roughly 95% of teenagers between the ages of thirteen and

seventeen use social media, with many doing so "almost constantly." Surgeon General Advisory, R.42-2, PageID#493 (quotation omitted). Social-media companies, for their part, have intentionally designed their platforms to be addictive. Ohio Merit Br.5–6 (collecting support). Research has linked children's social-media use to many problems including poor sleep, anxiety, neuroticism, body-image disorders, and depression. Surgeon General Advisory, R.42-2, PageID#495–96, 499. To make matters much worse, social media also facilitates cyberbullying and predatory behavior against children. *Id.*, PageID#498. All the while, social-media companies profit greatly from children. And they impose lopsided terms of service to protect their profits. *See* Ohio Merit Br.7–9 (collecting examples).

*Second*, the scope of Ohio's child-protection statute proves notable. That statute's parental-consent provision—the focus of this case—is narrower than NetChoice suggests. The provision does not apply just because a child creates a social-media account. *Contra* NetChoice Stay Mot.5. Rather, by its plain text, the provision is limited to situations where social-media platforms are attempting to "*contract* with a child." Ohio Rev. Code §1349.09(B)(1) (emphasis added); *see also id.* §1349.09(E). Without child contracting, parental consent is not required.

*Third*, a final procedural point warrants emphasis. During summary-judgment proceedings in this case, the Supreme Court decided *Moody v. NetChoice, LLC*, 603

U.S. 707 (2024). That decision, which also involved the online world, clarified the type of record parties need to support a facial attack under the First Amendment. 603 U.S. at 724–26. After *Moody*, the district court asked the parties if further proceedings were necessary. But NetChoice agreed to proceed without further record development. Op. & Order, R.56, PageID#1310. Despite that decision, the district court ultimately granted facial relief.

**II.** Ohio appealed and, more than four months ago, this Court reversed in a divided decision. Judge Clay wrote the lead opinion for the Court. He concluded that NetChoice lacked third-party standing to assert children's First Amendment rights. Op.10–16. As for NetChoice's remaining First Amendment challenges (asserting its members' rights), Judge Clay determined that the challenged statute met strict scrutiny. *Id.* at 21–26. Given that determination, Judge Clay found it unnecessary to decide whether NetChoice's record satisfied *Moody*'s requirements for facial review. *Id.* at 26–27.

Judge Batchelder concurred. Like Judge Clay, she concluded that NetChoice lacked third-party standing to assert children's rights. *Id.* at 44–51. She then explained that NetChoice's remaining First Amendment challenges failed because NetChoice did not build a proper facial record under *Moody*. *Id.* at 52–55. Because

of that record-building failure, Judge Batchelder did not decide whether, and to what extent, the challenged statute implicates First Amendment protections. *Id.* at 54.

Judge Ritz dissented. He would have allowed NetChoice to assert children's rights, applied strict scrutiny, and held Ohio's statute unconstitutional. *Id.* at 61–71.

**III.** The Court granted NetChoice's request for a fourteen-day extension to file a petition for rehearing *en banc*. Ruling Letter. NetChoice moved the full Court for *en banc* review, but the Court denied the request without calling for a response.

**IV.** Following the denial of *en banc* review, NetChoice moved to stay the issuance of the mandate pending the filing and disposition of a petition for *certiorari*. NetChoice Stay Mot. The Court granted NetChoice's motion but ordered that the mandate "shall promptly issue if the petition is not filed within ninety days from the date of the final judgment by this court." Stay Order.

## ARGUMENT

A movant seeking to stay this Court's mandate faces "a daunting standard." *White v. Plappert*, 137 F.4th 579, 581 (6th Cir. 2025) (quotation omitted). Under Appellate Rule 41, a movant "must show that his petition for *certiorari* would present a substantial question and that there is good cause for a stay." *Id.* (alterations accepted) (quoting Fed. R. App. P. 41(d)(1)). Rule 41's good-cause standard "calls for looking to the normal principles that guide equitable relief." *Id.*

When applying those principles, a movant's likelihood of success is "tied to the *certiorari* process." *Id.* A movant must show both "a reasonable probability that four Justices will vote to grant *certiorari* and that five Justices will vote to reverse." *Id.* (quotation omitted). Beyond those showings, a movant must also establish that irreparable harm will occur absent a stay. *Id.* Finally, the "normal principles" of equitable relief, *id.*, also include consideration of whether a stay will harm others or disserve the public interest, *see Nken v. Holder*, 556 U.S. 418, 425–26 (2009).

NetChoice's motion falls well short under this daunting standard. This case presents multiple issues and has serious record flaws. What is more, many other cases about children and social media—which are likely better vehicles to address the underlying merits—are percolating in the other courts. *See, e.g.*, *NetChoice v. Att'y Gen., Ga.*, ___ F.4th ___, 2026 WL 3079563 (11th Cir. Oct. 15, 2026); *CCIA v. Uthmeier*, ___ F.4th ___, 2026 WL 3071065 (11th Cir. Oct. 14, 2026). All that makes it quite unlikely that the Supreme Court will grant *certiorari* here. Even if the Supreme Court took that unlikely step, it is also unlikely that the Supreme Court would agree with all of NetChoice's maximalist positions (so as to reverse this Court's judgment). Finally, extending the stay would go against the public interest: the challenged statute protects Ohio's children, while NetChoice's true motivation is trying to keep social-media giants unregulated.

## I. The Supreme Court is unlikely to grant *certiorari* to review this multi-issue, flawed-record vehicle.

At a high level of abstraction, this case is no doubt an important one. Whether the States may employ commonsense requirements to protect children from the dangers of social media is a significant topic being litigated across the country. The snag for NetChoice is that the Supreme Court's *certiorari* process does not work at a high level of abstraction. Rather, in considering whether to accept a case, the High Court dives into the finer details to identify the best vehicles for providing guidance.

This case is problematic in that regard. As an initial matter, there are several different issues packed into this case. Noticeably, despite its burden to identify a "substantial question" worthy of *certiorari*, *see* Fed. R. App. P. 41(d)(1), NetChoice has never actually set forth the specific legal question or questions it intends to present to the Supreme Court. At least implicitly, however, NetChoice concedes that it will need to present questions about (1) its third-party standing to assert the rights of children, (2) whether it built a sufficient facial record, and (3) whether Ohio's statute actually offends the First Amendment. *See* NetChoice Extend Stay Mot., Ex.A.3–8; NetChoice Stay Mot.7, 12–13, 17–18. It is farfetched to think that the Supreme Court will wish to tackle all those complicated issues through a single decision. That is especially so when there are many other similar cases percolating

throughout the country. *See* NetChoice Extend Stay Mot., Ex.A.3–4; NetChoice Stay Mot.8 & n.2.

This case also has vehicle flaws that further decrease the odds of a grant. As noted above (at 5), during trial-court proceedings, NetChoice consciously skipped the opportunity to build a more robust record. *See* Op. & Order, R.56, PageID#1310. The Supreme Court will likely view that choice negatively. In *Moody*, the Supreme Court emphasized that the "first step in the proper facial analysis is to assess the state laws' scope." 603 U.S. at 724. In the "variegated and complex" context of the online world, that means a party seeking facial relief must build a record that accounts for "an ever-growing number of apps, services, functionalities, and methods for communication and connection." *Id.* at 725. To be sure, the Supreme Court might ultimately wish to provide further guidance about what a proper facial record looks like in the online context. But this case would be an exceedingly poor vehicle for doing so. NetChoice, after all, did not even *try* to build the type of record that *Moody* envisioned.

To add another flaw, NetChoice brought only a facial challenge to Ohio's statute. *See* Compl., R.1, PageID#19. In other litigation, by contrast, NetChoice has raised as-applied challenges to state laws. *See, e.g.*, *Att'y Gen., Ga.*, 2026 WL 3079563 at *1–2; *Uthmeier*, 2026 WL 3071065 at *2, *8–15; *NetChoice, LLC v. Bonta*, 152 F.4th

1002, 1011 (9th Cir. 2025). The distinction makes this case less attractive for clarifying First Amendment standards. To the extent the Supreme Court wishes to speak about the interaction between the First Amendment and social media, a case with an as-applied challenge would be a much better vehicle. As Judge Batchelder's analysis illustrates, a court does not even need to "engage in the" underlying First Amendment merits here if it agrees with Ohio that NetChoice failed to meet its "facial burden" of developing a sufficient record. Op.54.

The Supreme Court, of course, often takes cases to resolve splits among the circuits. This case is also lacking in that regard. With little analysis in its initial ask for a stay, NetChoice suggested that the panel's decision on third-party standing breaks from the Fifth Circuit's decision in *NetChoice v. Fitch*, 134 F.4th 799, 802–03, 806–07 (5th Cir. 2025). NetChoice Extend Stay Mot., Ex.A.6–7; NetChoice Stay Mot.17. But this supposed conflict does not withstand scrutiny. Here, both Judge Clay's and Judge Batchelder's opinions recognized that third-party standing was improper because of inherent conflicts between social-media companies and children. Op.14–16, 45–47. The Fifth Circuit's analysis in *Fitch*, however, did not analyze whether conflicts between litigants and rightsholders disrupted third-party standing. *See Fitch*, 134 F.4th at 806–07. Thus, this case does not present the type of square split likely to grab the Supreme Court's attention.

The Supreme Court will also have its pick of upcoming social-media cases, which further reduces the chances of a grant here. As everybody acknowledges, there are a "slew" of cases involving social media and children being litigated across the country. *See* NetChoice Extend Stay Mot., Ex.A.3–4; NetChoice Stay Mot.8 & n.2. Most, if not all, of those cases are at an earlier stage. *See* NetChoice Stay Mot.8–9 (noting that "several of those cases involve pending appeals"). That makes it even more unlikely that the Court will select this case, especially given the above vehicle problems.

On a related note, NetChoice also exaggerates the similarity between Ohio's statute and other state laws. As Ohio has stressed throughout this appeal, the challenged parental-consent provision at the heart of this case applies only to those who seek to contract with children. *See* Ohio Rev. Code §1349.09(B)(1), (E). Other States' laws are not so limited. For example, several States have sought to more directly regulate how social-media platforms share information with minors outside of contracting. *E.g.*, *CCIA v. Paxton*, 184 F.4th 420, 428 (5th Cir. 2026) (monitoring and filtering requirements); *Bonta*, 152 F.4th at 1010–11 (addictive-feed restrictions); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1212 (N.D. Ga. 2025) (advertising). NetChoice is thus wrong to imply, as it has previously, that resolving the First Amendment analysis in this case will help resolve First Amendment issues in other cases. *See, e.g.*,

NetChoice Stay Mot.8–9. The narrowness of Ohio's law, in comparison to laws of other States, is yet another factor that makes this case a poor choice for giving nationwide guidance.

## II. The Supreme Court is unlikely to reverse this Court's judgment.

Even if the Supreme Court takes this case, it is unlikely to reverse. Again, this case involves three issues: (1) whether NetChoice has third-party standing to assert the rights of children, (2) whether NetChoice built a proper facial record under *Moody*, and (3) whether Ohio's child-protection statute violates the merits. To prevail, NetChoice will need to win on every issue. And its odds are low for all of them.

***Third-party standing.*** Generally, litigants can assert only their own rights. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Sometimes, litigants can assert another's rights, but they must have a close relationship with the rightsholder, and the rightsholder must be hindered from protecting his own interests. *Id.* at 129–30. A close relationship will not exist when the litigant has a reason to "raise positions contrary to the interests of the third party." *Amato v. Wilentz*, 952 F.2d 742, 751–52 (3d Cir. 1991). These third-party standing rules are loosened, to some extent, when it comes to the First Amendment. But safeguards do not disappear. Even with overbreadth challenges under the First Amendment it remains "crucial" that a litigant seeking to assert the rights of others can "reasonably be expected properly to frame

the issues and present them with the necessary adversarial zeal." *Sec'y of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 958, 956 (1984).

As Judge Clay and Judge Batchelder correctly recognized, material conflicts between children and social-media companies make third-party standing improper here. *See* Op.10–16, 44–51. Those conflicts cannot be divorced from the First Amendment challenges NetChoice seeks to raise: NetChoice's First Amendment challenges, by their very nature, willingly sacrifice children's contracting rights. NetChoice nonetheless suggests that it faces little to no prudential barriers in asserting children's First Amendment rights. *See* NetChoice Stay Mot.19–20. But that greatly oversimplifies present doctrine. To assert an overbreadth challenge under the First Amendment, a litigant cannot be "an inadequate advocate" for the rightsholder. *Munson*, 467 U.S. at 958. And the Supreme Court has been particularly sensitive to allowing third-party standing in the sensitive context of domestic relations. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15–17 (2004).

***Facial record.*** NetChoice's chances are even worse when it comes to the record in this case. *Moody* teaches that a mandatory step for facial relief—and a particularly complicated one in the online context—is building a record that demonstrates a challenged law's full coverage. 603 U.S. at 724–26. NetChoice made no attempt to build such a record. *See* Op. & Order, R.56, PageID#1310. It implies that such a record

was unnecessary because it assumes that the constitutional analysis will be the same in most or all applications. *See* NetChoice Stay Mot.2–3, 16. That is an incredibly shaky assumption. The Supreme Court has yet to announce definitive First Amendment standards governing regulation of social media. But the Court has signaled that the "variegated and complex" nature of the online world makes it likely that "diverse activities could well fall on different sides of the constitutional line." *Moody*, 603 U.S. at 725–26. For example, platforms that "[c]urat[e] a feed" and platforms that "transmit[] direct messages"—both of which in theory could fall within the challenged statute's coverage—might lead to different constitutional analyses. *Id.*

Judge Batchelder is hardly alone in faulting NetChoice for shoddy record building. The Fifth, Ninth, and Eleventh Circuits have encountered similar problems after the Supreme Court's *Moody* decision. *See NetChoice, LLC v. Paxton*, 121 F.4th 494, 497–500 (5th Cir. 2024); *Bonta*, 152 F.4th at 1021–22; *Att'y Gen., Ga.*, 2026 WL 3079563 at *5–8; *Uthmeier*, 2026 WL 3071065 at *15–18.

***First Amendment.*** Even if NetChoice clears standing and record-building hurdles, Ohio is likely to win on the underlying merits. As Judge Clay's lead opinion explains, the challenged statute survives even the most demanding constitutional scrutiny. *See* Op.21–27. Ohio has compelling interests in protecting children, helping parents do so, and preventing child contracting. The parental-consent provision

takes a modest, but important step to further these interrelated interests: it ensures that parents have at least some awareness of children's social-media use when social-media companies are trying to contract with children.

Tellingly, even post-decision, NetChoice still has not identified a better regulatory option. *See* NetChoice Stay Mot.7–12. That is, NetChoice fails to highlight any alternative approach that would work as well in serving Ohio's interests but be less intrusive for children, parents, and social-media companies. NetChoice's real desire is no secret: it wants its members left to only "*self-regulation*." NetChoice Merit Br.58 (emphasis original). But not even the strictest scrutiny requires that.

Importantly, in gauging the odds of success here (assuming *certiorari* is granted), this Court should also remember Ohio's alternative arguments. If this case proceeds further, Ohio will continue to argue that the challenged parental-consent provision regulates child contracting (which is conduct not speech) in a manner consistent with the historical infancy doctrine. *See* Ohio Merit Br.29–39. Ohio understands that no member of the panel adopted that logic. But the Supreme Court very well might. That Court has far more flexibility to clarify existing doctrine. And several of the High Court's recent constitutional cases, including First Amendment cases, have embraced historical comparisons. *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 472–73 (2025); *Vidal v. Elster*, 602 U.S. 286, 295–96 (2024).

## III. An extension of the stay will cause irreparable harm and disserve the public interest.

As noted above, this Court considers the "normal principles that guide equitable relief" when deciding whether good cause for a stay exists. *White*, 137 F.4th at 581. This Court, it follows, should consider whether an extension of the stay would be in the public interest and whether an extension of the stay would harm others. *Nken*, 556 U.S. at 425–26.

These considerations dovetail with the merits. Specifically, in First Amendment cases, the public interest largely merges with the merits. *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020). Relatedly, Ohio and its citizens are always harmed when duly enacted state laws are improperly enjoined. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (*per curiam*). The upshot is this: if the district court was wrong to enjoin the challenged statute (as a majority of the panel concluded), the already months-long delay in issuing the mandate (and years-long delay in preventing Ohio's child-protection laws from going into effect) has irreparably harmed Ohio and the public (and more specifically, Ohio's children). Further extending the stay will only exacerbate these ongoing injuries.

In perhaps more practical terms, the challenged statute takes the important step of ensuring that parents are involved (at least at the outset) with their children's

social-media use. This, in turn, helps protect children from the many dangers associated with social media. *See above* at 4. At bottom, further delaying the implementation of Ohio's statute—which has been wrongly enjoined for nearly three years—risks real-world harms to Ohio's children.

## CONCLUSION

The Court should deny NetChoice's motion to extend the stay of the mandate.

Respectfully submitted,

D. ANDREW WILSON
Attorney General of Ohio

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
**Counsel of Record*
GREGORY P. MATHEWS
Senior Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.sridharan@ohioago.gov

*Counsel for Appellant*
*Ohio Attorney General*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this response complies with the type-volume requirements and contains 3,738 words. *See* Fed. R. App. P. 27(d)(2)(A).

I further certify that this response complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2026, this response was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN